SEP 13 2022 PM 2:29
FILED-USDC-CT-NEW HAVEN

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

V. W.

                           Plaintiff,

           -against-

Yale University; Yale Health Center at the Yale
University; Graduate School of Arts and Sciences
at the Yale University; Department of Economics
at the Yale University; Beth Grunschel, M.D., in
her individual and professional capacities; and
Edward Vytlacil, Ph.D., in his individual and
professional capacities,

                         Defendants.

Case No.: 22CV1156 (seu)

September 13, 2022

Jury Trial Demanded

## COMPLAINT

Plaintiff V.W. (hereinafter "Plaintiff") in this action against Defendants the Yale University ("University"), Yale Health Center at the Yale University ("Yale Health"), Graduate School of Arts and Sciences at the Yale University ("Graduate School"), Department of Economics at the Yale University ("Department") (together, "Yale") and Beth Grunschel, M.D. and Edward Vytlacil, Ph.D. (altogether "Defendants"), hereby alleges upon information and belief as follows:

## PRELIMINARY STATEMENT

1.    This lawsuit is arising out of severe and pervasive unlawful actions inflicted on Plaintiff by Plaintiff's school and employer, Yale and the individuals who committed the acts. The discrimination and retaliation have been permitted to exist and continue from the very beginning of Plaintiff's admission to a Ph.D. program at the Graduate School at Yale till this date.

2.      As part of its core values, Yale University claims, "Yale University's mission is to create, disseminate, and preserve knowledge through research and teaching." See the Academic Freedom and Faculty Standards of Conduct of Yale University's Faculty Handbook, p. 5.

3.      As part of its oaths and promises to the world, Yale University claims, "the University's Equal Opportunity Statement is made known to all segments of the general community serviced by the University. It is included in catalogues and brochures dealing with student admissions, programs and scholarships of the University as well as on its website which are all available to the general public. Yale University's Equal Opportunity Statement: the University is committed to basing judgments concerning the admission, education, and employment of individuals upon their qualifications and abilities and affirmatively seeks to attract to its faculty, staff, and student body qualified persons of diverse backgrounds. In accordance with this policy and as delineated by federal and Connecticut law, Yale does not discriminate in admissions, educational programs, or employment against any individual on account of that individual's sex, race, color, religion, age, disability, status as a veteran, or national or ethnic origin; nor does Yale discriminate on the basis of sexual orientation or gender identity or expression. University policy is committed to affirmative action under law in employment of women, minority group members, individuals with disabilities, and protected veterans," published in its annual Return of Organization Exempt From Income Tax, Form 990, filed with the Internal Revenue Service, U.S. Department of the Treasury, open to public inspection. See, for example, Yale University's Tax Year 2020 Form 990 online at https://apps.irs.gov/pub/epostcard/cor/060646973 _202006_990_2021052618203257.pdf (all internet materials as last visited September 8, 2022).

4.      In addition, between 2016 and 2020, Yale University annually certified, under penalty of perjury, compliance with the applicable requirements of "Racially Nondiscriminatory

Policy" for its qualification as an exempt corporation under 26 U.S. Code § 501(c)(3) as an educational organization within the meaning of 26 U.S. Code § 170(b)(1)(A)(ii).

5.      Unfortunately, such oaths and promises contradict what has been going on at Yale.

6.      As detailed below, Yale University failed its oaths and promises by its knowing discrimination against Plaintiff and by its knowing participation and ratification of discrimination and harassment toward Plaintiff that created a hostile educational environment and workplace where Yale's employees are so emboldened to engage in flagrant discrimination and retaliation against a parenting student that some of the act amounts to sexual assault, battery, threat by words, and custodial interference.

7.      Behind Yale University's veneer of prestige and privilege lies a troubling pattern and history wherein the voices of women within its student body, professor and employee ranks who courageously come forward with complaints of sexual harassment against men in positions of power are suppressed and ignored.

8.      Powerful men at Yale University are repeatedly given "passes" and the "benefit of the doubt" when the victims of their sexual misconduct come forward, whereas their victims are forced to go through hoops just to obtain a modicum of justice. Through this pattern of deliberate indifference, Yale University intends to send a message that the University will not stand behind those who have been innocently victimized by persons in power; instead, it will favor and protect the powerful who most contribute to the University's prestige and fortune.

9.      Commencing December 30, 2014, in return for Plaintiff's entrustment to Yale with her educational and professional fulfillment, Yale University subjected Plaintiff to blatant discriminatory and retaliatory acts, with vicious discrimination, harassment, intimidation, and retaliation, led by Professor Vytlacil, colluding with Yale's employees.

10.     Perhaps most disturbingly, despite receiving multiple complaints about Professor Vytlacil's unlawful harassing behavior since the start of Plaintiff's admission at Yale University, Yale took no meaningful against Professor Vytlacil. Plaintiff's voice for "zero tolerance of sexual harassment and discrimination" was, however, met with retaliation at Yale, which supports a workplace and educational environment that protects the perpetrators and victimizes the victims.

11.     Accordingly, in this action, Plaintiff seeks declaratory, injunctive, and equitable relief, as well as, monetary damages to redress the defendants' conspiracy to injure Plaintiff and negligence to deprive Plaintiff of her right to privacy and fundamental right under the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment of the United States Constitution in violation of 42 U.S.C.§§ 1981, 1983, 1985, and 1986. This complaint opposes the defendants' ongoing unlawful discrimination on the basis of race, sex, national origin, ancestry, disability, record of disability, and/or because the defendants regarded Plaintiff as disabled in violation of 42 U.S.C. §§ 1981 and 1983 and the (1) Americans with Disabilities Act as amended, ("ADA") 42 U.S.C. § 12101 *et seq*.; (2) Title VI of Civil Rights Act as amended, 42 U.S.C. § 2000d *et seq*.; (3) Title VII of Civil Rights Act as amended, 42 U.S.C. § 2000e *et seq*.; (4) Title IX of the Education Amendments of 1972 as amended, 20 U.S.C. § 1681 *et seq*.; (5) Section 504, Rehabilitation Act of 1973 as amended, 29 U.S.C. § 794; (6) Art. XXI of Amendments to the Constitution of the State of Connecticut; and (7) Fourteenth Amendment of the United States Constitution. Plaintiff also alleges claims for breach of contract, tortious interference with contract, and intentional infliction of emotional distress.

12.     Defendants own, lease, operate or control a place of public accommodation within the meaning of the ADA, 42 U.S.C. § 12181 (7)(j), Yale University, with its principal place of business located in the City of New Haven and the County of New Haven, Connecticut, that

operate program or activity within the meaning of (1) Section 504, Rehabilitation Act of 1973, 29 U.S.C. § 794(b)(3)(A)(ii), (2) Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d-4a(3)(A)(ii), and (3) Title IX of the Education Amendments of 1972, 20 U.S.C. § 1687(3)(A)(ii); qualify as employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b); and has violated and is violating the above-mentioned laws. Defendants ignored the explicit legal requirement for making Yale University, an educational institution, which is a public accommodation, accessible to individuals with disabilities.

13.     This action seeks to right that wrong by recompensing Plaintiff and making Defendants' place of public accommodation fully accessible so that Plaintiff and other similarly situated can have the full and equal educational opportunity that Defendants provide to non-disabled peers and majority students and employees.

14.     Defendants are also vicariously liable for the acts and omissions that violates the Family Educational Rights and Privacy Act, ("FERPA") 20 U.S.C. § 1232g, Conn. General Statutes §§ 52-146d to 52-146j, 53a-180d and 17a-504 by wilfully and maliciously causing, or attempting to cause, or conspiring with other person to cause, Plaintiff who does not have psychiatric disabilities to be committed to the Yale New Haven Hospital, Inc. and Yale Health for psychiatric disabilities.

15.     "On August 13, 2020, the United States notified Yale that Yale was in violation of Title VI." *See USA v. Yale University*, 3:20-cv-01534 (CSH), Dkt No. 1 (Complaint), ¶ 35.

16.     Defendants are also liable for the acts and omissions that violates 18 U.S. Code § 1621(2) by falsely certifying the Yale University was in compliance with the applicable requirements of "Racially Nondiscriminatory Policy" for its qualification as an exempt corporation

under 26 U.S. Code § 501(c)(3) as an educational organization within the meaning of 26 U.S. Code § 170(b)(1)(A)(ii) in the tax year of 2016 and thereafter.

## ADMINISTRATIVE REQUIREMENTS

17.     On or about December 4, 2020, Plaintiff filed a complaint with the Office of Provost at Yale University against Defendants alleging violations of the Title IX of the Education Amendments of 1972 as amended, 20 U.S.C. § 1681 *et seq.* ("Title IX") and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* (hereinafter "Title IX Complaint"). On December 22, 2020, the Title IX Office within the Office of Provost confirmed upon the receipt of Plaintiff's Title IX Complaint but chose not to pursue her claim up to this date.

18.     Plaintiff's Title IX Complaint was simultaneously filed with the U.S. Department of Education, Office for Civil Rights ("OCR").

19.     The OCR dismissed Plaintiff's Complaint on December 23, 2020.

20.     Plaintiff appealed the OCR's decision of dismissal on February 7, 2021.

21.     The OCR dismissed Plaintiff's appeal on February 24, 2021.

22.     On or about February 16, 2022, Plaintiff filed charges of discrimination in three separate complaints with the Connecticut Commission on Human Rights and Opportunities (the "CHRO") against Defendants Yale Health, Department, and Edward Vytlacil, Ph.D., respectively, alleging, *inter alia*, violations of the (1) Americans with Disabilities Act as amended, 42 U.S.C. § 12101 *et seq.*; (2) Title VI of Civil Rights Act as amended, 42 U.S.C. § 2000d *et seq.*; (3) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; (4) Title IX, 20 U.S.C. § 1681 *et seq.*; (5) Section 504 of the Rehabilitation Act of 1973; and (6) Conn. Gen. Stat. §§ 46a-60 and 46a-71.

23.     These CHRO charges were dual filed with the Equal Employment Opportunity Commission ("EEOC") alleging violations of the above-mentioned laws against Defendants.

24.     Plaintiff has received her Release of Jurisdiction from the CHRO and her Notices of Right to Sue from the EEOC regarding her charges of discrimination against Yale Health and Department of Economics, respectively.

25.     When Plaintiff receives her Notice of Right to Sue from the EEOC regarding her charges of discrimination against Edward Vytlacil, Ph.D., Plaintiff will seek leave to amend this Complaint to assert claims under the above-mentioned laws against Edward Vytlacil, Ph.D., arising from the same facts as alleged herein.

26.     Any and all other prerequisites to the filing of this suit have been met.

### JURISDICTION AND VENUE

27.     This court has jurisdiction over this matter pursuant to 42 U.S.C. §§ 1981, 1983, 1985, 1986, 12188, 2000d *et seq.*, and 2000e *et seq.*, and 28 U.S.C. §§ 1331, 1332, and 1343, as this action involves federal questions regarding the conspiracy to and the deprivation of Plaintiff's rights under 42 U.S.C. §§ 1981, 1983 and 1985, the ADA, the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504, Rehabilitation Act of 1973, and the Fourteenth Amendment to the United States Constitution. 42 U.S.C. § 1986 specifically provides that "any number of persons guilty of such wrongful neglect or refusal mentioned in § 1985 may be joined as defendants in the action."

28.     Plaintiff also asserts the supplemental jurisdiction of the court for state statutory claims pursuant to the Conn. General Statutes §§ 46a-60, 46a-71, 52-146d to 52-146j, 53a-180d, and 17a-504 and Art. XXI of Amendments to the Constitution of the State of Connecticut. Federal supplemental jurisdiction is asserted pursuant to 28 U.S.C. § 1367.

29.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because the University maintain its principal executive office in this District, and a substantial part of the acts or omissions giving

rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## PARTIES

30.  Plaintiff is an adult resident of New Haven, Connecticut and Queens, New York.

31.  Initials are used in the caption of this action to preserve the confidentiality of Plaintiff in conformity with the privacy provisions of the Family Educational and Privacy Rights Act, 20 U.S.C § 1232g(b) and Conn. General Statutes §§ 52-146d to 52-146j.

32.  Plaintiff was born in the People's Republic of China, moved to the United States in 2006, and obtained the citizenship of the United States in 2010.

33.  Yale University is a nonstock corporation principally engaged in the business of providing higher education with its principal place of business located in the City of New Haven and the County of New Haven, Connecticut.

34.  Yale University operates the Yale Graduate School of Arts and Sciences ("Graduate School"), School of Medicine, School of the Environment, as well as twelve other schools that all together compose Yale University. "[Graduate School] educates graduate students to seek answers to life's most challenging questions by leading in the advancement, application, and preservation of knowledge. [Graduate School] carry out this mission by investing in and drawing upon the strengths of a collaborative, diverse, and inclusive community of scholars and researchers." *See* Graduate School of Arts and Sciences Programs and Policies 2022-2023 on Mission Statement. The Graduate School operates "the fifty-eight departments and programs that offer courses of study leading to the Ph.D. degree," *Ibid.*, and the Department of Economics ("Department") is one among them. Defendants Yale University, Graduate School, and Department are each and separately "educational institution" within the meaning of 20 U.S.C. § 1681 (c).

35.     At all relevant times, Defendant Yale University has enrolled Plaintiff in its education program or activity, has employed Plaintiff in its educational institution, controls and has controls the terms and conditions of Plaintiff's enrollment and employment, and qualifies as an educational institution and as an employer and/or joint employer under all relevant statutes.

36.     Yale University operates Yale Health and works in conjunction with the Yale School of Medicine and Yale New Haven Hospital, Inc., to provide student health services on campus. Through Yale Health, Yale University provides its enrolled students the healthcare coverage and services as both an insurer and healthcare provider. The healthcare coverage offered at Yale is called "Yale Health Basic." Under the contract between Yale University and any eligible enrolled student, the student upon enrollment at Yale is "automatically" enrolled and covered under the "Yale Health Basic" healthcare insurance plan, at no charge, to receive healthcare services, including, but not limited to, primary care and Student Mental Health & Counseling, at the Yale Health. In addition, any eligible enrolled student also receives and is billed for an optional healthcare coverage, "Yale Health's Hospitalization/Specialty Coverage," underwritten by Yale, unless he or she expressly waives such an option of coverage. *See* the 2022-2023 Yale Health Student Handbook, p. 10. Available online at https://yale.box.com/shared/static/zh5st3w 1plvfn934we3iplrd470zgecd.pdf (all internet materials as last visited September 9, 2022).

37.     Upon information and belief, Yale University in the calendar year 2019 was an exempt corporation under 26 U.S. Code § 501(c)(3) as an educational organization within the meaning of 26 U.S. Code § 170(b)(1)(A)(ii) and subject to the qualification, publicity, and compliance requirement of "Racially Nondiscriminatory Policy" in Yale's charter, bylaws, or other governing instrument, or in a resolution of its governing body as required by the Internal Revenue Service, U.S. Department of the Treasury, to be eligible to receive charitable

contributions deductible from income taxes under §§ 170(a)(1) and (c)(2) of the Internal Revenue Code, 26 U.S.C. § 170(a)(1) and (c)(2). Rev. Proc. 75-50, 1975-2 Cum. Bull. 587. In 2019, Yale certified, under penalty of perjury, compliance with the applicable requirements of sections 4.01 through 4.05 of the Revenue Procedure, in relevant part, as follows, the school must state its nondiscrimination policy in its organizational charter, *id.*, § 4.01, and in all of its brochures, catalogs, and other advertisements to prospective students, *id.*, § 4.02; the school must make its nondiscrimination policy known to the entire community served by the school and must publicly disavow any contrary representations made on its behalf once it becomes aware of them, *id.*, § 4.03; the school must have nondiscriminatory policies concerning all programs and facilities, *id.*, § 4.04, including scholarships and loans, *id.*, § 4.05. Accord to Yale's "Racially Nondiscriminatory Policy" and "Equal Opportunity Statement," "University policy is committed to affirmative action under law in employment of women, minority group members, individuals with disabilities, and protected veterans." *See* Yale University's Return of Organization Exempt From Income Tax, Form 990 of Tax Year 2020, p. 50.

38.     Upon information and belief, Yale University receives federal financial assistance and is subject to the (1) Americans with Disabilities Act as amended, 42 U.S.C. § 12101 *et seq.*; (2) Title VI of Civil Rights Act as amended, 42 U.S.C. § 2000d *et seq.*; (3) Title VII of Civil Rights Act as amended, 42 U.S.C. § 2000e *et seq.*; (4) Title IX of the Education Amendments of 1972 as amended, 20 U.S.C. § 1681 *et seq.*; (5) Section 504, Rehabilitation Act of 1973 as amended, 29 U.S.C. § 794; (6) Family Educational Rights and Privacy Act of 1974 as amended, 20 U.S.C. § 1232g; and (7) Fourteenth Amendment of the United States Constitution.

39.     Upon information and belief, Defendant Beth Grunschel, M.D., ("Dr. Grunschel") was employed as an employee in the Office of Student Mental Health & Counseling at the Yale

Health between April 2019 and February 2020. According to Dr. Grunschel's "biography" on the website of the Yale School of Medicine, Dr. Grunschel is employed as a faculty or employee at the Yale School of Medicine specializing in psychiatry, and at all times herein was acting in her capacity as an agent of Yale. Available online at https://medicine.yale.edu/profile/beth_grunschel/?tab=bio (all internet materials as last visited September 9, 2022). Dr. Grunschel is licensed as a physician in the State of Connecticut and an adult resident of Trumbull, Connecticut.

40.     Defendant Edward Vytlacil, Ph.D., is an adult resident of Hamden, Connecticut. Defendant Edward Vytlacil, Ph.D., (hereinafter "Professor Vytlacil") is and has been employed as "Professor of Economics" at the Department of Economics at Yale University on or about September 1, 2015 and thereafter, and at all times herein acting in his capacity as an agent of Yale.

41.     Plaintiff's relationship to Professor Vytlacil is further defined in JUDGMENT OF DIVORCE entered in the Supreme Court of the State of New York, County of New York, on September 10, 2015, *Cooper, J.* (hereinafter referred to as the "Foreign Matrimonial Judgment" in accordance with Conn. General Statutes §§ 46b-70 to 46b-75), and its incorporated, *but not merged into*, STIPULATION OF SETTLEMENT AND AGREEMENT dated June 18, 2015 (hereinafter "Settlement Agreement"). The Settlement Agreement provides its own independently survived "Binding Effect" upon Plaintiff and Professor Vytlacil, as well as a waiver for modification. Plaintiff and Professor Vytlacil executed the Settlement Agreement on June 18, 2015, and thereafter. The Settlement Agreement was filed, certified, and registered in the Superior Court of New Haven in the State of Connecticut on May 7, 2019.

42.     Plaintiff's relationship to Defendant Dr. Grunschel, Yale Health, and Yale University is further defined in Conn. General Statutes §§ 52-146d to 52-146j which protect the privilege and confidentiality of all communications and records between Plaintiff, a "patient"

within the meaning of §52-146d(6), and Dr. Grunschel, a "psychiatric mental health provider" within the meaning of §52-146d(7), at Yale Health at the Yale University, a "mental health facility" within the meaning of §52-146d(5).

## **RELEVANT FACTUAL AND PROCEDURAL HISTORY**

I.   **Yale University's Troubling History of Protecting Male Professors in Position of Power Accused of Sexual Harassment**

43.     Despite being considered as one of the top universities in the world, Yale University has a disturbing history of doing shockingly little to address or prevent the perpetration of sexual harassment and misconduct against female students and subordinates by male professors and faculty in positions of power, which has allowed and encouraged misconduct to continue, resulting in a harassing and hostile workplace and educational environment.

44.     Even more alarming, and despite what has obviously been mere "lip service" by administrators about how the University is "dedicate[ed to] eradicate[ing] sexual misconduct at Yale," the University has displayed a well-chronicled pattern of failing to take complaints of sexual harassment seriously. See *Castro v. Yale University*, 3:20-cv-00330-JBA, Dkt. No. 44 (Amended Complaint), at ¶¶ 38-39.

45.     Instead, the default practice at Yale University has been to rush to the defense of perpetrators of sexual misconduct, to offer them the institutional protection within Yale, rather than applying policy or measures on the book to hold them accountable, especially those who generate revenue and grants for the University.

46.     Simply put, Yale University has a record of prioritizing revenues over the rights of its female workforce and student body, and of unfairly protecting powerful male harassers at the expense of their innocent female victims. *Id.*, ¶ 41.

47.     For example, Manuel Lopes Fontes, M.D., a professor at the Yale School of Medicine and the Vice Chair of Diversity, Equity and Inclusion at Yale was sued in 2020 by six female subordinates who accused him of sexual harassment, and the University of doing nothing to stop him. See *Castro v. Yale University, et al*., 3:20-cv-00330 (JBA), Dkt. No. 1 (Complaint).

48.     Similarly, Gilbert I. Bond, Ph.D., a male professor at the Yale School of Divinity was sued in 2004 by a female teaching fellow who complained about his gender discrimination and sexual harassment, and the University' taking no measures upon her complaint or to stop the perpetration of sexual harassment. See *Urie, v. Yale University,* 3:04-cv-00094 (RNC), Dkt. No. 1 (Complaint), at ¶¶ 7-27.

49.     Also, the School of Drama at Yale was sued in 2005 by a female graduate student who complained about sexual harassment and the Chair of the School did nothing about her complaint but ratified sexual discrimination and harassment by asking her to "seek psychiatric help" and eventually expelling her from the graduate studies program at Yale. See *Greenhouse v. Yale University*, 3:05-cv-01429 (AHN), Dkt. No. 1 (Complaint), at ¶¶ 7-9.

50.     Yale University was sued in 2006 by a female Research Assistant who worked under one male Scientist supervisor in a laboratory at Yale for discrimination, sexual harassment, and retaliation while Yale took no meaningful action on her complaint but rather forced her to take sick leave without pay, see a physician at Yale, then similarly terminated her position. See *Sangan v. Yale University, et al.*, 3:06-cv-00587 (PCD), Dkt No. 1 (Exhibit A, Complaint), Pp. 7-14.

51.     The current Chair of the Pharmacology Department at Yale University, Joseph Schlessinger, M.D., was sued in 2006 by a former secretary who accused him of sexual misconduct, and the University of doing nothing to stop him.

52.     Likewise, in 2015, two federal lawsuits were filed against Rex Mahnensmith, M.D., a Professor of Nephrology and director of an affiliated clinic at Yale University, accusing him of sexually harassing certain female clinic employees, yet Yale of doing nothing to stop it. See *Castro v. Yale University*, 3:20-cv-00330-JBA, Dkt. No. 1 (Complaint), at ¶¶ 40-43.

53.     Recently, Eugene Richmond, M.D., a Yale University Professor of Psychiatry and decades-long member of the Yale University School of Medicine faculty, was determined by an independent investigator to have sexually assaulted at least five Yale University students and sexually harassed at least eight students over a period of 25 years. The alleged assaults took place in a bedroom Dr. Richmond required students to share with him at a research facility on the Caribbean Island of St. Kitts. However, Yale University, knowing the alleged sexual misconduct, did nothing to ensure that Dr. Richmond no longer brought students to his Caribbean facility, allowing the assault to continue for years. *Id.*, ¶¶ 44-46.

54.     In fact, a 2015 survey by the Association of American Universities (AAU) found that 13.3% and 53.9% of women in graduate or professional programs at Yale University have been subject to sexual assault and sexual harassment, respectively; and that 29.5% of women in graduate or professional programs at Yale University experienced sexual harassment by a Yale faculty member. Yale's figure is much higher than the average rate of sexual misconduct as compared to other similar institutions. See Yale University 2015 AAU Campus Climate Survey on Sexual Misconduct, Pp. 3, 5, and 7. (Available online at https://provost.yale.edu/sites/default/files/files/WestatReportYaleUniversity-1.pdf (all internet materials as last visited September 9, 2022)).

55.     Moreover, almost half of female students (53.9%) in graduate or professional programs at Yale University experienced one or more sexually harassing behaviors, but only 5.7%

of women reported these behaviors, which speaks to the higher barriers to reporting at Yale and lack of efficacy of Yale University's reporting resources. *Id.*, at p. 9.

56.     Unsurprisingly, the 2019 survey by the AAU shows a systematically increasing pattern of sexual assault and sexual harassment at Yale University comparing to the 2015 AAU survey. 74.9% of women in graduate or professional programs at Yale University have experienced one or more sexually harassing behaviors, comparing to the 53.9% in the 2015 survey. See Yale University 2019 AAU Campus Climate Survey on Sexual Misconduct, p. 13 (Available online at https://provost.yale.edu/sites/default/files/files/YaleUniversity-Report-Appendices-Intro-2019.pdf (all internet materials as last visited September 9, 2022)).

57.     Clearly, Yale University has an endemic and not isolated problem with effectively addressing and preventing sexual harassment and sexual misconduct on its campus. One of the problems as above-described is Yale University's troubling pattern and history of suppressing the voices of women within its student body, professor and employee ranks who courageously come forward with complaints of sexual harassment against men in positions of power by (1) deeming those women to need "psychiatric help" or "see a physician," (2) taking advantage of its internal health service at Yale Health on campus and affiliated Yale New Haven Hospital, Inc., then (3) using the medical condition of a complainant to discharge the complaint and/or complainant from Yale without providing accommodation, intervention, or remedy to those who come forward. This troubling pattern might have contributed to its endemic of sexual harassment and sexual misconduct on-going at Yale.

58.     For example, a Yale employee who worked at the New Haven Mental Health Outreach for Mothers program at Yale funded with a $2.5 million five-year federal grant sued Yale

in 2015 for refusing to provide her with a reasonable accommodation of her disability. *See Wilson v. Yale University*, 3:15-cv-00207 (RAR), Dkt No. 1 (Complaint), ¶¶ 1-14.

59.     In addition to the endemic of sex-based discrimination and harassment at Yale, "[f]or at least 50 years, Defendant Yale University (Yale) has intentionally subjected applicants to Yale College to discrimination on the grounds of race and national origin. (Hereinafter, references to "race" include "national origin.") For the last few decades, Yale's oversized, standardless, intentional use of race has subjected domestic, non-transfer applicants to Yale College to discrimination on the ground of race." "Yale's race discrimination includes imposing undue and unlawful penalties on racially-disfavored applicants, including in particular most Asian, and White applicants." *See USA v. Yale University*, 3:20-cv-01534 (CSH), Dkt No. 1 (Complaint), ¶¶ 2-3.

60.     "Yale has engaged in this race discrimination despite receiving millions of dollars of federal taxpayer funding subject to Title VI's restrictions. Yale's race discrimination violates Title VI's requirement that '[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.' 42 U.S.C. § 2000d." *Id.,* ¶4.

61.     "In 2016, the United States Department of Justice received a complaint from a coalition of over 130 Asian-American organizations alleging that Yale discriminates against Asians in Yale's undergraduate admissions to Yale College. On August 13, 2020, the United States notified Yale that Yale was in violation of Title VI." *Id.,* ¶ 35.

**II.     <u>Discrimination, Harassment, and Retaliation Against Plaintiff</u>**

62.     Professor Vytlacil previously held a faculty position in the Department of Economics at Yale University between 2008 and 2012, then left his position at Yale and went to the New York University in 2012.

63.     Plaintiff and Professor Vytlacil were married in April 2013 in New York, New York, separated in December 2013, and commenced a divorce action in May 2014. Plaintiff and Professor Vytlacil settled and resolved the issues raised in the divorce action by the Settlement Agreement dated June 18, 2015 and Judgment of Divorce was entered in the Supreme Court of the State of New York, County of New York, on September 10, 2015.

64.     Plaintiff applied for the doctoral-degree/Ph.D. program at the Yale School of the Environment (formerly the School of Forestry and Environmental Studies) within the Graduate School at Yale for the admission in the academic year of 2015-2016 and submitted her complete application materials on December 30, 2014 online through the Graduate School's application management website.

65.     During February 2015, knowing that Plaintiff had applied for the doctoral-degree program at Yale, amid the divorce action between Plaintiff and Professor Vytlacil, Professor Vytlacil attempted to get a job offer from the Department of Economics at Yale.

66.     On February 16, 2015, the Chair of the Department of Economics at that time, Professor Dirk Bergemann, asked Plaintiff to provide him her application materials for the doctoral-degree program at the School of the Environment.

67.     Professor Vytlacil, through Professor Dirk Bergemann, informed the Graduate School that Plaintiff had a new-born child who was still nursing, which caused the Graduate School to discriminatorily intervene with the admission's decision at the School of Environment, on the basis of sex and parenting student status.

68.     On March 4, 2015, Professor Dirk Bergemann explained in an email to Plaintiff that the involvement of the Department of Economics and the Graduate School with Plaintiff's application for the doctoral-degree program at the School of Environment had caused the

Admission Committee at the School of Environment to modify its decision of Plaintiff's admission into its doctoral-degree program to offering Plaintiff "*the possibility that [Plaintiff] first completes the MESc (referring to the Master of Environmental Science program) and then transfers to the Ph.D. program,*" based on "certain weakness" in Plaintiff's application perceived by the Graduate School rather than by the Admission Committee at the School of Environment at Yale.

69.     During Plaintiff's two-year studies at the School of the Environment between 2015 and 2017, the members in the Admission Committee at the School confirmed with Plaintiff that the Committee had already decided to admit Plaintiff to its doctoral-degree program in the academic year of 2015-2016, but the Graduate School intervened after the Department of Economics contacted the Graduate School about Plaintiff's application. Hence, the Committee changed Plaintiff's admission decision from admitting into its Ph.D. program to first enrolling in the Master of Environmental Science degree program and then transferring her enrollment to the Ph.D. program at the School of the Environment.

70.     However, upon Plaintiff's successfully completing her Master of Environmental Science degree program in May 2017, Yale University breached its agreement with Plaintiff by refusing to transfer Plaintiff's enrollment to the Ph.D. program at the School of the Environment, instead transferring Plaintiff's application for the Ph.D. program at the School of the Environment to the Department of Economics where Professor Vytlacil was employed as a faculty.

71.     Plaintiff had never applied for the Ph.D. program at the Department of Economics. Nor Plaintiff had any desire to enroll in the Ph.D. program at the Department of Economics, subjecting to the supervision of Professor Vytlacil.

72.     In fact, Plaintiff had applied for the Ph.D. program at the School of the Environment each year since December 2014 in three consecutive years for the admission of academic year of

2015-2016, 2016-2017, and 2017-2018. Upon the agreement with Yale, Plaintiff's enrollment at Yale University would be directly transferred to the Ph.D. program at the School of the Environment after the completion of the master's degree program.

73.    Due to Professor Vytlacil's involvement and manipulation, through Department of Economics, in Plaintiff's educational program or activity at the School of the Environment, Plaintiff was treated unfairly by Yale, on the basis of sex and parenting student status.

74.    The Ph.D. program admission has long been delegated to the academic program internally. Each academic department that offers courses of study leading to the Ph.D. degree within the Graduate School makes its own decisions regarding the Ph.D. program admissions. For instance, the administration of Graduate School cannot differentiate a good doctoral candidate in Chemistry vs. Biochemistry and Molecular Biophysics. In fact, the Graduate School announced its official policy in 2017 that the Dean of Graduate School shall not interfere with the decision of the Ph.D. program admission within each academic department.

75.    Since the fall academic term of 2015, Plaintiff made numerous internal complaints about the disparate treatment and gender-based harassment led by Professor Vytlacil, in concert with Department of Economics. But Yale did nothing in response to Plaintiff's complaints, instead violated the rules, policy, and Equal Opportunity Statement of the University in discriminating Plaintiff in admission and educational program on the basis of sex and parenting student status which was such severe, pervasive, and objectively offensive that deprived Plaintiff of equal access to educational program and activity and subjected Plaintiff to discrimination and harassment starting from the beginning of Plaintiff's admission at Yale.

76.    Upon Plaintiff's completion of her master's degree program at the School of the Environment in May 2017, Plaintiff left no choice but continued her doctoral-degree program at

the Department of Economics which she had never applied for and to be subject to Professor Vytlacil's discriminatory and harassing conduct at the Department of Economics. Yale did nothing to intervene but permit such misconduct to continue for years.

77.    Because Yale did nothing to stop discrimination and sexual harassment against Plaintiff, the hostile environment towards Plaintiff created by Professor Vytlacil under "the unequal institutional power inherent in the relationship between faculty member and student" continuously worsened after Plaintiff's enrollment at the Department of Economics since the fall academic term of 2017.

78.    On March 27, 2019, at 9:33AM, the following morning after Professor Vytlacil came back from his two-week trip in China, Professor Vytlacil intentionally stalked Plaintiff and misused the emergency 9-1-1 system subject to Conn. Gen. Stat. § 53a-180d for the sole purpose of making false alarm or complaint about Plaintiff, alleging, [Plaintiff] lives alone right now at her home. … "[Plaintiff] was previously forced to a mental hospital and forced to take medicine." … "[Plaintiff] is not a direct harm of [herself] at all, but she is extremely delusional, she hears voices and talking back to voices that are not there. She believes, for example, she will walk in the traffic the car will stop, because all the cars are only there because of her. She hasn't done anything to harm herself yet." … "[Plaintiff's] mom doesn't speak English," … " is small Chinese woman."

79.    Despite the allegations made by Professor Vytlacil regarding his personal knowledge of the location, "mental state" and/or "belief" of Plaintiff's in the morning of March 27, 2019, Plaintiff and Professor Vytlacil lived separately in two different cities and have been living separately since December 2014.

80.    Knowing Plaintiff was at that time applying for law schools for a joint degree of Juris Doctor in law and Ph.D. in economics in the academic year of 2019-2020, when the 9-1-1

dispatcher asked Professor Vytlacil on March 27, 2019 whether Professor Vytlacil could meet the 9-1-1 field officer at Plaintiff's house, Professor Vytlacil responded, "yes" … "though Plaintiff is going to at least wonder what the heck we are doing."

81.     When the 9-1-1 field officers arrived at Plaintiff's home, Plaintiff was still asleep. The field officers broke into Plaintiff's home with the key unlawfully obtained with Professor Vytlacil. Nor did Plaintiff had any contact with anyone prior to the break-in of the 9-1-1 field officers who then told Plaintiff the reason that they were at her home was because "Ed called" therefore Plaintiff needed to go with them to the hospital.

82.     In no circumstance of any emergency, in the absence of evidence of any psychiatric disabilities, Plaintiff was forced to leave her house with the 9-1-1 field officers in the early morning of March 27, 2019 and to be transported by an ambulance to the Emergency Room at the Yale New Haven Hospital, simply because "Ed called."

83.     Once Plaintiff arrived in the emergency room, the Yale New Haven Hospital involuntarily committed Plaintiff in its psychiatric unit upon the Police Request for Emergency Examination issued by the New Haven Police 9-1-1 field officers who unlawfully detained Plaintiff from her home in the morning of March 27, 2019.

84.     Between March 27, 2019 and February 25, 2020, Professor Vytlacil repeatedly, intentionally engaged in discriminatory and retaliatory conducts similarly to the above-described against Plaintiff for her complaining about discrimination and sexual harassment at Yale. The purposeful and frequent harassment by Professor Vytlacil caused Plaintiff who does not have any psychiatric disabilities to be unlawfully, involuntarily detained from her home and committed to Yale New Haven Hospital for psychiatric disabilities during the educational program and activity at the Department of Economics at Yale.

85.     Plaintiff has been deeply devastated and humiliated by Professor Vytlacil' unlawful, harassing, and retaliatory conducts which injured Plaintiff's fundamental rights under the federal and state constitutions and statutes, interfered with Plaintiff's educational program and activity in the Ph.D. program at Yale, and disrupted Plaintiff's applications for joint degree programs of J.D. in Law and Ph.D. in Economics in the academic year of 2019-2020.

### III.    Discrimination, Harassment, and Retaliation in Concert with Professor Vytlacil by Yale Health

86.     On or about April 23, 2019, Plaintiff started seeing Dr. Grunschel at the Office of Student Mental Health & Counseling at the Yale Health for therapy sessions discussing Plaintiff's concerns that Yale University so far took no action addressing Plaintiff's complaints about discrimination, sexual harassment, and retaliation led by Professor Vytlacil and reports to the Associate Dean at the Graduate School, Richard G. Sleight, and the Director of Graduate Studies in the Department, Professor Yuichi Kitamura, and Plaintiff's fear over further retaliatory act by Professor Vytlacil.

87.     On May 1, 2019, Dr. Grunschel called Plaintiff's cellphone between 13:25 and 15:00PM, while she was attending a Ph.D.-level class in the Department on Yale's campus. Because the class was in session, Plaintiff decided not to answer Dr. Grunschel's call. Plaintiff came home shortly after her class at or around 15:20PM, two police officers from the New Haven Police Department showed up at Plaintiff's home at or about 15:46PM, without a warrant, while Plaintiff was home alone, preparing a meal.

88.     The Police told Plaintiff outside of Plaintiff's home on May 1, 2019 that they received "a call from the DCF,"[1] and were preforming a "welfare check" on Plaintiff.

---

[1] Referring to the Connecticut Department of Children and Families.

89.     Only until Plaintiff requested the New Haven Police's record upon the Freedom of Information Act  ("FOIA") Request regarding the May 1, 2019 incident, Plaintiff found out that the person who called the Police on May 1, 2019 was Dr. Grunschel at the Yale Health. Contrary to what the New Haven Police alleged, the Police never made any contact with the DCF that day.

90.     In the recording of Dr. Grunschel's call to the emergency 9-1-1 system subject to Conn. Gen. Stat. § 53a-180d made on May 1, 2019 obtained upon Plaintiff's FOIA request, Dr. Grunschel alleging that she was "a psychiatrist calling about a patient that [she] need to find. [she is] not sure where [the patient] is." … "[Dr. Grunschel] thinks [the patient] needs to go to the emergency room." The reason of Dr. Grunschel's call to the emergency 9-1-1 system as she explained to the 9-1-1 dispatcher was because she was away and just got back in the Office of Student Mental Health & Counseling at the Yale Health, alleging "she just found out that the DCF called her" while she was away telling her about Professor Vytlacil's calls with the DCF regarding the behavior of Plaintiff.

91.     Although as Dr. Grunschel further explained to the 9-1-1 dispatcher, Plaintiff was last seen in the Office of Student Mental Health & Counseling at the Yale Health the day before Dr. Grunschel made 9-1-1 call, *i.e.*, April 30, 2019, by "someone in [the] Office. It was not [Dr. Grunschel]."

92.     In Plaintiff's medical record prepared by Dr. Grunschel on May 1, 2019, Plaintiff was profiled as "as a 'Chinese Woman' who has a daughter and was recently hospitalized," as well as the descriptions of Plaintiff's behavior at Plaintiff's home in three-fold of hearsay, allegedly based on a phone call made by a social worker from the DCF, Velee Lindsay, reporting the calls of Professor Vytlacil made to the DCF. "[The] patient was transported on a Police Emergency Evaluation Report to Yale New Haven Hospital."

93.     Upon the discharge from the Yale New Haven Hospital, Plaintiff was not diagnosed with any mental disorder or mental health condition. However, Plaintiff's educational program and activity was interrupted and Plaintiff's parenting time with her daughter was interfered by the intentionally discriminatory and retaliatory act led by Professor Vytlacil colluded with the Yale Health, all because Plaintiff complained about discrimination and sexual harassment.

94.     In fact, Plaintiff has been in contact with the DCF, including Velee Lindsay. Despite the frequent, intentional calls made by Professor Vytlacil to the DCF with defamatory, harassing, statutorily discriminating allegations against Plaintiff, the DCF issued its final determination of no further service needed in Plaintiff's family on May 13, 2019.

95.     While Plaintiff discussed discrimination, sexual harassment, and retaliation happening in her educational program and activity led by Professor Vytlacil during the therapy sessions at Yale Health, Yale Health continued to profile Plaintiff as a "Chinese" woman who enrolled in a "Ph.D. program" in the Department of Economics with the frequent reports of "Professor Vytlacil called" the Office of Student Mental Health & Counseling at the Yale Health to "report" on Plaintiff.

96.     During the summer recess of 2019 at the Yale University, between May and August 19, 2019, Professor Vytlacil came to Plaintiff's home address every evening, stalking and demanding Plaintiff's daughter to spend overnight stay with him, but he would return the Child back to Plaintiff the next day.

97.     Plaintiff made numerous complaints about Professor Vytlacil's sexual harassment and misconduct to the Director of Graduate Studies at the Department of Economics, Professor Yuichi Kitamura, and the Associate Dean of the Graduate School, Richard G. Sleight. But Yale did nothing to stop him.

98.     Despite Plaintiff's disagreement and complaints against Professor Vytlacil' conduct, Professor Vytlacil insisted that if Plaintiff took a vacation with him, he would then agree to stop coming to Plaintiff's address every evening and let Plaintiff's daughter stay overnight stay with Plaintiff afterwards. In pressuring Plaintiff to agree with Professor Vytlacil's plan of a vacation, Professor Vytlacil intimidated Plaintiff by harassing her every evening outside of her home, by interfering with Plaintiff's parenting time, by making frequent and repeated calls to Dr. Grunschel at the Office of Student Mental Health & Counseling at the Yale Health to interfere with Plaintiff's therapy sessions, and by blatantly discussing his plan of "vacation together" in front of other students and faculty members at the Department of Economics.

99.     Professor Vytlacil's discriminatory and harassing conducts had caused Plaintiff to be treated unfairly and resulted in a hostile and abusive environment at Yale that deprived Plaintiff of equal access to educational program and activity. However, Yale's tone-deaf decision on Plaintiff's numerous complaints was to endow Professor Vytlacil by claiming that Professor Vytlacil's conduct was of a "family matter."

100.    Out of the suspicion of the true motive of Professor Vytlacil's plan of a vacation, Plaintiff brough her mother—who had just recently came back from China—along the trip with Professor Vytacil.

101.    Between August 18 and 22, 2019, Professor Vytlacil sexually harassed and assaulted Plaintiff on numerous occasions during the "vacation" with Plaintiff traveling from New Haven, Connecticut to Owls Head, Maine, stopping overnight at Newburyport, New Hampshire. Professor Vytlacil arranged one hotel room during for the one-night stop in Newburyport on August 18, 2019, then one rental house with three bedrooms for three consecutive nights in Owls Head, Maine. Once arrived in Maine, it soon became clear that Professor Vytlacil's true intention

was to sexually harass and assault Plaintiff. Professor Vytlacil asked Plaintiff's mother to look after Plaintiff's daughter, while he repeatedly sneaked into Plaintiff's room and began to unwantedly touch and forcibly grope her, despite Plaintiff's objections. Plaintiff was disgusted by Professor Vytlacil's harassing behavior, found it absurd, and refused his sexual advances. Professor Vytlacil threatened Plaintiff that if she reported him, he would not let Plaintiff see her daughter ever again.

102.    On August 29, 2019, at 19:59PM, Professor Vytlacil intentionally, purposefully, and falsely used the emergency 9-1-1 system subject to Conn. Gen. Stat. § 53a-180d outside Plaintiff's home while Plaintiff with her daughter were inside at home in no circumstance of any emergency. On the call with the 9-1-1 dispatcher, Professor Vytlacil alleged, *inter alia*, "Plaintiff is Chinese," … "[s]he's actually at home, just not, refusing to let [Professor Vytlacil] take her daughter."

103.    Professor Vytlacil's intentional false alarm to the emergency 9-1-1 system in no circumstance of an emergency caused the New Haven Police Department to unlawfully remove Plaintiff's daughter from her home on August 29, 2019, without due process.

104.    On September 4, 2019, at 15:58PM, Professor Vytlacil  used the emergency 9-1-1 system subject to Conn. Gen. Stat. § 53a-180d outside the elementary school of Plaintiff's daughter, to intentionally and purposefully make a false alarm or complaint to the 9-1-1 dispatcher, alleging, "[Professor Vytlacil has] an unwanted person in [his] car." … "They opened the door and came in, and refused to leave." "It is [Professor Vytlacil's] ex wife. She is bipolar with psychosis. She is not taking her medicine. [Professor Vytlacil] have a court order have her not to interfere with [his] custody and she keeps entering [Professor Vytlacil's] car, unwelcomed. And right now she is in [Professor Vytlacil's] car." … "She is Asian."

105.    Plaintiff's daughter just started attending her elementary school on September 3, 2019. This incident caused a hostile, discriminatory environment to Plaintiff, Plaintiff's daughter, and her family at Yale and the community in New Haven. Nevertheless, Yale University did nothing to intervene or stop such harassment led by a faculty member perpetrating upon a student.

106.    On October 12, 2019, Professor Vytlacil made another purposeful false emergency 9-1-1 alarm or complaint against Plaintiff at 16:42PM outside her home, alleging that he called on behalf of his "mother-in-law" as which he intentionally, frequently referred to Plaintiff's mother till this day, despite the fact Professor Vytlacil and Plaintiff were and have remained divorced since September 2015 and lived separately since December 2014. Professor Vytlacil continued defaming, discriminating, and harassing Plaintiff, alleging, *inter alia*, to the 9-1-1 dispatcher, that "[Plaintiff] is bipolar with psychosis. She is having an active, active psychosis. Last time, she had a manic episode." … " Because it is really them. [Professor Vytlacil] just use [his] phone. And [Professor Vytlacil's] just an observer."

107.    On or about August 23, 2019, after Plaintiff had changed her healthcare provider, no longer saw Dr. Grunschel, and terminated the therapist-patient relationship with the Office of Student Mental Health & Counseling at Yale Health, Professor Vytlacil continued to make frequent reports to the Office of Student Mental Health & Counseling at Yale Health alleging his personal knowledge of mental disorder of Plaintiff's. Nevertheless, Yale Health continued to purposefully conspire with Professor Vytlacil by unlawfully breaching into Plaintiff's medical record with Professor Vytlacil's defamatory, harassing, statutorily discriminating allegations against Plaintiff on the basis of race, sex, national origin, ancestry, disability, record of disability, and/or because the defendants regarded Plaintiff as disabled to wilfully and maliciously cause, or

attempt to cause, or conspire with other person to cause, Plaintiff who does not have psychiatric disabilities to be committed to Yale New Haven Hospital for psychiatric disabilities.

108.   Professor Vytlacil constantly exploited the unequal institutional power inherent in the relationship between faculty member and student at Yale and in the community at large to intentionally harass Plaintiff and purposefully manipulate her decisions in the education program and activity, as well as her personal choice of healthcare providers on and off the campus at Yale to achieve his personal interest in defaming and discrediting Plaintiff because she complained about his discrimination, sexual harassment and assault, and retaliation.

109.   On February 19, 2020, after Professor Vytlacil had been denying Plaintiff's parental access to her daughter for over a month. Despite Plaintiff had explained to Professor Vytlacil that Plaintiff didn't have any mental disorder and hoped that he could acknowledge the fact in a candid manner, and stop intentionally attacking Plaintiff with his defamatory, harassing, and discriminatory statements and purposefully plotting his allegations as a threat in front of authority to withhold Plaintiff's daughter and disrupt Plaintiff's education program and activity at Yale. However, Professor Vytlacil, instead of engaging in meaningful consultation in good faith with Plaintiff, again aggravated his harassing behaviors by purposefully utilizing the emergency 9-1-1 system at 17:51PM, alleging, *inter alia*, to the 9-1-1 dispatcher as follows, "[Professor Vytlacil] want [Plaintiff] to have an evaluation, she is diagnosed with bipolar with psychosis. And [Professor Vytlacil] think she is having psychotic episode right now."

110.   Between February 20 and 25, 2020, Professor Vytlacil sent Plaintiff frequent and repeated intimating and harassing text messages to Plaintiff's cellphone, among other things, stating the following:

"[Professor Vytlacil] want to encourage [Plaintiff] to go back to Yale health." (Plaintiff received from Professor Vytlacil on February 21, 2020)

…

"[Plaintiff] need to go back into treatment. [Plaintiff] can go back to Yale health;" … "[Professor Vytlacil] will also talk to [his] lawyer. But [Professor Vytlacil]'s not agreeing to [Plaintiff] seeing [the daughter] this weekend. [Professor Vytlacil] think [Plaintiff] need to go back into treatment." (Plaintiff received from Professor Vytlacil on February 22, 2020).

…

"No. [Plaintiff] need to go back into treatment;" … "[Plaintiff] need to be back in treatment. [Plaintiff] need to be back on medication. [Plaintiff] should go back to Yale health. [Plaintiff] need to get better;" … "[Plaintiff] need to go on medical leave, not personal leave. If [Plaintiff] go on personal leave than Yale does not pay for [Plaintiff's] health insurance. [Plaintiff] need to go on medical leave. If [Plaintiff] go on personal leave than [Plaintiff] will have to pay [Plaintiff] for health insurance, and [Professor Vytlacil] don't think [Plaintiff] have extra money to spend when [Plaintiff] don't have to;" … "Go to Yale health tomorrow. Or even tonight. Get back into treatment. Let [Professor Vytlacil] know when [Plaintiff] have done that;" … "After [Plaintiff] go back into treatment [Plaintiff and Professor Vytlacil] can talk about schedules. Go back to take health and get treatment. The sooner the better. [Plaintiff] can go tonight to acute care for the mental health provider on call. Or walk in tomorrow. [Professor Vytlacil's] not talking to [Plaintiff] further until [Plaintiff] do that. It is wasting both of [Plaintiff's and Professor Vytlacil's] time to talk before then. Until [Plaintiff] do that [Professor Vytlacil's] not responding further. It is just a waste of time. The sooner [Plaintiff] are back in treatment the better for [Plaintiff] and for [the Daughter] and for [the Daughter] to have time with [Plaintiff] again. [Professor Vytlacil's] not wasting more time on this until [Plaintiff] are back in treatment." (Plaintiff received from Professor Vytlacil on February 24, 2020).

…

"[Professor Vytlacil's] not going to waste time arguing with [Plaintiff]. It is 8:30. Yale health just opened." … "[Is Plaintiff] at Yale health now?" … "No. [Professor Vytlacil's] proposing that [Plaintiff] go back into treatment at Yale health. Once [Plaintiff] are back in treatment [Plaintiff and Professor Vytlacil] can discuss setting up visitations." (Plaintiff received from Professor Vytlacil on February 25, 2020).

111.    Yale Health simultaneously documented in Plaintiff's medical record at the Office of Student Mental Health & Counseling ("Office") that Professor Vytlacil called and emailed Dr. Grunschel on February 20, 2020. Because Dr. Grunschel was no longer employed at Yale Health, so Professor Vytlacil's email sent to Dr. Grunschel was forwarded to other doctors in the Office. Despite Plaintiff no longer went to the Office and had changed her healthcare provider to a clinic outside of Yale's network. Yale Health, nevertheless, entered the following statement into Plaintiff's medical record, in relevant part:

"[Plaintiff] has been increasingly delusional, erratic, and manic;" … "[Plaintiff] has been off meds;" … "[Plaintiff] attempted to enter [Professor Vytlacil's] house on February 19, 2020 and take their daughter;"… "[Professor Vytlacil] reports that child is safely in his custody, the child's therapist and school was informed;" … "[Professor Vytlacil] filed DCF report regarding the incident;" … "[Professor Vytlacil] contact the Police Department at Yale University for a restraining order;" … and "[Professor Vytlacil] contacted the Yale Health Mental Health and Counseling Department and advised them to hospitalize [Plaintiff] in the ER or the Yale Psychiatric Hospital…"

## IV.    Yale University Had Actual Knowledge of Violations but Showed Deliberate Indifference and Refused to Provide Accommodation

112.    Despite Plaintiff's numerous reports and internal grievance to the Associate Dean Richard G. Sleight at the Graduate School and the Director of Graduate Studies at the Department of Economics, Professor Yuichi Kitamura, seeking accommodation, intervention, and protection against further discrimination, harassment, and retaliation. Yale took no meaningful action against Professor Vytlacil or investigate upon Plaintiff's complaint.

113.    On December 18, 2019, Plaintiff explained her particularly devastating circumstance to the officials at the Department of Economics and requested to apply for the University College of London-Yale Exchange Scholar Program, starting the 2020 Spring term, to continue her doctoral study in the exchange program in the United Kingdom, hoping to get some sort of relief from the hostile, abusive, and discriminatory environment toward Plaintiff at Yale. However, Professor Yuichi Kitamura, the Director of Graduate Studies at the Department denied Plaintiff request for accommodation and transfer and stated in an email dated on January 9, 2020 that the Department cannot accommodate Plaintiff's request, and no other corrective measures were provided to relieve Plaintiff from any further discrimination, harassment, and retaliation led by Professor Vytlacil in concert with Yale Health.

114.    On February 24, 2020, Plaintiff met with the Associate Dean Richard G. Sleight at the Graduate School to file her internal grievance complaint against Professor Vytlacil, the Department of Economics, and Yale Health and explained to the Dean that the harassment on the

basis of sex, race, ancestry, national origin, parenting student status, and disability were severe, pervasive, and objectively offensive and had resulted in a hostile and abusive environment in the Department of Economics that deprived Plaintiff of her equal access to educational program and activity at Yale.

115.    On February 24, 2020, Plaintiff also discussed with Dean Sleight regarding her request to apply for the University College of London-Yale Exchange Scholar Program to continue her doctoral-degree program in a different educational institution, considering the particularly abusive, offensive environment in the Department of Economics at Yale. However, Dean Sleight denied Plaintiff's request for accommodation, but recommended Plaintiff to take a Leave of Absence instead. No other relief or corrective measures were provided by the Graduate School. Dean Sleight wrote to Plaintiff via email on February 24, 2020 as follow:

> "The Department of Economics and the Graduate School have approved Plaintiff's request for a personal leave of absence for the remainder of the spring 2020 term, effective from February 27 through September 1, 2020."

116.    The officials at the Graduate School and the Department of Economics had actual knowledge of the intentional and purposeful statutory violation, discrimination, harassment, retaliation, and faculty misconduct but failed to adequately respond to Plaintiff's internal grievance complaint. Yale's deliberate indifference of Plaintiff's rights under federal and state constitutions and statutes, including but not limited to ADA, Title VI, Title VII, and Title IX, Section 504 of the Rehabilitation Act of 1973, Conn. Const. Amend. XXI, and Fourteenth Amendment of the U.S. Constitution, caused and continue to cause Plaintiff subject to further harassment, discrimination, and retaliation, and deprived Plaintiff of equal access to educational program and activity, equal protection of the laws and equal privileges and immunities.

**V.    Yale University's Retaliation after Complaint about Discrimination and Harassment**

117.    Professor Vytlacil had been successfully getting Yale, Plaintiff's school and employer, to treat her differently on the basis of race, sex, national origin, ancestry, disability, record of disability, and/or because the defendants regarded Plaintiff as disabled. Because Plaintiff complained of discrimination and sexual harassment, Yale went along with Professor Vytlacil and continued to harass Plaintiff in concert with Yale Health on the basis of (perceived) psychiatric disability about Plaintiff, which was at the hands of Professor Vytlacil, Department of Economics, and Yale Health, as well as the others who might have brought into it.

118.    Yale University could have, but failed to, promptly and equitably investigate Plaintiff's complaints it received about harassment, discrimination, and inappropriate faculty misconduct by Professor Vytlacil, et al. that would have prevented the defendants from further retaliating against Plaintiff for asserting her rights. Instead, Yale took no action upon Plaintiff's complaints, and offered no supportive measures.

119.    On or about December 4, 2020, Plaintiff filed a complaint with the Office of Provost at Yale University against Defendants alleging violations of the Title IX of the Education Amendments of 1972 as amended, 20 U.S.C. § 1681 *et seq.* ("Title IX") and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* (hereinafter "Title IX Complaint").

120.    On December 22, 2020, the Title IX Office within the Office of Provost confirmed upon the receipt of Plaintiff's Title IX Complaint but chose not to pursue her claim up to this date.

121.    Rather, on January 27, 2021, Associate Dean for Academic Support at the Graduate School at Yale, Allegra di Bonaventura, sent Plaintiff an email, and stated the following:

> "*I write to confirm that you are administratively withdrawn from Yale's Graduate School of Arts and Sciences effective immediately. If you have any questions, please contact me or your DGS.*"

122.    On or about February 1, 2021, Yale terminated Plaintiff's stipend income and salary wages breaching the agreement between Yale and Plaintiff without due process.

## CAUSE OF ACTION

### FIRST CAUSE OF ACTION

**COUNT ONE:**    **DISCRIMINATION AND IMPAIRMENT OF EQUAL CONTRACTUAL RIGHTS UNDER THE LAW (42 U.S.C. §§ 1981 AND 1983)**

123.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs designated 1 through 122 with the same force and effect as if fully set forth at length herein.

124.    Yale University's "Racially Nondiscriminatory Policy" and "Equal Opportunity Statement" expressly provides, in relevant part:

> "the University is committed to basing judgments concerning the admission, education, and employment of individuals upon their qualifications and abilities and affirmatively seeks to attract to its faculty, staff, and student body qualified persons of diverse backgrounds. In accordance with this policy and as delineated by federal and Connecticut law, Yale does not discriminate in admissions, educational programs, or employment against any individual on account of that individual's sex, race, color, religion, age, disability, status as a veteran, or national or ethnic origin; nor does Yale discriminate on the basis of sexual orientation or gender identity or expression. University policy is committed to affirmative action under law in employment of women, minority group members, individuals with disabilities, and protected veterans," See Yale University's Return of Organization Exempt From Income Tax, Form 990, of 2019.

125.    On March 4, 2015, Plaintiff entered into the agreement with Defendants that Plaintiff first enrolled in the Master of Environmental Science program ("MESc") to do "right from the beginning all the requisite Ph.D. work, and after completion of the MESc, with a strengthened academic profile, simply transfers into the Ph.D. program, and thus will not take any more time than if [Plaintiff] was to directly enter into the Ph.D. program," at the School of Environment.

126.    Defendants breached its agreement by denying Plaintiff's application for the Ph.D. program at the School of Environment on the basis of race, sex, and parenting student status in violation of Yale's "Racially Nondiscriminatory Policy" and "Equal Opportunity Statement" and

by denying Plaintiff's direct transfer into the Ph.D. program upon her "completion of the MESc" degree program at the School of Environment at Yale.

127.    Defendants' offer of an employment and enrollment contract to Plaintiff dated February 18, 2017, expressly provides, in relevant part:

> "[Yale Graduate School] award you a financial aid package that pays your full tuition and provides a minimum level of support of $30,250 per twelvemonth year for up to five years. Students pursue course work during their first two years of study. Because the faculty considers teaching essential to the professional preparation of all doctoral students, students normally teach in years three and four. In year five, students receive a stipend to work exclusively on the dissertation. We hope that you will finish in five years, but a sixth year of funding is available, if necessary. If you have not completed your dissertation by the end of year five and the Department of Economics certifies that you will do so by August of the following year, you will be eligible in year six for a teaching position and a nine-month, academic-year stipend, i.e. three quarters of the twelve-month stipend. If as occasionally happens, no suitable teaching is available in any of the years in which you are scheduled to teach, you will nonetheless continue to receive a full stipend during that period. (For further detail on teaching expectations, please review your program's section of the Programs and Policies.) The Department of Economics, Cowles Foundation and Economic Growth Center have awarded you a fellowship of $7,750 in each of your first four years of study, bringing your annual stipend to at least $38,000. All stipends and teaching assignments are contingent on satisfactory academic progress."

128.    Defendants breached its agreement by denying Plaintiff's equal education opportunity and equal access to educational program and activity on the basis of race, sex, national origin, ancestry, disability, record of disability, and/or because the defendants perceived Plaintiff as "mentally ill," in violation of 42 U.S.C. §§ 1981 and 1983.

129.    Defendants breached its agreement by terminating Plaintiff's "financial aid," "salary wages in a teaching position," and/or "a stipend to work exclusively on the dissertation" on the basis of race, sex, national origin, ancestry, disability, record of disability, and/or because the defendants perceived Plaintiff as "mentally ill," in violation of 42 U.S.C. §§ 1981 and 1983.

130.    The Faculty Handbook on Academic Freedom and Faculty Standards of Conduct expressly provides, in relevant part:

"The integrity of the teacher-student relationship is crucial to the University's educational mission. This relationship vests considerable trust in the faculty member, who, in turn, bears authority and accountability as mentor, educator, and evaluator. When acting in their role as teachers, members of Yale faculty treat students and trainees with respect. They set an example of academic integrity and educate their students and trainees in the requirements of honest scholarship. They evaluate their students' and trainees' work solely on the basis of its intellectual merit and adherence to course or program requirements. They maintain proper professional boundaries and never exploit the unequal institutional power inherent in the relationship between faculty member and student or trainee."

131.    The Handbook constitutes an agreement between Yale and Plaintiff.

132.    Defendants breached its agreement by engaging in discriminatory, harassing, and retaliatory conduct against Plaintiff on the basis of race, sex, national origin, ancestry, disability, record of disability, and/or because the defendants regarded Plaintiff as "mentally ill," and by repudiating the agreement of evaluating Plaintiff's work at Yale "solely on the basis of its intellectual merit and adherence to course or program requirements."

133.    Moreover, the Settlement Agreement between Plaintiff and Professor Vytlacil on Article 2 Child Custody, incorporated, *but not merged into*, the Foreign Matrimonial Judgment, certified and registered on May 7, 2019 in the Superior Court of New Haven in the State of Connecticut, expressly provides, in relevant part:

"[Plaintiff and Professor Vytlacil] shall have joint legal custody of, and joint decision-making rights and responsibilities regarding [the daughter]"… "If the parents are unable to agree on a decision regarding a material matter concerning [the daughter] (including whether an issue is a material matter), they shall first attempt in good faith to resolve their differences and work together to reach a resolution, and if unable to do so, they shall work with the Parent Coordinator, as set forth in paragraphs 31 through 39 of this Article, to reach a resolution; provided, however, that in the event of a disagreement as to a medical issue, the parties shall seek the assistance of the Child's treating pediatrician. If the parties remain unable to agree after working with the Parent Coordinator (or in the case of a medical issue, the Child's treating physician) to resolve the disputed issue, either party has the right to seek relief from a Court of competent jurisdiction."

134.    Defendants' unlawful practices, acts and omissions caused and will continue to cause substantial impairment and deprivation of Plaintiff's contractual and constitutional rights and obligations in making decisions concerning the care, custody, and control of her child and

Plaintiff's equal right in the State of Connecticut "to make and enforce contracts, … and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens," in violation of 42 U.S.C. §§ 1981 and 1983.

135.    As a result of Yale's breach, Plaintiff has and will continue to suffer damages.

136.    Plaintiff also seeks punitive damages against Defendants because of Defendants' willful and/or reckless disregard for Plaintiff's civil rights, in an amount to be determined at trial but no less than Five Hundred Thousand ($500,000.00).

<b>SECOND CAUSE OF ACTION</b>

**COUNT TWO:**          **FAILURE TO PREVENT A CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS (42 U.S.C. § 1986)**

137.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs designated 1 through 122 with the same force and effect as if fully set forth at length herein.

138.    "[A] § 1986 plaintiff must show that: (1) the defendant had actual knowledge of a § 1985 conspiracy, (2) the defendant had the power to prevent or aid in preventing the commission of a § 1985 violation, (3) the defendant neglected or refused to prevent a § 1985 conspiracy, and (4) a wrongful act was committed." *Clark v. Clabaugh*, 20 F.3d 1290, 1295-96 (3d Cir. 1994).

139.    Defendants were aware of Yale's "Racially Nondiscriminatory Policy" and "Equal Opportunity Statement" and the Faculty Handbook on Academic Freedom and Faculty Standards of Conduct. Defendants were on notice of the discriminatory conduct engaged in by faculty and employees at Yale. Defendants' responsibility for addressing a complaint against discrimination and preventing the commission of discrimination was provided in the Faculty Handbook.

140.    Nevertheless, Defendants neglected or refused to prevent the wrongful act as above-described and intentionally conspired with Professor Vytlacil for the purpose of depriving,

either directly or indirectly, Plaintiff of equal educational opportunity, equal protection of the laws, and/or equal privileges and immunities under the laws—a § 1985 conspiracy.

141.    As a result of Defendants' wrongful act and omission, Plaintiff was discriminated, harassed, and retaliated by Defendants. Plaintiff was subjected by Defendants to segregation and discrimination in the exercise or enjoyment of her civil rights on the basis of disability, record of disability, and/or because Defendants regarded Plaintiff as "mental ill" in violation of the ADA as amended, 42 U.S.C. § 12101 *et seq*.; Section 504, Rehabilitation Act of 1973 as amended, 29 U.S.C. § 794, and Art. XXI of Amendments to the Constitution of the State of Connecticut.

142.    Defendants discriminated and harassed on the basis of sex, and retaliated Plaintiff for making complaints about discrimination and sexual harassment in violation of Title IX of the Education Amendments of 1972 as amended, 20 U.S.C. § 1681 *et seq*.; and Art. XXI of Amendments to the Constitution of the State of Connecticut.

143.    Defendants violated Title VI of Civil Rights Act as amended, 42 U.S.C. § 2000d *et seq*. and Title VII of Civil Rights Act as amended, 42 U.S.C. § 2000e *et seq*. and Art. XXI of Amendments to the Constitution of the State of Connecticut by denying Plaintiff the equal protection of the law and by subjecting Plaintiff to segregation and discrimination in the exercise or enjoyment of her civil rights because of race, ancestry and national origin.

144.    Yale led by its top leadership knowingly repudiated all duties of the agreements between Yale and Plaintiff, ratified and allowed the abusive and hostile educational environment to flourish, and intentionally engaged in its own acts of discriminatory and retaliatory conduct against Plaintiff in violation of 42 U.S.C. §§ 1981, 1983 and 1985. Such wrongful act could have been prevented by Defendants' reasonable diligence, in acting accord to Yale's rule and policy and the above-mentioned federal and state laws and constitutions.

145.    As a direct and proximate result of Yale's wrongful act and neglect, Plaintiff has and will continue to suffer damages for which Plaintiff is entitled to an award to recover.

146.    Plaintiff also seeks punitive damages against Defendants because of Defendants' willful and/or reckless disregard for Plaintiff's civil rights, in an amount to be determined at trial but no less than Five Hundred Thousand ($500,000.00).

### THIRD CAUSE OF ACTION
**COUNT THREE:    CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS (42 U.S.C. § 1985(3))**

147.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs designated 1 through 122 with the same force and effect as if fully set forth at length herein.

148.    "A legally sufficient § 1985(3) complaint must aver a conspiracy between two or more persons intended to deprive any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws and an act by one of the conspirators in furtherance of the conspiracy which injured another person or deprived him of exercising any right or privilege of a citizen of the United States. See *Griffin v. Breckenridge*, 403 U.S. 88, 102-103 (1971); *Cameron v. Brock*, 473 F.2d 608, 610 (6 Cir. 1973)." *Girard v. 94th St. Fifth Ave. Corp.*, 530 F.2d 66, 70 (2d Cir. 1976).

149.    By the above-described conduct, Defendants intended to deprive Plaintiff of the equal protection of the laws or equal privileges and immunities under the law, including but not limited to, the (1) agreement between Yale and Plaintiff, (2) Settlement Agreement between Plaintiff and Professor Vytlacil, (3) Title VI of Civil Rights Act as amended, 42 U.S.C. § 2000d *et seq.*, (4) Title VII of Civil Rights Act as amended, 42 U.S.C. § 2000e *et seq.*, (5) Title IX of the Education Amendments of 1972 as amended, 20 U.S.C. § 1681 *et seq.*, (6) ADA as amended, 42

U.S.C. § 12101 *et seq.*, (7) Section 504, Rehabilitation Act of 1973 as amended, 29 U.S.C. § 794, (8) Art. XXI of Amendments to the Constitution of the State of Connecticut, and (9) Fourteenth Amendment of the United States Constitution, on the basis of race, sex, national origin, ancestry, disability, record of disability, and/or because the defendants regarded Plaintiff as disabled.

150.   Defendants' intentional discriminatory and retaliatory act in furtherance of the conspiracy which injured Plaintiff and deprived Plaintiff of exercising the right or privilege of a citizen of the United States protected in the above-mentioned laws.

151.   As a direct and proximate result of Yale's unlawful and discriminatory act, Plaintiff has and will continue to suffer damages for which Plaintiff is entitled to an award to recover.

152.   Plaintiff also seeks punitive damages against Defendants because of Defendants' willful and/or reckless disregard for Plaintiff's civil rights, in an amount to be determined at trial but no less than Five Hundred Thousand ($500,000.00).

**FOURTH CAUSE OF ACTION**

**COUNT FOUR:**     **DISCRIMINATION IN VIOLATION OF TITLE VI OF CIVIL RIGHTS ACT**

153.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs designated 1 through 122 with the same force and effect as if fully set forth at length herein.

154.   "In order to establish a claim based on [Title VI of the Civil Rights Act of 1964], the plaintiff must show, *inter alia*, that the defendant discriminated against him on the basis of race, see, e.g., *Guardians Association v. Civil Service Commission*, 463 U.S. 582, 602-03, 607 n. 27 (1983); *General Building Contractors Association, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982), that that discrimination was intentional, see, e.g., *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265 (1977), and that the discrimination

was a 'substantial' or 'motivating factor' for the defendant's actions, *Gierlinger v. Gleason*, 160 F.3d 858, 868 (2d Cir. 1998) (quoting *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977))." *Tolbert v. Queens College*, 242 F.3d 58, 70 (2d Cir. 2001).

155.    "Yale has engaged in this race discrimination despite receiving millions of dollars of federal taxpayer funding subject to Title VI's restrictions. Yale's race discrimination violates Title VI's requirement that '[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.' 42 U.S.C. § 2000d." *See USA v. Yale University*, 3:20-cv-01534 (CSH), Dkt No. 1 (Complaint), ¶ 4.

156.    "On August 13, 2020, the United States notified Yale that Yale was in violation of Title VI." *Id.*, ¶ 35.

157.    Plaintiff was born in the People's Republic of China and Asian-American.

158.    By the above described conduct, Plaintiff was discriminated against on the basis of race and national origin by Defendants.

159.    Plaintiff was also subject to differential treatment because of her race and national origin, and the discrimination was a 'substantial' or 'motivating factor' for the defendant's actions. Defendants frequently profiled Plaintiff as "a Chinese woman" and/or "Asian" in their vicious, malicious attempt to deprive Plaintiff of equal educational opportunity, equal protection of the laws, and/or equal privileges and immunities under the laws.

160.    Defendants were on notice of the discriminatory conduct engaged by faculty and employees at Yale. While Plaintiff was falsely regarded by Defendants as "a Chinese woman" who was "mentally ill" after Plaintiff complained about discrimination and harassment and clarified with Defendants that Plaintiff is an American citizen and does not have any mental

disorders. Yale failed to carry out their duties and obligations pursuant to Title VI to take corrective action.

161.    Yale allowed and fostered an environment in which discriminatory and harassing practices that were, and continue to be, sufficiently severe or pervasive to create an educational environment that is both subjectively and objectively hostile, abusive and retaliatory.

162.    Defendants also violated Title VI of the Civil Rights Act of 1964 by creating and allowing a cultural of discrimination based on race and national origin to permeate its educational program or activity, student health service, and all aspects of Plaintiff's educational environment, by profiling Plaintiff as "Chinese woman" and/or "Asian," rather than "evaluating Plaintiff's work solely on the basis of its intellectual merit and adherence to course or program requirements" in accord to Yale Faculty Handbook. This hostile and abusive educational environmental was created by decisions, preferences, and conduct engaged in by Yale. The severe, and pervasively abusive environment was continuous throughout Plaintiff's enrollment and employment at Yale.

163.    Yale tolerated, condoned, ratified and/or engaged in the racially discriminatory educational environment, or, in the alternative, knew, or should have known, of its existence, yet failed to conduct proper investigations and failed to take remedial action, in breach of Yale's "Equal Opportunity Statement" and "Racially Nondiscriminatory Policy."

164.    As a direct and proximate result of Defendants' unlawful discriminatory and conduct in violation of Title VI, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

165.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title VI of the Civil Rights Act of 1964, for which Plaintiff is entitled to an award of damages in an amount to be determined at trial but no less than Five Hundred Thousand ($500,000.00).

**FIFTH CAUSE OF ACTION**

**COUNT FIVE:**     **DISCRIMINATION   IN   VIOLATION   OF   TITLE   IX   OF   THE EDUCATION AMENDMENTS OF 1972**

166.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs designated 1 through 122 with the same force and effect as if fully set forth at length herein.

167.    Title IX of the Education Amendments Act of 1972 states, "No person in the United States shall on the basis of sex, be … subject to discrimination under any education program or activity receiving Federal financial assistance."

168.    To establish a prima facie case of discrimination in violation of Title IX of the Education Amendments of 1972, a plaintiff needs only allege "facts giving rise to a plausible minimal inference of bias." *Doe v. Columbia Univ.*, 831 F.3d 46, 55 (2d Cir. 2016).

169.    By the above-described conduct, Plaintiff was discriminated against on the basis of her sex and parenting student status by Defendants, including, but not limited to, by sexual harassment and sexual misconduct during the educational program or activity at Yale.

170.    Defendants were on notice of the discriminatory conduct engaged in by faculty and employees at Yale. Yale failed to carry out their duties and obligations pursuant to Title IX to investigate and take corrective action.

171.   Defendants allowed and fostered an environment in which discriminatory and harassing practices that were, and continue to be, sufficiently severe or pervasive to create an educational environment that is both subjectively and objectively hostile, abusive and retaliatory.

172.   By the above-described conduct, Defendants tolerated, condoned, ratified and/or engaged in the sexually abusive educational environment, or, in the alternative, knew, or should have known, of its existence, yet failed to conduct proper investigations and failed to take remedial action.

173.   By reason of the continuous and ongoing nature of the above-described sexual harassment and sexual discrimination conduct, Plaintiff are entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

174.   As a direct and proximate result of Defendants' unlawful actions or inactions, Plaintiff has suffered, and will continue to suffer, harm, including, but not limited to, loss of educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

175.   Plaintiff is entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, attorneys' fees and costs and other appropriate relief.

176.   Plaintiff also seeks punitive damages against Defendants because of Defendants' willful and/or reckless disregard for Plaintiff's civil rights, in an amount to be determined at trial but no less than Five Hundred Thousand ($500,000.00).

## SIXTH CAUSE OF ACTION
**COUNT SIX:**          **RETALIATION   IN   VIOLATION   OF   TITLE   IX   OF   THE EDUCATION AMENDMENTS OF 1972**

177.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs designated 1 through 122 with the same force and effect as if fully set forth at length herein.

178.   "Under Titles VII and IX, 'a plaintiff claiming retaliation must establish a prima facie case by showing: (1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse action; and (4) a causal connection between the protected activity and the adverse action.' *Papelino v. Albany College of Pharmacy*, 633 F.3d 81, 91 (2d Cir. 2011); see also *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015)." *Castro v. Yale Univ.*, 518 F. Supp. 3d 593 (D. Conn. 2021).

179.   By the above-described conduct, Defendants have retaliated against Plaintiff in violation of Title IX by, *inter alia*, failing to properly investigate Plaintiff's claims of discrimination and sexual harassment, forcing Plaintiff to withdraw from her Ph.D. program, and terminating Plaintiff's stipend and salary without due process, in retaliation of a protected activity of Plaintiff's complaint about sex discrimination and sexual harassment.

180.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered, and will continue to suffer, harm, including, but not limited to, loss of educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

181.   As a direct and proximate result of Defendants' unlawful conduct in violation of Title IX, Plaintiff has suffered, and continue to suffer, harm for which she is entitled to an award of damages to the greatest extent permitted by law, including, but not limited to, monetary and/or economic harm.

182.    Plaintiff is entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, attorneys' fees and costs and other appropriate relief.

183.    Plaintiff also seeks punitive damages against Defendants because of Defendants' willful and/or reckless disregard for Plaintiff's civil rights, in an amount to be determined at trial but no less than Five Hundred Thousand ($500,000.00).

**SEVENTH CAUSE OF ACTION**

**COUNT SEVEN:**    **DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**

184.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs designated 1 through 122 with the same force and effect as if fully set forth at length herein.

185.    Eight years after the U.S. Supreme Court's decision in *Pennhurst State School and Hospital v. Halderman*, 451 U. S. 1 (1981), Congress enacted several laws designed to improve the way in which this Nation treats the mentally disabled. In enacting the ADA, Congress spoke with a clear voice that "the term 'disability' means, with respect to an individual, (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102 (1).

186.    "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182 (a).

187.    "It shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity

because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 42 U.S.C. § 12182 (b)(1)(E).

188.    Plaintiff is individual with disability within the meaning of 42 U.S.C. § 12102(1)(C).

189.    Yale is a place of public accommodation within the meaning of 42 U.S.C. § 12181(7) and a "mental health facility" within the meaning of §52-146d (5).

190.    At all relevant times, Defendants were aware of the ADA relating to accessibility for individuals with disabilities.

191.    Defendants have engaged and continue to engage in prohibited misconduct against Plaintiff within the meaning of 42 U.S.C. §§ 12182 (b) (2) (A) (i)-(v), that did in fact deprive Plaintiff of her rights guaranteed against private impairment, including, but not limited to, the right to fully and equally enjoy Defendants' place of public accommodation at Yale, which is guaranteed to Plaintiff by the ADA. See 42 U.S.C. § 12101 *et seq.*

192.    Defendants' conscious objective has been to purposely impair Plaintiff's lawfully protected rights to accessibility within Defendants' place of public accommodation at Yale's campus by purposely, fraudulently alleging Plaintiff were "bipolar with psychosis" … "has been increasingly delusional, erratic, and manic;" … "has been off meds;" … and "advise [Yale Health] to hospitalize [Plaintiff] in the ER or Yale Psychiatric Hospital … with the intention of creating an inaccessible public accommodation, for the purpose of depriving Plaintiff of equal educational opportunity, equal protection of the laws, and/or equal privileges and immunities under the laws.

193.    Defendants continue to operate Yale's campus, their premises, in an inaccessible manner for such individuals as Plaintiff.

194.    Defendants' intentional conduct alleged herein against a class of people with disabilities who has (A) a mental impairment that substantially limits one or more major life

activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment, see 42 U.S.C. § 12102 (1), were in furtherance to purposely control, operate, and maintain their premises in a manner that injured Plaintiff's person and deprived Plaintiff of equal rights and privileges of a citizen of the United States including, but not limited to, the right to fully and equally use Defendants' place of public accommodation at Yale's campus in the same manner as non-disabled peers.

195.    As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff was injured and continue to endure monetary and/or economic harm, including, but not limited to, loss of educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

196.    Plaintiff is entitled to all legal and equitable remedies available for violations of the ADA, including compensatory damages, attorneys' fees and costs and other appropriate relief.

197.    Plaintiff also seeks punitive damages against Defendants because of Defendants' willful and/or reckless disregard for Plaintiff's civil rights, in an amount to be determined at trial but no less than Five Hundred Thousand ($500,000.00).

**EIGHTH CAUSE OF ACTION**
**COUNT EIGHT:    <u>RETALIATION  IN  VIOLATION  OF  THE  AMERICANS  WITH DISABILITIES ACT</u>**

198.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs designated 1 through 122 with the same force and effect as if fully set forth at length herein.

199.    To establish a prima facie case of retaliation, "the elements of a retaliation claim under either Section 504 or the ADA are (i) a plaintiff was engaged in protected activity; (ii) the

alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Weixel v. Board of Educ. of City of New York*, 287 F.3d 138, 148 (2d Cir. 2002) (citation omitted.)

200.    A request for reasonable accommodation is an ADA-protected activity. *Id.*, at 149. Plaintiff receives protection even if she was not entitled to the reasonable accommodation, as long as she made her request in good faith. *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir. 2000).

201.    Plaintiff requested for reasonable accommodation of disability regarded by Defendants on or about April 23, 2019, including, but not limited to, fully and equally use Defendants' place of public accommodation on Yale's campus in the same manner as non-disabled peers; and equal educational opportunity for Plaintiff in the program or activity at Yale.

202.    One of the accommodations Plaintiff requested were enjoyed by her similarly situated parents.

203.    "In accordance with [Yale's] policy and as delineated by federal and Connecticut law, Yale does not discriminate in admissions, educational programs, or employment against any individual on account of that individual's sex, race, color, religion, age, disability, status as a veteran, or national or ethnic origin." Return of Organization Exempt From Income Tax, Form 990, of 2019.

204.    Nevertheless, Defendants ignored and denied Plaintiff's requested for reasonable accommodation of disability regarded by Defendants and in return retaliated Plaintiff for making such request.

205.    By failing to comply with the ADA but in return retaliating Plaintiff for making a request for reasonable accommodation, Defendants have articulated to disabled persons such as Plaintiff that they are subject to injury as a participant at Yale Defendants' place of public accommodation.

206.    Defendants violated the Americans with Disabilities Act as amended by denying Plaintiff the accommodation enjoyed by similarly-situated peers, by fraudulently alleging Plaintiff was of mental illness and by wilfully and maliciously causing, or attempting to cause, or conspiring with other person to cause, Plaintiff who does not have psychiatric disabilities to be committed to Yale New Haven Hospital for psychiatric disabilities, because Plaintiff complained about discrimination. The retaliatory act was by decisions, preferences and conduct of Defendants.

207.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the Americans with Disabilities Act as amended, Plaintiff has suffered, and continues to suffer, loss of educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

208.    Yale's unlawful and retaliatory actions constitute malicious, willful and wanton violations of the Americans with Disabilities Act as amended, for which Plaintiff is entitled to an award of punitive damages.

209.    Plaintiff also seeks punitive damages against Defendants because of Defendants' willful and/or reckless disregard for Plaintiff's civil rights, in an amount to be determined at trial but no less than Five Hundred Thousand ($500,000.00).

## NINTH CAUSE OF ACTION
**COUNT NINE:        DISCRIMINATION   IN   VIOLATION   OF   SECTION   504, REHABILITATION ACT OF 1973**

210.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs designated 1 through 122 with the same force and effect as if fully set forth at length herein.

211.    "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794 (a).

212.    In enacting Section 504, Rehabilitation Act of 1973, Congress' express intent is to "protect the legal and human rights of individuals with disabilities." 29 U.S.C. § 794e(a)(1).

213.    "To establish a prima facie violation of section 504, a plaintiff must prove that: 1) he or she is a '[individuals with disabilities]' as defined in the Rehabilitation Act; 2) he or she is 'otherwise qualified' to participate in the offered activity or to enjoy its benefits; 3) he or she is being excluded from such participation or enjoyment solely by reason of his or her [disabilities]; and 4) the program denying the plaintiff participation receives federal financial assistance." *Rothschild v. Grottenthaler*, 907 F.2d 286, 289-90 (2d Cir. 1990) (citing *Doe v. New York University*, 666 F.2d 761, 774-75 (2d Cir. 1981)).

214.    Plaintiff is individual with a disability within the meaning of 29 U.S.C. § 705 (20)(B).

215.    Defendant Yale is a "program or activity" within the meaning of 29 U.S.C. § 794(b)(3)(A)(ii), and receives federal financial assistance.

216.    Defendant Yale is also a "mental health facility" within the meaning of §52-146d (5).

217.    Plaintiff is "otherwise qualified" to participate in the offered activity or to enjoy its benefits as a student who has been enrolling at Yale since September 1, 2015. Plaintiff has been and is being excluded from such participation or enjoyment solely by the reason that Defendants unlawfully discriminated her on the basis of disability, record of disability, and/or because the defendants regarded Plaintiff as disabled, since March 27, 2019.

218.    "The Second Circuit has recognized a private cause of action to enforce section 504. *See Kampmeier v. Nyquist,* 553 F.2d 296, 299 (2d Cir. 1977) (on denial of motion for preliminary injunction); *accord Camenisch v. University of Texas,* 616 F.2d 127, 130-32 (5th Cir.), *cert. granted,* ___ U.S. ___, 101 S.Ct. 352, 66 L.Ed.2d 213 (1980)." *Lynch v. Maher*, 507 F. Supp. 1268, 1279 (D. Conn. 1981).

219.    Defendants have and continue to subject Plaintiff to disparate treatment and disparate impact by directly and indirectly refusing, withholding, and denying the accommodations, full and equal access to facilities, benefits, and privileges of their program or activity because of disability in violation of the Section 504, Rehabilitation Act of 1973.

220.    Defendants violated Section 504, Rehabilitation Act of 1973 by intentionally stalking, harassing, and discriminating Plaintiff; by falsely, maliciously causing, or attempting to cause, or conspiring with other person to cause, Plaintiff who does not have psychiatric disabilities to be committed to Yale New Haven Hospital for psychiatric disabilities; and by wilfully certifying falsely to the psychiatric disabilities of Plaintiff's.

221.    Defendants also violated Section 504, Rehabilitation Act of 1973 by showing deliberate indifference to Plaintiff's numerous requests for accommodations or relief to Plaintiff.

222.    As a direct and proximate result of Defendants' unlawful discrimination in violation of Section 504, Rehabilitation Act of 1973, Plaintiff has suffered, and continues to suffer loss of

educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

223.    Defendants' unlawful discrimination conduct constitutes malicious, willful, and wanton violation of Section 504, Rehabilitation Act of 1973 for which Plaintiff is entitled to an award to recover the damage she suffered and continue to suffer.

224.    Plaintiff also seeks punitive damages against Defendants because of Defendants' willful and/or reckless disregard for Plaintiff's civil rights, in an amount to be determined at trial but no less than Five Hundred Thousand ($500,000.00).

<b>TENTH CAUSE OF ACTION</b>

| | |
|---|---|
| **COUNT TEN:** | **RETALIATION IN VIOLATION OF SECTION 504, REHABILITATION ACT OF 1973** |

225.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs designated 1 through 122 with the same force and effect as if fully set forth at length herein.

226.    To establish a prima facie case of retaliation, "the elements of a retaliation claim under either Section 504 or the ADA are (i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Weixel v. Board of Educ. of City of New York*, 287 F.3d 138, 148 (2d Cir. 2002)(citation omitted.)

227.    A request for reasonable accommodation is an [Section 504]-protected activity. *Id*., at 149. Plaintiff receives protection even if she was not entitled to the reasonable accommodation,

as long as she made her request in good faith. *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir. 2000).

228.   Plaintiff requested for reasonable accommodation of disability regarded by Defendants in or around April 2019, including, but not limited to, fully and equally access to Defendants' program or activity in the same manner as non-disabled peers; and equal educational opportunity in the program or activity at Yale.

229.   One of the accommodations Plaintiff requested were enjoyed by her similarly situated students and employees at Yale.

230.   Nevertheless, Defendants ignored and denied Plaintiff's requested for reasonable accommodation of disability regarded by Defendants and in return retaliated Plaintiff for making such request.

231.   Defendants violated the Section 504 by denying her the accommodation enjoyed by similarly-situated peers. The retaliatory act was by decisions, preferences and conduct of Defendants at Yale.

232.   By failing to comply with the Section 504, Rehabilitation Act of 1973 but in return retaliating Plaintiff for making a request for reasonable accommodation, Defendants have articulated to disabled persons such as Plaintiff that they are subject to injury as a participant at Defendants' program or activity.

233.   As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Section 504, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

234.     Yale's unlawful and retaliatory actions constitute malicious, willful and wanton violations of Section 504, for which Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial but no less than Five Hundred Thousand ($500,000.00).

## ELEVENTH CAUSE OF ACTION
## COUNT ELEVEN:   DISCRIMINATION IN VIOLATION OF TITLE VII OF CIVIL RIGHTS ACT

235.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs designated 1 through 122 with the same force and effect as if fully set forth at length herein.

236.     To establish a prima facie case of discrimination based on race, sex, or national origin, the plaintiff must show that (1) she is a member of a protected class, (2) she was subject to discrimination with respect to her compensation, terms, conditions, or privileges of employment, (3) the discrimination was on the basis of race, (4) the behavior was sufficiently severe or pervasive enough to alter the terms or condition of her employment, and (5) that the employer was liable for the behavior. 42 U.S.C. 2000e-2; *Henson v. City of Dundee*, 682 F.2d 897, 911 (11th Cir. 1982)

237.     Plaintiff was born in the People's Republic of China and Asian-American.

238.     Plaintiff is female.

239.     Defendants discriminated Plaintiff with respect to her compensation, terms, conditions, or privileges of employment. Plaintiff was also subjected to different enforcement of Yale's rules and policies in all aspect of Plaintiff' work and educational environment, concerning her admission, education, and employment at Yale.

240.     Rather than evaluating Plaintiff's work solely on the basis of its intellectual merit and adherence to course or program requirements, Defendants subjected Plaintiff to disparate

treatment and hostile and abusive environment because of Plaintiff's race, sex, and/or national origin, frequently alleging Plaintiff was "a Chinese woman."

241.    Defendants terminated Plaintiff's pay after she complained about discrimination and harassment on the basis of race, sex, and national origin.

242.    Defendants was on notice of the discriminatory conduct against Plaintiff engaged in by faculty and employees at Yale. Yale failed to carry out their duties and obligations pursuant to Title VII to take corrective action.

243.    Yale allowed and fostered an environment in which discriminatory and harassing practices that were, and continue to be, sufficiently severe or pervasive to create an educational environment that is both subjectively and objectively hostile, abusive and retaliatory.

244.    Defendants violated Title VII by creating and allowing a culture of discrimination motivated by race, sex, and national origin to permeate the healthcare service Defendants provide to Plaintiff at Yale Health and all aspects of her work and educational environment at Yale. This hostile and abusive environment was created by decisions, preferences and conduct engaged in by Yale. The severe and pervasive abusive environment was continuous through Plaintiff's enrollment and employment.

245.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages which Plaintiff is entitled to an award to recover.

246.     Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title VII, for which Plaintiff is entitled to an award of punitive damages.

| | |
|---|---|
| | **TWELFTH CAUSE OF ACTION** |
| **COUNT TWELVE:** | **RETALIATION IN VIOLATION OF TITLE VII OF CIVIL RIGHTS ACT** |

247.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs designated 1 through 122 with the same force and effect as if fully set forth at length herein.

248.     To establish a prima facie case of retaliation the Plaintiff must show: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

249.     Plaintiff complained about discrimination and harassment by Professor Vytlacil, Department of Economics, and Graduate School first during her admission in 2014, and numerous times during 2017 and thereafter.

250.     In March 2014, Plaintiff complained about discrimination to the Graduate School in its decision to modify Plaintiff's admission at the School of Environment at Yale.

251.     Since the fall academic term of 2017, Plaintiff made numerous internal complaints about the disparate treatment and gender-based harassment led by Professor Vytlacil, in concert with Department of Economics.

252.     Plaintiff made numerous complaints about Professor Vytlacil's discrimination, sexual harassment and misconduct to the Director of Graduate Studies at the Department of Economics, Professor Yuichi Kitamura, and the Associate Dean of the Graduate School, Richard G. Sleight. But Yale did nothing to stop it.

253.   Between August 2019 and February 2020, Plaintiff made numerous reports and internal grievance to the Associate Dean Sleight at the Graduate School and the Director of Graduate Studies at the Department of Economics, Professor Kitamura, seeking accommodation, intervention, and protection against further discrimination, harassment, and retaliation she received at Yale Health colluding with Professor Vytlacil because Plaintiff complained about discrimination and sexual harassment. Yale took no meaningful action or investigate upon Plaintiff's complaint.

254.   On or about December 4, 2020, Plaintiff filed a written complaint with the Office of Provost at Yale against Defendants' discrimination, sexual harassment, retaliation on the basis of race, sex, and national origin.

255.   On December 22, 2020, the Title IX Office within the Office of Provost confirmed upon the receipt of Plaintiff's Title IX Complaint but chose not to pursue her claim up to this date.

256.   On January 27, 2021, Associate Dean for Academic Support at the Graduate School, Allegra di Bonaventura, sent Plaintiff an email, expelling Plaintiff from her Ph.D. program at Yale without due process.

257.   By the actions detailed above, Defendants retaliated against Plaintiff based on her protected activities in violation of the Title VII by, *inter alia*, ignoring her multiple and repeated protected complaints about the discriminatory treatment she was subjected to, including discrimination that was inflicted subsequent to and in direct connection with her repeated complaints.

258.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of educational and employment opportunities,

humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

259.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title VII, for which Plaintiff is entitled to an award of punitive damages.

## THIRTEENTH CAUSE OF ACTION
**COUNT THIRTEEN:**          **BREACH OF CONTRACT (42 U.S.C. §§ 1981(C) AND 1983)**

260.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs designated 1 through 122 with the same force and effect as if fully set forth at length herein.

261.    Under the common law of Connecticut, a party may repudiate certain types of contracts prior to the time of performance, thereby entitling the non-repudiating party to damages for total breach. *See, e.g., Batter Building Materials Co. v. Kirschner*, 142 Conn. 1 (1954); *Harley v. Indian Spring Land Company*, 123 Conn. App. 800 (2010); *Martin v. Kavanewsky*, 157 Conn. 514 (1969).

262.    "'A positive statement to the promisee that the promisor will not perform his contract constitutes an anticipatory breach which is a total breach of contract.' *Sagamore Corporation v. Willcutt*, 120 Conn. 315, 318, 180 A. 464 (1935); *Wonalancet v. Banfield*, 116 Conn. 582, 586, 165 A. 785 (1933); 4 Corbin, Contracts 959, 973. The defendants' breach excused the plaintiff from further performance. *McCleave v. Flanagan Co.*, 115 Conn. 36, 40, 160 A. 305 (1932); *Segan Construction Corporation v. Nor-West Builders, Inc.*, 274 F. Sup. 691, 697 (D. Conn. 1967); 17 Am. Jur. 2d, Contracts, 448, 449." *Martin v. Kavanewsky*, 157 Conn. 514, 518-19 (1969).

263.    Yale University's "Racially Nondiscriminatory Policy," "Equal Opportunity Statement," Faculty Handbook, March 4, 2015 agreement, February 18, 2017 offer to Plaintiff of a employment and enrollment contract constitute agreement between Yale and Plaintiff.

264.    Yale breached its agreement by failing to perform its obligations pursuant to the agreement between Yale and Plaintiff.

265.    In addition to Yale's nonperformance, Yale's conduct constitutes a total breach of contract by repudiation of any future performance in issuing an official statement to Plaintiff on January 27, 2021, stating "that [Plaintiff is] administratively withdrawn from Yale's Graduate School of Arts and Sciences effective immediately.

266.    As a direct and proximate result of Yale's total breach of contract by repudiation of any future performance to Plaintiff, Plaintiff has suffered and will continue to suffer damages for which she is entitled to recover for a total breach.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for a judgment in her favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate the laws of the United States and the State of Connecticut;

B.    An award of compensatory damages in an amount to be determined at trial;

C.    An award of punitive damages in an amount to be determined at trial;

D.    Temporary injunctive relief to (a) reinstate Plaintiff as a full-time doctoral student in the Department of Economics of the Yale University; (b) enjoin the defendants, upon penalty to be determined by the Court, from using Plaintiff's (regarded) disability against Plaintiff to impede the completion of Plaintiff's doctoral studies in the Department of Economics; (c) enjoin

the defendants, upon penalty to be determined by the Court, from taking any further actions to impede or block Plaintiff's ability to complete her Ph.D. program in Economics; and (d) order specific performance of the contract such that Plaintiff is permitted to finish her doctoral studies;

E.      Injunctive relief requiring the University to (a) take effective steps to prevent sex-based discrimination and harassment, including sexual assault, in its education programs; (b) fully investigate conduct that may constitute sex-based harassment and/or sexual assault; (c) appropriately respond to all conduct that may constitute sex-based harassment and/or sexual assault; (d) treat all victims as complainants and provide such victims with "complainant" rights under Title IX and the University's Policy, regardless of whether the victims want to remain anonymous or pursue a formal investigation; (e) mitigate the effects of harassment and/or assault including by eliminating any hostile environment that may arise from or contribute to it; and (f) make Yale University's place of public accommodation fully accessible so that Plaintiff and other similarly situated can have the full and equal access that the defendants provide to non-disabled peers;

F.      A declaratory judgment that the decision to arbitrarily, administratively withdraw Plaintiff from the Yale University without due process was improper and void;

G.      A declaratory judgment that the actions, conduct, and practices of the defendants violated the racial nondiscriminatory policy of the Yale University with respect to Plaintiff's equal education opportunity and full and equal access to all programs and facilities operated by the University, including but not limited to, the Department of Economics and the student health services at the Yale Health Center;

H.      An award of liquidated damages;

I.      An award of the defendants to pay all medical costs incurred by Plaintiff as a result of from emotional and physical distress, mental anguish, discrimination and harassment she suffered and the failure to accommodate her (regarded) disability;

J.      An award of costs that Plaintiff have incurred in this action, including but not limited to, expert witness fees, as well as Plaintiff's reasonable attorney's fees and costs to the fullest extent permitted by law; and

K.      For such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all issues properly trial by jury in this action.

Respectfully submitted,

BY: Vanessa Wang

Plaintiff, In *Pro Se*
54 Linden Street
New Haven, CT 06511
Phone: (475) 313-9839
vanessa@childlessmotherfoundation.org