## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| V.W. | : | Case No.: 3:22-cv-001156 |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| Yale University; Graduate School of | : | Jury Trial Demanded |
| Arts and Sciences at Yale University; | : | |
| Department of Economics at Yale | : | |
| University; and Edward Vytlacil, Ph.D. | : | |
| In his Individual and Official Capacities, | : | |
| Defendants | : | September 11, 2023 |

## SECOND AMENDED COMPLAINT

Plaintiff V.W. (hereinafter "Plaintiff") in this action against Defendants the Yale University ("University"), Graduate School of Arts and Sciences at the Yale University ("Graduate School"), Department of Economics at the Yale University ("Department of Economics"), and Professor Edward Vytlacil, Ph.D. in his official and individual capacities (together, "Yale") (collectively "Defendants"), hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      This lawsuit arises out of a pattern and practice of discrimination, harassment, and disparate treatment based on race, sex, national origin, and perceived disability perpetrated by Defendants against the Plaintiff by her former school and employer, Yale. The discrimination and retaliation have been permitted to exist and involve a continuing course of conduct dating from the very beginning of Plaintiff's admission to a graduate program at Yale in 2015 until the present date.

2.     As part of its core values, Yale claims, "Yale University's mission is to create, disseminate, and preserve knowledge through research and teaching." See the Academic Freedom and Faculty Standards of Conduct of Yale University's Faculty Handbook, p.5.

3.     As part of its oaths and promises to the world, Yale's Equal Opportunity Statement is made known to all segments of the general community serviced by the University. It is included in catalogues and brochures dealing with student admissions, programs and scholarships of the University as well as on its website which are all available to the general public. Yale University's Equal Opportunity Statement: "…the University is committed to basing judgments concerning the admission, education, and employment of individuals upon their qualifications and abilities and affirmatively seeks to attract to its faculty, staff, and student body qualified persons of diverse backgrounds. In accordance with this policy and as delineated by federal and Connecticut law, Yale does not discriminate in admissions, education programs, or employment against any individual on account of that individual's sex, race, color, religion, age, disability, status as a veteran, or national or ethnic origin; nor does Yale discriminate on the basis of sexual orientation or gender identity or expression. University policy is committed to affirmative action under law in employment of women, minority group members, individuals with disabilities, and protected veterans," published in its annual Return of Organization Exempt From Income Tax, Form 990, filed with the Internal Revenue Service, U.S. Department of the Treasury, open to public inspection. See, for example, Yale University's Tax Year 2020 Form 990 online at https://apps.irs.gov/pub/epostcard/cor/060646973_202006_990_2021052618203257.pdf.

4.     In addition, between 2016 and 2020, Yale University annually certified, under penalty of perjury, compliance with the applicable requirements of "Racially Nondiscriminatory Policy" for its qualification as an exempt corporation under 26 U.S. Code § 501(c)(3) as an

educational organization within the meaning of 26 U.S. Code § 170(b)(1)(A)(ii). Unfortunately, such oaths and promises contradict what has been going on at Yale.

5.     As detailed below, Yale University failed its oaths and promises by its knowing discrimination against Plaintiff and by its knowing participation and ratification of discrimination and harassment toward Plaintiff that created a hostile work and educational environment where Yale's employees are so emboldened as to engage in flagrant discrimination and retaliation against the Plaintiff. Some of the acts committed by Yale employees include sexual assault, battery, threats, invasion of privacy, and wrongful involuntary commitment.

6.     Behind Yale University's veneer of prestige and privilege lies a troubling pattern and practice wherein the voices of women within its student body, professors and employee ranks who courageously come forward with complaints of sexual harassment against men in positions of power are suppressed and ignored.

7.     Under Yale's unspoken policy of protecting abusers, powerful men at Yale University are repeatedly given "passes" and the "benefit of the doubt" when the victims of their sexual misconduct come forward, whereas their victims are forced to go through hoops just to obtain a modicum of justice. Through this pattern and practice of deliberate indifference, Yale University intends to send a message that the University will not stand behind those who have been innocently victimized by persons in power; instead, it will favor and protect the powerful who most contribute to the University's prestige and fortune.

8.     Commencing upon December 30, 2014, in return for Plaintiff's entrustment to Yale with her educational and professional fulfillment, Yale University subjected Plaintiff to blatant discriminatory and retaliatory acts, with vicious discrimination, harassment, intimidation, and retaliation, led by Professor Vytlacil, colluding with some of Yale's other employees.

9.      Perhaps most disturbingly, despite receiving multiple complaints about Professor Vytlacil's unlawful harassing behavior since the start of Plaintiff's admission at Yale University, Yale took no meaningful action against Professor Vytlacil. Plaintiff's voice for "zero tolerance of sexual harassment and discrimination" was, however, met with retaliation at Yale, which supports a workplace and educational environment that protects the perpetrators and victimizes the victims.

10.     Accordingly, in this action, Plaintiff seeks monetary damages and equitable relief to redress the Defendants' injuries to the Plaintiff. This complaint seeks redress for the Defendants' ongoing unlawful discrimination on the basis of race, sex, national origin, disability, record of disability, and/or because the Defendants regarded Plaintiff as disabled. Further, the Plaintiff seeks compensation for the deprivation of her educational opportunities and the loss of income from Yale's bad faith breach of its employment agreement with Plaintiff. Finally, the Plaintiff seeks compensation for her wrongful termination in violation of public policy in Connecticut and for intentional infliction of emotional distress.

11.     The causes of action alleged herein by the Plaintiff include the following claims as against Defendants: (1) violation of Title VII of the Civil Rights Act as amended, 42 U.S.C. § 2000e *et seq*. based on race and national origin ("Title VII"); (2) retaliation in violation of Title VII for reporting discrimination; (3) violations of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. §46a-60(a) based on race and national origin (hereafter, "CFEPA"); (4) discrimination based on race against Professor Vytlacil pursuant to 42 U.S.C. § 1981; (5) sexual harassment based on hostile environment pursuant to Title VII; (6) sexual harassment based on hostile environment pursuant to CFEPA; (7) violations of the Americans with Disabilities Act as amended, ("ADA") 42 U.S.C. § 12101 *et seq*. based on disparate treatment and disparate impact; (8) violations of the CFEPA based on disparate treatment and disparate impact; (9) retaliation in

violation of the ADA and CFEPA for reporting disability discrimination; (10) violations of Title VI of the Civil Rights Act as amended, ("Title VI") 42 U.S.C. § 2000d *et seq*.; (11) violations of Title IX of the Education Amendments of 1972 as amended, ("Title IX") 20 U.S.C. § 1681 *et seq*.; (12) retaliation in violation of Title VI and Title IX; (13) breach of contract pursuant to Connecticut common law; (14) breach of the implied covenant of good faith and fair dealing pursuant to Connecticut common law; (15) wrongful termination in violation of public policy pursuant to Connecticut common law; (16) intentional infliction of emotional distress pursuant to Connecticut common law; (17) civil assault and battery as against Professor Vytlacil and Yale pursuant to Connecticut common law.

12.     Defendants own, lease, operate or control a place of public accommodation within the meaning of the ADA, 42 U.S.C. § 12181 (7)(j). Yale University, with its principal place of business located in the City of New Haven and the County of New Haven, Connecticut, operates a program or activity within the meaning of (1) Section 504, Rehabilitation Act of 1973, 29 U.S.C. § 794(b)(3)(A)(ii), (2) Title VI of the Civil Rights Act of 1964, ("Title VI") 42 U.S.C. § 2000d-4a(3)(A)(ii), and (3) Title IX of the Education Amendments of 1972, 20 U.S.C. § 1687(3)(A)(ii). Yale further qualifies as an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b); and has violated and is violating the above-mentioned laws.

13.     Defendants have also violated public policy in connection with the termination of Plaintiff from her position in that they have violated the Family Educational Rights and Privacy Act of 1974 as amended, ("FERPA") 20 U.S.C. § 1232g, and Conn. General Statutes §§ 52-146d to 52-146j, 53a-180d and 17a-504 by willfully and maliciously causing, or attempting to cause, or conspiring with other persons to cause, Plaintiff who does not have psychiatric disabilities to be committed to the Yale New Haven Hospital, Inc. and Yale Health for psychiatric disabilities.

**ADMINISTRATIVE REQUIREMENTS**

14.     On or about December 4, 2020, Plaintiff filed a complaint with the Office of Provost at Yale University against Defendants alleging violations of the Title IX of the Education Amendments of 1972 as amended, ("Title IX") 20 U.S.C. § 1681 *et seq.* and Title VI as amended, 42 U.S.C. § 2000d *et seq.* (hereinafter "Title IX Complaint"). On December 22, 2020, the Title IX Office within the Office of Provost confirmed the receipt of Plaintiff's Title IX Complaint but chose not to pursue her claim up to this date.

15.     Plaintiff's Title IX Complaint was simultaneously filed with the U.S. Department of Education, Office for Civil Rights ("OCR"). The OCR dismissed Plaintiff's Complaint on December 23, 2020. Plaintiff appealed the OCR's decision of dismissal on February 7, 2021. The OCR dismissed Plaintiff's appeal on February 24, 2021.

16.     On or about February 16, 2022, Plaintiff filed charges of discrimination in three separate complaints with the Connecticut Commission on Human Rights and Opportunities ("CHRO") against Defendants, respectively, alleging, *inter alia*, violations of the (1) ADA as amended; (2) Title VI; (3) Title VII; (4) Title IX as amended; and (5) CFEPA.

17.     These CHRO charges were dual filed with the Equal Employment Opportunity Commission ("EEOC") alleging violations of the above-mentioned laws against Defendants.

18.     Plaintiff has received three Releases of Jurisdiction from the CHRO on June 14, 2022 (attached as Exhibit "A") and received two Notices of Right to Sue from the EEOC on June 22, 2022 and August 3, 2022, respectively (attached as Exhibit "B") regarding her charges of discrimination against Defendants.

19.     Any and all other prerequisites to the filing of this suit have been met.

**JURISDICTION AND VENUE**

20.     This court has subject matter jurisdiction over this matter pursuant to 42 U.S.C. §§ 1981, 12188, 2000d *et seq*., and 2000e *et seq*., and 28 U.S.C. §§ 1331, 1332, and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under 42 U.S.C. §§ 1981, the ADA, Titles VI and VII the Civil Rights Act of 1964, and Title IX of the Education Amendments Act of 1972.

21.     Plaintiff also asserts the supplemental jurisdiction of the court for state statutory claims pursuant to the CFEPA, Conn. General Statutes § 46a-51 *et seq*. Further, supplemental jurisdiction is asserted over the Plaintiff's common law claims. Federal supplemental jurisdiction is asserted pursuant to 28 U.S.C. § 1367.

22.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because Yale maintains its principal executive office in this District, and a substantial part of the acts or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

23.     By reason of the continuous and ongoing nature of the below-described harassment, discrimination, and retaliatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

## PARTIES

24.     Plaintiff is an adult resident of New Haven, Connecticut and Queens, New York.

25.     Initials are used in the caption of this action to preserve the confidentiality of Plaintiff in conformity with the privacy provisions of the Family Educational and Privacy Rights Act, 20 U.S.C § 1232g(b) and Conn. General Statutes §§ 52-146d to 52-146j.

26.     Plaintiff was born in the People's Republic of China, moved to the United States in 2006, and obtained United States citizenship in 2010.

27.    Yale University is a nonstock corporation principally engaged in the business of providing higher education with its principal place of business located in the City of New Haven and the County of New Haven, Connecticut.

28.    Yale University operates the Yale Graduate School of Arts and Sciences ("Graduate School"), and the School of the Environment, as well as twelve other schools that all together compose Yale University. "[Graduate School] educates graduate students to seek answers to life's most challenging questions by leading in the advancement, application, and preservation of knowledge. [Graduate School] carry out this mission by investing in and drawing upon the strengths of a collaborative, diverse, and inclusive community of scholars and researchers." *See* Exhibit "C" Graduate School of Arts and Sciences Programs and Policies 2022-2023 on Mission Statement. The Graduate School operates "the fifty-eight departments and programs that offer courses of study leading to the Ph.D. degree," and the Department of Economics is one among them. Defendants Yale, Graduate School, and Department are jointly and separately an "educational institution" within the meaning of 20 U.S.C. § 1681 (c).

29.    At all relevant times, Defendant Yale has enrolled Plaintiff in its education program or activity, has employed Plaintiff in its educational institution, controls and has controlled the terms and conditions of Plaintiff's enrollment and employment, and qualifies as an educational institution and as an employer and/or joint employer under all relevant statutes.

30.    Yale University operates Yale Health and works in conjunction with the Yale School of Medicine and Yale New Haven Hospital, Inc., to provide student health services on campus. Through Yale Health, Yale University provides its enrolled students the health care coverage and services as both an insurer and healthcare provider.

31.     Yale University was an exempt corporation in the calendar year 2019 under 26 U.S. Code § 501(c)(3) as an educational organization within the meaning of 26 U.S. Code § 170(b)(1)(A)(ii) and subject to the qualification, publicity, and compliance requirement of a "Racially Nondiscriminatory Policy" in Yale's charter, bylaws, or other governing instruments, or in a resolution of its governing body as required by the Internal Revenue Service, U.S. Department of the Treasury, to be eligible to receive charitable contributions deductible from income taxes under §§ 170(a)(1) and (c)(2) of the Internal Revenue Code, 26 U.S.C. § 170(a)(1) and (c)(2). Rev. Proc. 75-50, 1975-2 Cum. Bull. 587.

32.     Yale University receives federal financial assistance and is subject to the (1) ADA; (2) Title VI; (3) Title VII; (4) Title IX; and (5) FERPA as amended, and 20 U.S.C. § 1232g.

33.     Beth Grunschel, M.D., ("Dr. Grunschel") was employed as an employee in the Office of Student Mental Health & Counseling at the Yale Health between April 2019 and February 2020. According to Dr. Grunschel's "biography" on the website of the Yale School of Medicine, Dr. Grunschel is employed as a faculty or employee at the Yale School of Medicine specializing in psychiatry, and at all times herein was acting in her capacity as an agent of Yale acting within the scope and authority of her employment with Yale. Dr. Grunschel is licensed as a physician in the State of Connecticut and an adult resident of Trumbull, Connecticut. Yale is vicariously liable for all of the actions of Dr. Grunschel set forth herein.

34.     Defendant Professor Vytlacil, Ph.D., is an adult resident of Hamden, Connecticut. Defendant is and has been employed as "Professor of Economics" at the Department of Economics at Yale University since about September 1, 2015 and thereafter, and at all times herein was acting in his capacity as an employee, agent, and servant of Yale. At all times relevant herein Professor Vytlacil was acting within the scope and authority of his employment at Yale and was at all times

acting as an agent, servant, or employee of Yale. Yale is liable for all of the misconduct committed by Professor Vytlacil as set forth herein.

35.     Plaintiff's relationship to Professor Vytlacil is further defined in a Judgment of Divorce entered in the Supreme Court of the State of New York, County of New York, on September 10, 2015, *Cooper, J.* (hereinafter referred to as the "Foreign Matrimonial Judgment" in accordance with Conn. General Statutes §§ 46b-70 to 46b-75). Plaintiff and Defendant Vytlacil were married in 2014 and divorced in 2015 pursuant to a Settlement Agreement. Vytlacil executed the Settlement Agreement on June 18, 2015, and thereafter. The Settlement Agreement was filed, certified, and registered in the Superior Court of New Haven in the State of Connecticut on May 7, 2019.

## FACTS RELEVANT TO ALL COUNTS

**I.     Yale University's Troubling History of Protecting Male Professors in Position of Power Accused of Sexual Harassment**

36.     Despite being considered as one of the top universities in the world, Yale University has a disturbing history of doing shockingly little to address or prevent the perpetration of sexual harassment and misconduct against female students and subordinates by male professors and faculty in positions of power, which has allowed and encouraged misconduct to continue, resulting in a harassing and hostile workplace and educational environment.

37.     Even more alarming, and despite what has obviously been mere "lip service" by administrators about how the University is "dedicate[ed to] eradicate[ing] sexual misconduct at Yale," the University has displayed a well-chronicled pattern and practice of failing to take complaints of sexual harassment seriously. See *Castro v. Yale University*, 3:20-cv-00330-JBA, Dkt. No. 44 (Amended Complaint), at ¶¶ 38-39.

38.     Instead, the default practice at Yale University has been to rush to the defense of perpetrators of sexual misconduct, to offer them the institutional protection within Yale, rather than applying policy or measures on the books to hold them accountable, especially those who generate revenue and grants for the University.

39.     Simply put, Yale University has a record of prioritizing revenues over the rights of its female workforce and student body, and of unfairly protecting powerful male harassers at the expense of their innocent female victims. *Id*., ¶ 41.

40.     For example, Manuel Lopes Fontes, M.D., a professor at the Yale School of Medicine and the Vice Chair of Diversity, Equity and Inclusion at Yale was sued in 2020 by six female subordinates who accused him of sexual harassment, and the University of doing nothing to stop him. See *Castro v. Yale University*, *et al*., 3:20-cv-00330 (JBA), Dkt. No. 1 (Complaint).

41.     Similarly, Gilbert I. Bond, Ph.D., a male professor at the Yale School of Divinity was sued in 2004 by a female teaching fellow who complained about his gender discrimination and sexual harassment, and the University' taking no measures upon her complaint or to stop the perpetration of sexual harassment. See *Urie, v. Yale University,* 3:04-cv-00094 (RNC), Dkt. No. 1 (Complaint), at ¶¶ 7-27.

42.     Also, the School of Drama at Yale was sued in 2005 by a female graduate student who complained about sexual harassment and the Chair of the School did nothing about her complaint but ratified sexual discrimination and harassment by asking her to "seek psychiatric help" and eventually expelling her from the graduate studies program at Yale. See *Greenhouse v. Yale University*, 3:05-cv-01429 (AHN), Dkt. No. 1 (Complaint), at ¶¶ 7-9.

43.     Yale University was sued in 2006 by a female Research Assistant who worked under one male Scientist supervisor in a laboratory at Yale for discrimination, sexual harassment,

and retaliation while Yale took no meaningful action on her complaint but rather forced her to take sick leave without pay, see a physician at Yale, then similarly terminated her position. See *Sangan v. Yale University, et al.*, 3:06-cv-00587 (PCD), Dkt No. 1 (Exhibit A, Complaint), Pp. 7-14.

44.    The current Chair of the Pharmacology Department at Yale University, Joseph Schlessinger, M.D., was sued in 2006 by a former secretary who accused him of sexual misconduct, and the University for doing nothing to stop him.

45.    Likewise, in 2015, two federal lawsuits were filed against Rex Mahnensmith, M.D., a Professor of Nephrology and director of an affiliated clinic at Yale University, accusing him of sexually harassing certain female clinic employees, yet Yale of doing nothing to stop it. See *Castro v. Yale University*, 3:20-cv-00330 (JBA), Dkt. No. 1 (Complaint), at ¶¶ 40-43.

46.    Recently, Eugene Richmond, M.D., a Yale University Professor of Psychiatry and decades-long member of the Yale University School of Medicine faculty, was determined by an independent investigator to have sexually assaulted at least five Yale University students and sexually harassed at least eight students over a period of 25 years. The alleged assaults took place in a bedroom Dr. Richmond required students to share with him at a research facility on the Caribbean Island of St. Kitts. However, Yale University, knowing the alleged sexual misconduct, did nothing to ensure that Dr. Richmond no longer brought students to his Caribbean facility, allowing the assault to continue for years. *Id.*, ¶¶ 44-46.

47.    In fact, a 2015 survey by the Association of American Universities (AAU) found that between 13.3% and 53.9% of women in graduate or professional programs at Yale University have been subject to sexual assault and sexual harassment, respectively; and that 29.5% of women in graduate or professional programs at Yale University experienced sexual harassment by a Yale

faculty member. Yale's figure is much higher than the average rate of sexual misconduct as compared to other similar institutions.

48.    Moreover, over half of female students (53.9%) in graduate or professional programs at Yale University experienced one or more sexually harassing behaviors, but only 5.7% of women reported these behaviors, which speaks to the higher barriers to reporting at Yale and lack of efficacy of Yale's reporting resources. *Id.*, at p. 9.

49.    Unsurprisingly, the 2019 survey by the AAU shows a systematically increasing pattern of sexual assault and sexual harassment at Yale University comparing to the 2015 AAU survey. 74.9% of women in graduate or professional programs at Yale University have experienced one or more sexually harassing behaviors, comparing to the 53.9% in the 2015 survey.

50.    Clearly, Yale University has exhibited a pattern and practice of failing to effectively address and prevent sexual harassment and sexual misconduct on its campus. One of the problems as above-described is Yale University's troubling pattern and history of suppressing the voices of women within its student body, professor, and employee ranks who courageously come forward with complaints of sexual harassment against men in positions of power by (1) deeming those women to need "psychiatric help" or "see a physician," (2) taking advantage of its internal health service at the Yale Health on campus and affiliated Yale New Haven Hospital, Inc. to support its bogus claims of psychiatric problems with women who complain of sexual harassment, then (3) using the medical condition of a complainant to discharge the complaint and/or complainant from Yale without providing accommodation, intervention, or remedy to those who come forward. This troubling pattern might have contributed to its endemic problem of sexual harassment and sexual misconduct on-going at Yale.

51.     For example, a Yale employee who worked at the New Haven Mental Health Outreach for Mothers program at Yale funded with a $2.5 million five-year federal grant sued Yale in 2015 for refusing to provide her with a reasonable accommodation of her disability. See *Wilson v. Yale University*, 3:15-cv-00207 (RAR), Dkt No. 1 (Complaint), ¶¶ 1-14.

52.     Most recently, a class action was filed against Yale, because "Yale have treated unequally and failed to accommodate students with mental health disabilities, including by modifying policies, in violation of federal law." "Yale's withdrawal policies and practices push students with mental health disabilities out of Yale, impose punitive consequences on students who have withdrawn, and place unreasonable burdens on students who, after a withdrawal, seek reinstatement." "The impact of Yale's discriminatory policies is harshest on students with mental health disabilities from less privileged backgrounds, including students of color, students from poor families or rural areas, and international students." See *Elis for Rachael, Inc. et al v. Yale University et al*, 3:22-cv-01517 (MPS), Dkt No. 1 (Complaint), ¶¶ 1-6.

53.     In addition to the endemic sex-based discrimination and harassment at Yale and Yale's unlawful policy and practice in denying accommodation of disability, "[f]or at least 50 years, Defendant Yale University (Yale) has intentionally subjected applicants to Yale College to discrimination on the grounds of race and national origin. (Hereinafter, references to 'race' include 'national origin.') For the last few decades, Yale's oversized, standardless, intentional use of race has subjected domestic, non-transfer applicants to Yale College to discrimination on the ground of race." "Yale's race discrimination includes imposing undue and unlawful penalties on racially-disfavored applicants, including in particular most Asian, and White applicants." *See USA v. Yale University*, 3:20-cv-01534 (CSH), Dkt No. 1 (Complaint), ¶¶ 2-3.

54.     "Yale has engaged in this race discrimination despite receiving millions of dollars of federal taxpayer funding subject to Title VI's restrictions. Yale's race discrimination violates Title VI's requirement that '[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.' 42 U.S.C. § 2000d." *Id.,* ¶4.

55.     "In 2016, the United States Department of Justice received a complaint from a coalition of over 130 Asian-American organizations alleging that Yale discriminates against Asians in Yale's undergraduate admissions to Yale College. On August 13, 2020, the United States notified Yale that Yale was in violation of Title VI." *Id.,* ¶ 35.

## II.   Relevant Facts Since September 2007

56.     Between September 2007 and May 2008, Plaintiff enrolled as a non-degree student taking courses at the Yale School of the Environment (formerly the School of Forestry and Environmental Studies) within the Graduate School at Yale for one academic year.

57.     In the Fall Semester ("Fall") of 2008, beginning on or about September 1, 2008, Plaintiff enrolled in a master's degree program in the University of Connecticut with full scholarship and stipend award. Plaintiff completed her program in December 2009 with a degree of Master of Arts in Economics.

58.     Professor Vytlacil previously held a faculty position in the Department of Economics at Yale between Fall 2008 and Spring Semester ("Spring") of 2012, then left his position at Yale and went to the New York University starting in Fall 2012.

59.     Plaintiff and Professor Vytlacil met in late 2008, started dating around October 2012, married in April 2013 in New York, New York, separated in April 2014, and commenced a divorce action in May 2014. Plaintiff and Professor Vytlacil settled and resolved the issues raised

in the divorce action by the Settlement Agreement dated June 18, 2015 and the Foreign Matrimonial Judgment was entered in the Supreme Court of the State of New York, County of New York, on September 10, 2015.

60.    Four months prior to the separation between Plaintiff and Professor Vytlacil, Plaintiff gave birth to a daughter ("Daughter") in December 2013. According to the New York divorce decree and its incorporated, *but not merged into*, Settlement Agreement, Plaintiff is the primary custodian of the Daughter and shares joint legal custody with Professor Vytlacil.

### III.    Discrimination, Harassment, and Retaliation Against Plaintiff Commencing Upon Plaintiff's Admission to Yale

61.    In early October, 2014, Plaintiff started applying for the doctoral-degree/Ph.D. program in the field of Environmental and Resource Policy at the Yale School of the Environment within the Graduate School for the admission in the academic year of 2015-2016 and submitted her complete application on December 30, 2014 online through the Graduate School's application management website. In her application, Plaintiff expressed her career goal in becoming a research and teaching faculty/professor in this field. Plaintiff also stated in her application that she will be pursuing a joint J.D. degree in Law.

62.    During February 2015, knowing that Plaintiff had applied for the doctoral-degree program at Yale, amid the divorce action between Plaintiff and Professor Vytlacil, Professor Vytlacil attempted to get a job offer from the Department of Economics at Yale where he left after Spring 2012.

63.    Professor Vytlacil, through Professor Dirk Bergemann, Chair of the Economics Department, deliberately interfered in the Plaintiff's admission process into the doctoral program. Professor Vytlacil informed the Graduate School that Plaintiff had a new-born child who was still

nursing, which caused the Graduate School to discriminatorily intervene with the admission's decision at the School of Environment, on the basis of her sex and parenting student status.

64.     In an email dated January 28, 2015, Professor Vytlacil wrote to Plaintiff: "I have told the Yale economics chair that you are applying to Yale Forestry, and that it would greatly increase the chances of me moving to Yale if you were to be accepted." Professor Vytlacil further stated that he had told the Yale economics chair that he and Plaintiff will require daycare for their child.

65.     On September 24, 2019, in a family law proceeding between Vytlacil and Plaintiff, Professor Vytlacil admitted to interfering with Plaintiff's application to Yale University. Vytlacil stated that he wanted to move back to the University and would not do so without Plaintiff. Vytlacil also stated that he acted so Plaintiff could be admitted to Yale's master's degree program in Economics.

66.     This deliberate interference with Plaintiff's graduate admissions was the start of what would become a continuing course of conduct of hostile and discriminatory actions contributing to a hostile environment for the Plaintiff at Yale based on sex.

67.     Professor Vytlacil engaged in these interventions to foster actual or apparent intimacy between Plaintiff and himself which was unwelcome attention based on sex. Further, Professor Vytlacil tried to create an impression that he was intimate or still involved with Plaintiff although they were in fact in divorce proceedings.

68.     On February 16, 2015, months after Plaintiff submitted her application, the Chair of the Department of Economics at that time, Professor Dirk Bergemann, asked Plaintiff by email, with Professor Vytlacil acting as an intermediary, to provide him Plaintiff's application materials for the doctoral-degree program at the School of the Environment.

69.     Plaintiff was hesitant and did not want to provide Professor Bergemann her application, however Professor Vytlacil pressured Plaintiff to do so while the two were undergoing hostile divorce proceedings.

70.     On March 4, 2015, Professor Dirk Bergemann stated in an email to Plaintiff that the involvement of the Department of Economics and Graduate School with Plaintiff's application for the doctoral-degree program at the School of Environment had caused the Admission Committee at the School of Environment to modify its decision to admit the Plaintiff into the Ph.D. program. The email states, "[t]he Graduate School, rather than the Forestry School, was not inclined to admit [Plaintiff] to the Ph.D., mostly based on certain weaknesses in the application documents." Upon information and belief, the "weaknesses" were not perceived by the School of Environment and Plaintiff would have been admitted but for the Graduate School's, School of Economic's, Bergemann's and Vytlacil's interference.

71.     The modification that resulted from Professor Vytlacil's discriminatory interference was that instead of directly admitting Plaintiff into the doctoral-degree program as already decided by the Admission Committee at the School of Environment, the Graduate School offered Plaintiff an admission that required Plaintiff first complete the Master of Environmental Science program and then transfer to the Ph.D. program at the School of Environment. Plaintiff's agreement with Yale dated March 4, 2015 upon her admission into the master's program was that Plaintiff shall transfer her study in the master's degree program to the doctoral degree program so that she shall not have to repeat "all requisite Ph.D. coursework, after completion of the master's degree program." Plaintiff started her enrollment at the Yale School of Environment on or about September 1, 2015. The agreement also included Plaintiff "will be awarded a fellowship and health

insurance during the masters, and then of course after the transfer into the PhD program this arrangement would continue."

72.    During Plaintiff's two-year studies at the School between 2015 and 2017, the members in the Admission Committee at the School confirmed with Plaintiff that the Committee had already decided to directly admit Plaintiff to its doctoral-degree program in the academic year of 2015-2016, but that the Graduate School intervened after the Department of Economics contacted the Graduate School about her application. Hence, the Committee changed Plaintiff's admission decision from directly admitting her into its Ph.D. program to first enrolling her in the master's degree program and then transferring her enrollment to its Ph.D. program.

73.    On or around December 11, 2019, Matthew Kotchen, School of Environment Associate Dean of Academic Affairs, told Plaintiff that the School of Environment recommended Plaintiff for admission to its Ph.D. program in 2015, but the Graduate School intervened after the Department of Economics contacted the Graduate School. Joanne DeBernardo, Assistant Dean of Student Services at Yale School of Environment, and Rosanne Stoddard, Registrar at Yale School of Environment, likewise told Plaintiff of the School of Environment's initial decision and the Graduate School's and Department of Economics' interference.

74.    This change in admissions status for the Plaintiff was caused directly by Professor Vytlacil's discrimination based on Plaintiff's race, gender, and parenting student status. Professor Vytlacil was able to accomplish this direct discrimination by means of his influence within the Department as a returning Professor.

75.    Plaintiff was notified of the admission decision by an email sent to her from Professor Dirk Bergemann, the Chair of the Department of Economics, dated March 4, 2015.

76.    Plaintiff received another email confirming the admission decision by a member in the Admission Committee at the School of the Environment, as well as the member's explanation of the decision of admission into the Ph.D. program was changed due to the involvement of Department of Economics and the Graduate School. On February 26, 2016, Professor Robert Mendelsohn, Plaintiff's advisor at the School of Environment, told Plaintiff by email that "[i]t was not the [School of Environment] that decided not to admit [Plaintiff]. To the contrary, [School of Environment] recommended [Plaintiff] for admission into the Ph.D. program in 2015, but the Graduate School intervened because the Department of Economics contacted them about [Plaintiff's] application."

77.    In the three consecutive years of 2014, 2015, and 2016, between Fall 2014 and Fall 2016, Plaintiff applied for the Ph.D. program at the School of the Environment, and submitted three complete applications, respectively each year, online through the Graduate School's application management website.

78.    However, in late February 2017, the Graduate School breached its March 4, 2015 agreement with Plaintiff by refusing to transfer her enrollment to the Ph.D. program at the School of the Environment, instead transferring her application for the Ph.D. program at the School of the Environment to the Department of Economics where Professor Vytlacil was employed as a faculty. No reason was given to Plaintiff for the transfer of her application to the Department of Economics. Plaintiff was more than qualified for admittance to the Ph.D. program at the School of Environment as she was already qualified in 2015 and subsequently earned a master's degree in environmental science from the University.

79.    Upon information and belief, the decision to deny Plaintiff admission in the Ph.D. program at the School of Environment and the transfer of her application to the Department of

Economics was done because the Graduate School was led to believe by Professor Vytlacil that Plaintiff, as a single "Chinese" mother with a young daughter, would be incapable of completing the Department of Environment Ph.D. program. Upon information and belief, this was also done by Professor Vytlacil so he could assert further control over Plaintiff and have an increased ability to harass Plaintiff.

80.    Graduate School announced its official policy in 2017 that the administration of the Graduate School shall not interfere with the decision of the Ph.D. program admission within each academic department. The involvement and manipulation of the Graduate School and Department of Economics with Plaintiff's education program and enrollment at the School of Environment was in violation of the Graduate School's policy.

81.    In addition, Graduate School first breached its March 4, 2015 agreement with Plaintiff by requiring her to re-take the requisite Ph.D. coursework in the Department of Economics which Plaintiff had completed in the School of Environment between 2015 and 2017 for her preparation towards the Ph.D. degree, even after Plaintiff's completion of her master's degree program at the School of the Environment in May 2017. Plaintiff was required to take all the requisite coursework for the Ph.D. program in the Department of Economics. On February 22, 2018, Yale Graduate School refused to honor eleven among fifteen courses Plaintiff took at the School of Environment between Fall 2015 and Spring 2017 and insisted that Plaintiff must spend the first two years of the Ph.D. program continuing coursework instead of working on her dissertation research.

82.    The March 4, 2015 agreement upon Plaintiff's admission at Yale was that she shall transfer her study in the master's degree program to the doctoral degree program, specifying that

Plaintiff shall not have to repeat "all requisite Ph.D. coursework, after completion of the master's degree program."

83.    Because of this requirement of repeating "all requisite Ph.D. coursework" in the Department of Economics after Plaintiff had completed her requisite Ph.D. coursework in the School of Environment at Yale, Plaintiff declined her enrollment at the law school she was admitted to in New York and decided to re-apply to law school after she met the requisite Ph.D. coursework at the Department of Economics at Yale.

84.    Due to Professor Vytlacil's sexual harassment and manipulation, through the Department of Economics and Graduate School, in Plaintiff's education program and activity at the School of the Environment since her admission in February 2015, she was treated unfairly by Yale, on the basis of her sex and parenting student status.

85.    Not only Plaintiff was required to repeat the requisite Ph.D. coursework twice more than a similarly-situated student/employee at Yale, her pay was reduced and less than a similarly-situated peer. A standard stipend income for a Ph.D. student at Yale was $38,000 annually. Because the Graduate School and Department of Economics discriminated against Plaintiff upon her admission on the basis of sex and parenting student status, her stipend was reduced to $15,000 per year between September 2015 and May 2017.

86.    Additionally, Plaintiff received zero (0) income during the summer of 2017, while Yale refused to allow her to remain in the School of Environment, interrupting her continuing education program and activity at the School of Environment, but transferred her to the Department of Economics that enrolled incoming first year Ph.D. students starting in Fall 2017. However, a similarly-situated Ph.D. student/employee who continues its enrollment at Yale receives stipend/wage income during summer recess. Because of the disparate treatment Plaintiff received

by the Graduate School and Department of Economics, she suffered loss of educational opportunity and income, since September 2015, starting upon her admission to Yale.

**IV.    Discrimination, Harassment, and Retaliation Against Plaintiff During Plaintiff's Enrollment in the Department of Economics Since Fall 2017**

87.    On or around September 1, 2017, Plaintiff enrolled in the doctoral degree program as a first-year Ph.D. student at the Department of Economics and her stipend was recovered to a standard pay of $38,000 annually. Plaintiff enrolled in the Ph.D. program at the Department of Economics despite not applying to it because of her desire to obtain a career in academia. Plaintiff believed her only option to work in academia was to enroll in the Economics program despite it not being within the environmental science field. If not for the Graduate School's, School of Economic's, Professor Bergemann's, and Professor Vytlacil's interference, Plaintiff would have completed all required coursework and would have been working on her Ph.D. dissertation in the School of Environment at this time. Instead, Plaintiff was required to continue taking coursework for the next two years.

88.    Since the beginning of Plaintiff's enrollment at Yale in Fall 2015, on or about September 1, 2015, she made numerous internal complaints about the disparate treatment, sexually hostile work environment, and gender-based harassment led by Professor Vytlacil, in concert with the Department of Economics and Graduate School. But Yale did nothing in response to Plaintiff's complaints.

89.    Upon Plaintiff's completion of the master's degree program at the School of the Environment in May 2017, she was left no choice but to continue her doctoral-degree program at the Department of Economics which she had never applied for and simultaneously to be subject to Professor Vytlacil's discriminatory and harassing conduct at the Department. Yale did nothing to intervene but permitted such misconduct to continue for years.

90.     Professor Vytlacil's conduct which was harassing and intimidating and which contributed to Plaintiff's hostile environment based on sex included the following:

(a)     creating an impression among faculty and staff at the Department of Economics that there was an on-going intimate relationship between Plaintiff and Defendant;

(b)     referring to Plaintiff's mother as "my mother in law" in front of faculty, students and staff to illustrate that Plaintiff and Defendant are intimate or "together;"

(c)     improperly surveilling the Plaintiff within the Department of Economics by tracking her activities by seeking reports on Plaintiff's activities from other faculty and graduate students;

(d)     stalking Plaintiff at her home and making false police reports about her to harass and intimidate her and to disrupt her course work;

(e)     pressuring and coercing Plaintiff into accompanying him on a vacation to Maine although she had no desire to attend; and

(f)     intimidating Plaintiff into accompanying him on an out of state vacation during which he sexually assaulted the Plaintiff.

91.     Because Yale did nothing to stop the discrimination and sexual harassment against Plaintiff, notwithstanding multiple complaints of the misconduct to Yale, the hostile environment towards her created by Defendant Professor Vytlacil under "the unequal institutional power inherent in the relationship between faculty member and student" continuously worsened after Plaintiff's enrollment at the Department of Economics.

**V.     Discrimination, Harassment, and Retaliation against Plaintiff, in Concert with Professor Vytlacil, by Yale Health During Plaintiff's Enrollment in the Department**

92.     In January 2019, upon completing all requisite Ph.D. coursework at the Department of Economics, Plaintiff began to re-apply for law schools in pursuing the joint Juris Doctor in law and Ph.D. degree.

93.     On March 27, 2019, at 9:33 a.m., the following morning after Professor Vytlacil came back from a two-week trip to China, Professor Vytlacil intentionally stalked Plaintiff and misused the emergency 9-1-1 system subject to Conn. General Statutes § 53a-180d for the sole purpose of making false alarm or complaint about Plaintiff, alleging, *inter alia*, "we want to report a concern about someone who might be mentally ill who we think might be a danger to herself or others . . . she lives alone right now at her home … she was previously forced to a mental hospital and forced to take medicine. … her mom doesn't speak English . . . " is small Chinese woman."

94.     The above statements of Plaintiff's mental state were false. Plaintiff was not a danger to herself or others, and there was no reason to believe that she was so.  Plaintiff and Professor Vytlacil lived separately in two different cities and have been living separately since April 2014, thus even if Plaintiff was in a distressed mental state, Professor Vytlacil would have had no personal knowledge of Plaintiff's location or mental state unless he was stalking Plaintiff.

95.     Knowing Plaintiff was at that time applying for law schools for a joint degree of Juris Doctor in law and Ph.D. in economics in the academic year of 2019-2020, when the 9-1-1 dispatcher asked Professor Vytlacil on March 27, 2019 whether Professor Vytlacil could meet the 9-1-1 field officer at Plaintiff's house, Professor Vytlacil responded, "yes . . . though she is going to at least wonder what the heck we are doing."

96.     When the 9-1-1 field officers arrived at Plaintiff's home on March 27, 2019, Plaintiff was still asleep. The field officers broke into Plaintiff's home with the key unlawfully obtained with Professor Vytlacil. Plaintiff had no contact with anyone prior to the break-in of the

9-1-1 field officers who then told Plaintiff the reason that they were at her home was because "Ed called" (referring to Professor Vytlacil) therefore she needed to go with them to the hospital.

97.     In no circumstance of any emergency, in the absence of evidence of any psychiatric disability, Plaintiff was forced to leave her house with the 9-1-1 field officers in the early morning of March 27, 2019 and to be transported by an ambulance to the Emergency Room at the Yale New Haven Hospital, Inc., simply because "Ed called."

98.     Once Plaintiff arrived in the emergency room, the Yale New Haven Hospital, Inc. involuntarily committed her in its psychiatric unit upon the Police Request for Emergency Examination issued by the New Haven Police 9-1-1 field officers who unlawfully detained her from her home in the morning of March 27, 2019. Plaintiff would not have been involuntarily committed if not for Professor Vytlacil fabricating a story of Plaintiff's mental state. Upon information and belief, Professor Vytlacil fabricated Plaintiff's mental state for the purpose of discrediting her complaints that she was being discriminated and retaliated against by Professor Vytlacil and Yale University. Since March 27, 2019 till this present date, Professor Vytlacil repeatedly, intentionally engaged in on-going discriminatory, harassing, and retaliatory conduct similar to the above-described against Plaintiff because she complained about discrimination and sexual harassment at Yale. Professor Vytlacil manipulated authorities at Yale, Graduate School, Department of Economics, Yale Health, and New Haven Police to purposefully and frequently harass and retaliate against Plaintiff.

99.     The effect of the purposeful and frequent harassment led by Professor Vytlacil in concert with Yale Health caused Plaintiff, who does not have any psychiatric disability, to be unlawfully and involuntarily detained from her home and committed to the Yale New Haven Hospital, Inc. for psychiatric disabilities. This involuntary commitment, lasting from March 27,

2019 to April 18, 2019, disrupted Plaintiff's education program or activity at the Department of Economics at Yale, and disrupted her applications for law school for the academic year of 2019-2020 in pursuing a joint J.D. in law and Ph.D. degree.

100.    Plaintiff has been deeply devastated and humiliated by Professor Vytlacil's unlawful, harassing, and retaliatory conduct which injured her fundamental rights, interfered with her education program or activity in the Ph.D. program at Yale, interfered with her enrollment in the joint degree programs of J.D. in Law and Ph.D. in environmental science and policy in the academic year of 2017-2018, and disrupted her applications for joint degree programs of J.D. in Law and Ph.D. in economics in the academic year of 2019-2020.

101.    Plaintiff complained about the above incident to Administrators for the Department of Economics, Pamela O'Donnell and the Director of Graduate Studies in the Department of Economics, Tuman Bewley, Ph.D. ("Professor Bewley") and Yuichi Kitamura, Ph.D. ("Professor Kitamura") who replaced Professor Bewley's position as the Director of Graduate Studies in or about May 2019, and Associate Dean Richard Sleight of the Graduate School. Each of these complaints by Plaintiff were disregarded by Yale and no action was taken.

102.    On or about April 23, 2019, Plaintiff started seeing Beth Grunschel, M.D. ("Dr. Grunschel") at the Office of Student Mental Health & Counseling ("Office") at the Yale Health for therapy sessions. During the therapy sessions, Plaintiff complained and discussed her concerns that Yale took no action addressing her complaints about discrimination, sexual harassment, and retaliation led by Professor Vytlacil. Plaintiff also discussed how she sent reports of said discrimination, harassment, and retaliation to the Associate Dean at the Graduate School, Richard G. Sleight, ("Dean Sleight") and the Director of Graduate Studies in the Department of Economics,

Professor Bewley, regarding such misconducts and her fear over further retaliatory acts by Professor Vytlacil.

103.    On May 1, 2019, Dr. Grunschel called Plaintiff's cellphone between 13:25 and 15:00 p.m., while she was attending a Ph.D.-level class in the Department of Economics on Yale's campus. Because the class was in session, Plaintiff decided not to answer Dr. Grunschel's call. Plaintiff came home shortly after her class at or around 15:20 p.m., two police officers from the New Haven Police Department showed up at her home at or about 15:46 p.m., without a warrant, while she was home alone, preparing a meal.

104.    The police officers told Plaintiff outside of her home on May 1, 2019 that they received "a call from the DCF," (referring to the Department of Children and Family in the State of Connecticut) and were performing a "welfare check" on her.

105.    Only until Plaintiff requested the New Haven Police's record upon the Freedom of Information Act ("FOIA") Request regarding the May 1, 2019 incident, Plaintiff found out that the person who called the Police on May 1, 2019 was Dr. Grunschel at the Yale Health. Contrary to what the New Haven Police alleged, the New Haven Police never made any contact with the DCF that day.

106.    In the recording of Dr. Grunschel's call to the emergency 9-1-1 system subject to Conn. General Statutes § 53a-180d made on May 1, 2019 obtained upon Plaintiff's FOIA request, Dr. Grunschel alleged that Dr. Grunschel was "a psychiatrist calling about a patient that [Dr. Grunschel] need to find. [Dr. Grunschel] not sure where [the patient] is. . . . [Dr. Grunschel] thinks [the patient] needs to go to the emergency room." The reason of Dr. Grunschel's call to the emergency 9-1-1 system, as Dr. Grunschel explained to the 9-1-1 dispatcher, was because Dr. Grunschel was away and just got back in the Office at the Yale Health, alleging "[Dr. Grunschel]

just found out that the DCF called her" while Dr. Grunschel was away telling her about Professor Vytlacil's calls with the DCF regarding Plaintiff's behavior.

107.    Plaintiff was last seen in the Office at the Yale Health the day before Dr. Grunschel made the 9-1-1 call, April 30, 2019, by "someone in [the] Office. It was not [Dr. Grunschel]." Plaintiff had no signs of mental distress that would warrant a welfare check.

108.    In Plaintiff's medical records reported by Dr. Grunschel on May 1, 2019, Plaintiff was profiled as "as a 'Chinese Woman' who has a daughter and was recently hospitalized," as well as the descriptions of Plaintiff's behavior at her home based on three-fold hearsay, allegedly based on a phone call made by a social worker from the DCF, Velee Lindsay, reporting the calls Professor Vytlacil made to the DCF. Dr. Grunschel's report ended with "the patient was transported on a Police Emergency Evaluation Report to Yale New Haven Hospital."

109.    In fact, Plaintiff had been in contact with the DCF since April 2019, including Velee Lindsay. Despite the frequent, malicious calls made by Professor Vytlacil to the DCF with defamatory, harassing, statutorily discriminating allegations against Plaintiff, where Professor Vytlacil underwent a campaign attempting to convince DCF Plaintiff was mentally ill, the DCF issued its final determination, dated May 13, 2019, of no further service needed in Plaintiff's family regarding Plaintiff's Daughter.

110.    Between March 27, 2019 and May 1, 2019, Professor Vytlacil frequently called and harassed Plaintiff during her education program or activity while her Ph.D.-level classes were in session to threaten her to sign a release of authorization for him to speak to her therapist or treating physicians or he would send Plaintiff's Daughter to a foster care. Plaintiff refused to sign. However, Professor Vytlacil was able to manipulate the DCF to pry into Plaintiff's medical records at the Yale Health.

111. Because of Dr. Grunschel's report, while acting as an agent of Yale University, Plaintiff was involuntarily admitted to Yale New Haven Hospital for seven days, and was then transferred to an inpatient psychiatric facility until May 17, 2019.

112. Upon the discharge from the Yale New Haven Hospital, Inc., Plaintiff was not diagnosed with any mental disorder or mental health condition.

113. Plaintiff's mental health did not effect her ability to complete her coursework or affect her performance of all duties as a Ph.D student.

114. The above situation, caused by Professor Vytlacil while acting in concert with Dr. Grunshcel, subjected Plaintiff to a hostile work environment and caused Plaintiff to miss law school application deadlines.

115. Plaintiff again complained about the above incident to Administrators for the Department of Economics, Pamela O'Donnell, Professor Bewley and Professor Kitamura, and Associate Dean Richard Sleight of the Graduate School. Plaintiff's complaints were completely disregarded by Yale and no action was taken to curtail Professor Vyltacil's harassing conduct.

116. In the beginning of Fall 2019, on or about September 1, 2019, Plaintiff decided to terminate her therapist-patient relationship with Dr. Grunschel and the Yale Health and sought therapy sessions with a provider in New York, outside of Yale's network. Since Plaintiff terminated the therapist-patient relationship with Dr. Grunschel, Plaintiff has sought psychiatric treatment from Donn Wiedershine, M.D., Dr. Lalitha de Silva, and Dr. Chi-Chi Obuaya. None of these psychiatrists have diagnosed Plaintiff with any mental disorders.

117. In fact, Dr. Lalitha de Silva, after observing Plaintiff for five months, wrote "At this time I have assessed her condition and reviewed her past medical records and found inconsistent analysis. . . . Based upon the review, I have found no symptoms of Bipolar Affective

Disorder. . . . I believe that [Plaintiff] is healthy and has no mental disorder, thus needs no medication." The above incidents also reflect how Plaintiff was discriminated based on her race, sex, and parental status.

118.    Yale Health profiled Plaintiff as a "Chinese" woman who has a daughter.

119.    Professor Vytlacil and the Yale Defendants and their employees and agents, including Dr. Grunschel, frequently and consistently described or referred to Plaintiff as a "Chinese woman" notwithstanding the fact that the Plaintiff was an American citizen who did not identify as "Chinese". This unwelcome false labeling of her citizenship shows direct evidence of discrimination based on Plaintiff's national origin.

120.    During the Yale summer recess of 2019, between mid-May and August 19, 2019, Professor Vytlacil came to Plaintiff's home address every evening, stalking Plaintiff.

121.    Despite Plaintiff's disagreement and complaints against Professor Vytlacil's conduct, Professor Vytlacil insisted that if Plaintiff took a "vacation" with him, he would then agree to stop coming to her address every evening and would allow Plaintiff's Daughter stay overnight with her afterwards. In pressuring Plaintiff to agree with Professor Vytlacil's plan of a "vacation," which was a four-night trip traveling from New Haven, Connecticut to Owls Head, Maine, Professor Vytlacil intimidated Plaintiff by harassing her every evening outside of her home, by interfering with Plaintiff's parenting time, by making frequent and repeated calls to Dr. Grunschel at the Yale Health to interfere with Plaintiff's therapy sessions, and by blatantly discussing his plan of "vacation together" in front of other students and faculty members at the Department at Yale to publicly create a false impression of sexual intimacy.

122.    Professor Vytlacil's discriminatory and harassing conduct had caused Plaintiff to be treated unfairly and resulted in a hostile and abusive environment at Yale that deprived her of

equal access to her education program and activity. However, Yale dismissed each of Plaintiff's numerous complaints, claiming that Professor Vytlacil's conduct was a "family matter."

123.    Plaintiff reluctantly agreed to accompany Professor Vytlacil on a vacation to Maine because she saw no other chance to stop the sexual harassment and racial discrimination to which Professor Vytlacil was subjecting her on a daily basis since Yale refused to act on such complaints.

124.    Out of suspicion of the true motive of Professor Vytlacil's plan of a "vacation," Plaintiff brought her mother—who had just recently returned from China—along on the trip with Professor Vytlacil.

125.    Between August 18, 2019 and August 22, 2019, Professor Vytlacil sexually harassed and assaulted Plaintiff on multiple occasions during the trip to Maine. On August 18, 2019, Professor Vytlacil arranged one hotel room for a one-night stop in Newburyport, Massachusetts. Professor Vytlacil also arranged one rental house with three bedrooms for three consecutive nights in Owls Head, Maine. Once they arrived in Maine, it soon became clear that Professor Vytlacil's true intention was to sexually harass and assault Plaintiff. Professor Vytlacil asked Plaintiff's mother to look after Plaintiff's Daughter, while he repeatedly sneaked into Plaintiff's room and unwantedly touched and forcibly groped Plaintiff, despite Plaintiff's objections. Plaintiff was disgusted by Professor Vytlacil's harassing behavior and refused his sexual advances. Professor Vytlacil threatened Plaintiff that if she reported him, he would never let Plaintiff see her Daughter again.

126.    On August 29, 2019, at 19:59 P.M., Professor Vytlacil intentionally, purposefully, and falsely used the emergency 9-1-1 system subject to Conn. General Statutes § 53a-180d outside Plaintiff's home while Plaintiff with her Daughter were inside at home in no circumstance of any emergency. On the call with the 9-1-1 dispatcher, Professor Vytlacil alleged, *inter alia*, "Plaintiff

is Chinese," … "[s]he's actually at home, just not, refusing to let [Professor Vytlacil] take her daughter."

127.    Professor Vytlacil's intentional false alarm to the emergency 9-1-1 system in no circumstance of an emergency caused the New Haven Police Department to unlawfully remove Plaintiff's Daughter from her home on August 29, 2019, without due process.

128.    This action by Professor Vytlacil was part of his ongoing and longstanding behavior perpetrated by him against Plaintiff since she enrolled in Yale University. Professor Vytlacil repeatedly coerced Plaintiff into obedience by exerting a "teacher student power relationship" over Plaintiff on and off campus. Upon information and belief Professor Vytlacil's conduct was done because of animus to Plaintiff's race, sex, national origin, disability and/or because Plaintiff was regarded as disabled.

129.    On September 24, 2019, in a family law court proceeding, Professor Vytlacil asserted under oath regarding his conduct as a faculty member towards Plaintiff—a student—at the Department of Economics,

> "[Professor Vytlacil's Attorney]: Okay. So you would be aware if [Plaintiff] was attending classes or school or doing her obligations at Yale?"
>
> "[Professor Vytlacil]: Yes. I mean, it is possible [Plaintiff] can sneak in, well, I'm sorry, wrong word. It's possible that she would be able to come to the department once in a while without me noticing. You know, if she was there as much as she had been, I would certainly have observed her. I'm in the same building complex as where her classes would be. I speak to the same faculty that she would be talking to at some point."

130.    This statement under oath confirms Professor Vytlacil used his position to stalk and monitor Plaintiff's work and educational program pursuits. This is direct evidence of the discrimination and hostile environment Professor Vytlacil created for Plaintiff at Yale University.

131.    On October 12, 2019, Professor Vytlacil made another purposeful false emergency 9-1-1 alarm or complaint against Plaintiff at 16:42 p.m. outside her home, alleging that he called

on behalf of his "mother-in-law" as which he intentionally, frequently referred to Plaintiff's mother till this day, despite the fact Plaintiff and Professor Vytlacil were and have remained divorced since September 10, 2015 and lived separately since April 2014. Professor Vytlacil continued defaming, discriminating against, and harassing Plaintiff, alleging, *inter alia*, to the 9-1-1 dispatcher, that "[Plaintiff] is bipolar with psychosis. She is having an active, active psychosis. Last time, she had a manic episode."

132.    This continued harassment and profiling of the Plaintiff as a "mentally ill Chinese woman" provides direct evidence of Professor Vytlacil's discriminatory intent.

133.    Despite Plaintiff changing her healthcare provider, no longer saw Dr. Grunschel, and had terminated the therapist-patient relationship with the Office at Yale Health, Professor Vytlacil continued to make frequent reports to the Office at Yale Health alleging his personal knowledge of Plaintiff's alleged mental disorder. Yale Health continued to purposefully conspire with Professor Vytlacil and unlawfully breached into Plaintiff's medical records.

134.    Professor Vytlacil constantly exploited the unequal institutional power inherent in the relationship between faculty member and student at Yale and in the community at large to intentionally harass Plaintiff and purposefully manipulate her decisions in the education program or activity, as well as Plaintiff's personal choice of healthcare providers on and off the campus at Yale, to achieve his personal interest in defaming and discrediting her because she complained about his discrimination, sexual harassment and assault, and retaliation.

135.    On February 19, 2020, after Professor Vytlacil had been denying Plaintiff's parental access to her Daughter for over a month. Plaintiff explained to Professor Vytlacil that she didn't have any mental disorder and that she hoped that he could acknowledge the fact in a candid manner, and stop intentionally attacking her with his defamatory, harassing, and discriminatory statements

and purposefully plotting his allegations as a threat in front of authority to withhold her Daughter

from her and to disrupt her education program and/or activity at Yale. However, Professor Vytlacil,

instead of engaging in meaningful consultation in good faith with Plaintiff, again aggravated his

harassing behaviors by purposefully utilizing the emergency 9-1-1 system at 17:51 p.m., alleging,

*inter alia*, to the 9-1-1 dispatcher as follows, "[Professor Vytlacil] want her to have an evaluation,

she is diagnosed with bipolar with psychosis. And [Professor Vytlacil] think she is having

psychotic episode right now."

136.    Between February 20, 2020 and February 25, 2020, Professor Vytlacil sent Plaintiff

frequent and repeated intimidating and harassing text messages to her cellphone, where he

attempted to coerce Plaintiff to seek unneeded psychiatric treatment and medication. These

messages were a continuation of the severe and pervasive hostile environment that he was creating

for Plaintiff.

137.    On February 20, 2020, Yale Health documented in Plaintiff's medical records that

Professor Vytlacil called and emailed Dr. Grunschel. Because Dr. Grunschel was no longer

employed at Yale Health, Professor Vytlacil's email sent to Dr. Grunschel was forwarded to other

doctors at Yale Health, despite the fact that Plaintiff was no longer receiving treatment at Yale

Health and had changed her healthcare provider to a clinic outside of Yale's network since

September 1, 2019. Yale Health, nevertheless, entered the following defamatory, discriminatory,

and fraudulent statement into Plaintiff's medical records on February 20, 2020, in relevant part:

> [Plaintiff] has been increasingly delusional, erratic, and manic . . . [Plaintiff] has
> been off meds; . . . [Plaintiff] attempted to enter [Professor Vytlacil's] house on
> February 19, 2020 and take their daughter; . . . [Professor Vytlacil] reports that child
> is safely in his custody, the child's therapist and school was informed; . . . [Professor
> Vytlacil] filed DCF report regarding the incident; . . . [Professor Vytlacil] contact
> the Police Department at Yale University for a restraining order; . . . [Professor
> Vytlacil] contacted the Yale Health Mental Health and Counseling Department and
> advised them to hospitalize [Plaintiff] in the ER or the Yale Psychiatric Hospital.

138.    Professor Vytlacil's false reporting Plaintiff as showing signs of mental illness and erratic behavior in an attempt to discredit her complaints of sexual harassment and discrimination against him reveals direct evidence of unlawful retaliation. These actions are further evidence of discrimination against the Plaintiff by Professor Vytlacil based on his perception of her as mentally ill.

## VI.    Yale University Had Actual Knowledge of Violations but Showed Deliberate Indifference and Refused to Provide Accommodation

139.    Plaintiff submitted numerous reports and internal grievances to Associate Dean Sleight at the Graduate School and Professor Kitamura, Director of Graduate Studies at the Department of Economics replacing Professor Bewley in or about May 2019, seeking accommodation, intervention, and protection against further discrimination, harassment, and retaliation. Yale took no meaningful action against Professor Vytlacil or to investigate her complaints.

140.    On or about February 18, 2017, Plaintiff submitted her initial complaint to Associate Dean Richard Sleight, Professor Truman Bewley, and Pamela O'Donnell. Plaintiff complained that Yale breached the March 3, 2015 Agreement that Plaintiff would be enrolled in the Ph.D. program in the School of Environment following the completion of her master's degree, and would not be required to repeat coursework. However, Yale did not honor the agreement and Plaintiff was unrightly denied admittance to the School of Environment Ph.D. program. Plaintiff subsequently enrolled in the Ph.D. program at the Department of Economics and sought credits for the required coursework. On April 27, 2017, Plaintiff met with Professor Bewley, Director of Graduate Studies at the Department of Economics at that time, who was troubled by the situation and told Plaintiff they will forward Plaintiff's complaint to Associate Dean Sleight. Associate Dean Sleight did not respond to Plaintiff's complaint until February 22, 2018. Associate Dean

Sleight agreed to give Plaintiff credit for four of fifteen courses she needed for her Ph.D. and insisted the Plaintiff spend another two years pursuing coursework instead of working on her dissertation research. Associate Dean Sleight failed to provide any further relief to remedy the breach of the March 3, 2015 agreement and the delay of Plaintiff's academic progress in completing the Ph.D. program.

141.    On April 23, 2019, shortly after Plaintiff was discharged from the Yale New Haven Hospital Psychiatric Unit, Plaintiff contacted the Dean's office and scheduled to meet with Associate Dean Sleight. Plaintiff scheduled to meet with Associate Dean Sleight on May 2, 2019, where she intended to complain of Professor Vytlacil's discriminatory and harassing behavior. However, Plaintiff missed the meeting after Dr. Grunschel, acting in concert with Professor Vytlacil or because of Professor Vytlacil's false reports of mental illness, called the police on Plaintiff and had her involuntarily committed through May 17, 2019. Upon information and belief, Professor Vytlacil made false reports of Plainitff's mental illness to prevent her from complaining of the discriminatory and harassing conduct she was subjected to from Professor Vytlacil. After Plaintiff was discharged, Plaintiff rescheduled her meeting with Associate Dean Sleight for May 22, 2019.

142.    Plaintiff met with Associate Dean Sleight and complained about the discrimination and harassment against Plaintiff led by Professor Vytlacil at the Department of Economics that continuously subjected Plaintiff to offensive, unfair treatment at Yale Graduate School and Department of Economics on the basis of race, ancestry, national origin, sex, disability, record of disability, and/or because Vytlacil regarded Plaintiff as "mentally ill." Plaintiff also explained the sequence of events led by Professor Vytlacil, Dr. Grunschel and Yale Health that caused Plaintiff to be unlawfully detained from her home and involuntarily committed to a psychiatric hospital

twice. Dean Sleight shared with Plaintiff a story of another Ph.D. candidate's experience as "mentally ill" student who enrolled at Yale Graduate School. Plaintiff clarified to Associate Dean Sleight that she was not diagnosed with any mental disorder upon discharge from the Yale New Haven Hospital Psychiatric Unit.

143.    On May 24, 2019, Associate Dean Sleight approved Plaintiff's 'Temporary Incomplete Forms' for the two courses she was taking in the Spring semester of 2019. No further relief was provided by Yale Graduate School, and no action was taken to curtail Professor Vytlacil's discriminatory and harassing behavior. By July 31, 2019, Plaintiff completed the two incomplete courses in the Spring Semester of 2019 and received "High Pass" for both courses. Thus, at this time, Plaintiff had completed the requisite course work requirement for the first two years of study at Yale Department of Economics and completed all other Ph.D. degree program requirements at Department of Economics.

144.    Shortly after Plaintiff came back from Maine, she met with Pamela O' Donnell and Professor Yuichi Kitamura and reported to them Professor Vytlacil's sexual harassment and sexual misconduct perpetrated between August 18 and 22, 2019. They told Plaintiff that she should report to the police and no further relief was provided by Yale Department of Economics.

145.    Between August 30 and September 19, 2019, Plaintiff received multiple emails from Associate Dean Sleight asking Plaintiff to meet with him to discuss a "confidential matter." On September 19, 2019, Plaintiff met with Associate Dean Sleight and discussed the sexual assault by Professor Vytlacil that occurred in Owls Head, Maine between August 18 and 22, 2019 and the threats, discrimination, harassment, sexual harassment, and retaliation that was targeted at Plaintiff by Professor Vytlacil at Department of Economics. Plaintiff requested the Yale Graduate School to provide investigation, accommodation, and corrective measures to prevent further harassment

and retaliation. Associate Dean Sleight commented that it was important to receive mental health treatment to help Plaintiff through this difficult time and recommended Plaintiff take a personal leave of absence to "sort things out." Plaintiff refused. No other relief was provided to Plaintiff.

146.    On or around December 18, 2019, Plaintiff again explained her particularly devastating circumstance to the officials at the Department of Economics and Graduate School and requested to apply for the University College of London-Yale Exchange Scholar Program ("UCL"), starting the 2020 Spring term, to continue her doctoral study in the exchange program in the United Kingdom, hoping to get some sort of relief from the hostile, abusive, and discriminatory environment she was enduring at Yale. Plaintiff explained to Dean Sleight that she had visited the Department of Economics at the UCL and obtained informal approval from the Department Chair, Professor Antonio Cabrales, for her to participate its Ph.D. degree program and was encouraged to apply via the Yale-UCL Exchange Scholars program.

147.    However, Professor Kitamura denied Plaintiff's request for accommodation or transfer and stated in an email to Plaintiff, dated on January 9, 2020, that the Department cannot accommodate her request. No other corrective measures were provided to relieve her from any further discrimination, harassment, and retaliation led by Professor Vytlacil in concert with Yale Health, Yale Graduate School, and Yale School of Economics.

148.    On February 24, 2020, Plaintiff met with Associate Dean Sleight at the Graduate School to file another internal grievance complaint against Defendants Professor Vytlacil, Department of Economics, and Yale Health, respectively, and explained to Associate Dean Sleight that the harassment on the basis of sex, race, ancestry, national origin, parenting student status, and disability were severe, pervasive, and objectively offensive and had resulted in a hostile and

abusive environment in the Department that deprived Plaintiff of her equal access to education programs or activity at Yale.

149.    On February 24, 2020, Plaintiff also discussed with Associate Dean Sleight her request to reapply for the University College of London-Yale Exchange Scholar Program to continue her doctoral-degree program in a different educational institution, considering the particularly abusive, offensive environment in the Department at Yale. However, Associate Dean Sleight stated that since the Department of Economics denied Plaintiff's request, the Yale Graduate School could not interfere with the decision. Associate Dean Sleight denied her request for accommodation, but recommended that Plaintiff take an unpaid leave of absence instead.

150.    Dean Sleight then went over with Plaintiff the options of leave of absence—personal or medical reasons. Dean Sleight further explained that only medical leave of absence would offer a student healthcare coverage during the leave of absence. Plaintiff reminded Dean Sleight that due to Dr. Grunschel's above unlawful conduct, Plaintiff had terminated her patient-provider relationship with Yale Health.

151.    No other relief or corrective measures were provided by the Graduate School.

152.    Associate Dean Sleight wrote to Plaintiff via email on February 24, 2020 as follow:

The Department of Economics and the Graduate School have approved [Plaintiff's] request for a personal leave of absence for the remainder of the spring 2020 term, effective from February 27 through September 1, 2020.

153.    On or about August 3, 2020, amid COVID-19, Plaintiff informed Associate Dean Sleight of Plaintiff's intent to return in the Fall Semester of 2020 from her leave of absence.

154.    On or around December 4, 2020, Plaintiff filed a formal Title IX complaint against Professor Vytlacil, Yale Health, and Dept of Economics to the Yale University Provost Office. However, Yale failed to follow its "Review Procedures for Complaints about Violations of the

Faculty Standards of Conduct" in address Plaintiff's complaint about Professor Vytlacil's violation of the Faculty Standards of Conduct.

155.    After Plaintiff's complaint was filed, Plaintiff learned that Associate Dean Sleight retired from the Administration of Yale Graduate School. He was replaced by Associate Dean Allegra di Bonaventura.

156.    The top Administration at the Graduate School and Department of Economics had actual knowledge of the intentional and purposeful statutory violation, discrimination, harassment, retaliation, and faculty misconduct but failed to adequately respond to the Plaintiff's internal grievance complaints. Yale's deliberate indifference to Plaintiff's rights under federal and state constitutions and statutes, including but not limited to, the ADA, Title VI, Title VII, and Title IX, caused and continue to cause Plaintiff to be subjected to further harassment, discrimination, and retaliation, and deprived Plaintiff of equal access to education programs and activities.

157.    Professor Vytlacil had successfully caused Yale, Plaintiff's school and employer, to treat her differently on the basis of race, sex, national origin, ancestry, disability, record of disability, and/or because Defendants Yale, Graduate School, Department of Economics, and Professor Vytlacil regarded Plaintiff as disabled. Even though Plaintiff complained of discrimination and sexual harassment, Yale went sided with Professor Vytlacil and allowed him to continue to harassing Plaintiff in concert with Yale Health, Yale Graduate School, and Department of Economics on the basis of race, sex, national origin, ancestry, disability, record of disability, and/or because the defendants regarded her as disabled.

158.    Yale could have, but failed to, promptly and equitably investigate Plaintiff's complaints it received about harassment, discrimination, and inappropriate faculty misconduct by Professor Vytlacil and the other named Defendants, that would have prevented Defendants

Graduate School, Department of Economics, and Professor Vytlacil from further retaliating against Plaintiff for asserting her rights. Instead, Yale took no action upon Plaintiff's complaints, and offered no supportive measures.

## VII.    Yale's Retaliation after Plaintiff's Complaint about Discrimination and Harassment

159.    On or about December 4, 2020, Plaintiff filed a Title IX Complaint with the Office of Provost at Yale against defendants Department, Yale Health, and Professor Vytlacil alleging violations of Title IX and Title VI.

160.    On December 22, 2020, the Title IX Office within the Office of Provost at Yale confirmed upon the receipt of her Title IX Complaint but chose not to pursue Plaintiff's claim to this date.

161.    Rather, on January 27, 2021, Associate Dean for Academic Support at the Graduate School at Yale, Allegra di Bonaventura, sent Plaintiff an email, and stated the following:

> I write to confirm that you are administratively withdrawn from Yale's Graduate School of Arts and Sciences effective immediately. If you have any questions, please contact me or your DGS.

162.    On January 28, 2021, Professor Vytlacil asserted under oath in a court proceeding regarding his personal knowledge of the (perceived) psychiatric disability about Plaintiff, particularly:

> *"So for the diagnosis, it has to be hearsay. [Professor Vytlacil] can tell what [Professor Vytlacil has] observed in terms of mental illness."*

163.    On or about February 1, 2021, Yale terminated Plaintiff's stipend income and salary wages, breaching the March 4, 2015 agreement and February 18, 2017 agreement between Yale and Plaintiff. Pursuant to the admissions offer Plaintiff received from Yale Graduate on February 18, 2017 a Ph.D. student receives the annual stipend until year six of enrolment. However, Plaintiff's stipend was terminated during her fourth year of enrolment.

164.    Furthermore, on April 28, 2021, Yale Health denied Plaintiff's student health benefit when she visited Yale Health's Urgent Care office. Despite this, Yale University billed Plaintiff for this visit to Yale Health and for the entire academic year of Fall 2020 - Spring 2021 of student health coverage, contrary to the zero deductible and free health coverage policy of the service provided by Yale Health to students as provided in the Yale Health Student Handbook and Yale Graduate School of Arts and Sciences February 18, 2017 Admission Offer to Plaintiff. Yale Health billed Plaintiff $204.40 for her urgent care visit and $4,739.00 for her Yale student health coverage for the Fall 2020 – Spring 2021 academic year.

165.    Despite Yale Health's zero deductible and free health coverage policy, on or about October 26, 2021, Yale University opened a collection account with the collection agency Delta Management Associates, Inc. against Plaintiff for her April 28, 2021 visit to Yale Health's Urgent Care office and for the entire academic year of Fall 2020 - Spring 2021 of student health coverage.

## VIII.    Professor Vytlacil's Retaliation in 2021 in Response to Plaintiff's Title IX Complaint

166.    While Plaintiff's Title IX Complaint against Professor Vytlacil and other named Defendants was pending at Yale, Defendant Professor Vytlacil intentionally and purposefully retaliated against her for asserting her rights.

167.    On May 21, 2021, Professor Vytlacil made once again a purposeful false emergency 9-1-1 alarm or complaint against Plaintiff around 14:11 p.m., alleging a violation of a civil restraining order. The Hamden Police Officer who arrived at Professor Vytlacil's address in Hamden, Connecticut in response to Professor Vytlacil's complaint, reported the following:

> [Professor Vytlacil] stated that on May 7, 2021 while he was leaving his house to pick up his daughter (Juvenile Victim) herein referred to as "JV," he observed a Black SUV parked nearby which he thought belonged to his ex-wife [V.V.] (referring to Plaintiff by her prior married name) and her current husband. [Professor Vytlacil] stated that [T.W.] who is [V.V.'s] father was walking towards him from the direction of the that vehicle. [T. W.] attempted to give him a gift bag saying it was for "[B.]" which is his nick name for "JV." [Professor Vytlacil] said

[T.W.] speaks very little English, but that he indicated the bag was from "mama" for "[B.]" [Professor Vytlacil] stated he tried to communicate that he was on his way to pick up "JV" and he would be right back and didn't take the bag (gift).That on May 21, 2021, the Affiant [Police Officer] spoke to [V.V.] by phone. The Affiant explained the purpose of the call and appeared to be surprised and confused about why I was calling. Furthermore, [V.V.] denied that she went to Hamden, CT on May 7, 2021."

168.    On May 22, 2021, after receiving the call from the Hamden Police concerning Professor Vytlacil's obvious, intentional harassment and retaliation after Plaintiff filed a Title IX Complaint against him, she started experiencing miscarrying symptoms. On May 23, 2021, Plaintiff went to the Emergency Room and was diagnosed with "threatened miscarriage in early pregnancy" by the Yale New Haven Health Bridgeport. Plaintiff and her husband lost their expected child. Plaintiff suffered emotional and physical stress which caused her to undergo a miscarriage due to the continuous harassment and retaliation by defendants Yale, Graduate School, Department, and Professor Vytlacil.

## IX.    Plaintiff's Enrollment at Yale in 2021 and Yale's Further Retaliation in 2022

169.    On or about February 1, 2022, Plaintiff received Yale's Tuition Statement of Calendar Year 2021, Form 1098-T, issued to all students enrolled in the calendar year who have been assessed qualified tuition and related expenses and filed by Yale with the Internal Revenue Service, U.S. Department of the Treasury.

170.    On February 16, 2022, Plaintiff submitted a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunities Commission ("EEOC") against Professor Vytlacil, Department of Economics, and Yale Health.

171.    On March 9, 2022, Yale cut off Plaintiff's access to her Yale email account, thereby isolating her from teachers and classmates and denying her equal access to educational resources available to students and preventing her from continuing her doctoral studies.

172.    Throughout Plaintiff's enrollment at Yale, since September 1, 2015, she received "Honor" or "High Pass" grades for all the courses she took.

173.    Pursuant to Plaintiff's enrollment contract with Yale, provided in the admission letter issued by the Graduate School to her dated February 18, 2017, in relevant part:

> [I]n year five, students receive a stipend to work exclusively on the dissertation. [Yale Graduate School] hope that [Plaintiff] will finish in five years, but a sixth year of funding is available, if necessary. If [Plaintiff] have not completed [Plaintiff's] dissertation by the end of year five and the Department of Economics certifies that [Plaintiff] will do so by August of the following year, [Plaintiff] will be eligible in year six for a teaching position and a nine-month, academic-year stipend, i.e. three quarters of the twelve-month stipend.

174.    The only remaining academic requirement for Plaintiff to complete her doctoral degree program at Yale is the dissertation.

175.    Yale and the Graduate School did not investigate Plaintiff's numerous informal appeals to the University's administration, failed to investigate alleged violation of Yale's Faculty Standards of Conduct, "Racially Nondiscriminatory Policy," and sexual misconduct policy.

176.    Yale and the Graduate School failed to investigate Plaintiff's formal internal Title IX Complaint.

177.    In return, the Graduate School retaliated against Plaintiff for making such complaint by immediately forcing her to "administratively withdraw" from the Graduate School and terminating her stipend and wage salary without due process and failed to give her an opportunity to be heard before proceeding with an administrative withdrawal and wage termination, in violation of Yale's policy and in breach of contract.

178.    Yale has failed to allow Plaintiff to resume her academic studies or her stipend employment at the Graduate School since her forced administrative withdrawal.

**CAUSES OF ACTION**

## I.    FIRST CAUSE OF ACTION

**COUNT ONE:**    **VIOLATION OF TITLE VII BASED ON RACE AND NATIONAL ORIGIN AS AGAINST YALE AND PROFESSOR VYTLACIL**

179.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the Complaint as if fully set forth herein.

180.    Plaintiff was born in the People's Republic of China and is an Asian-American woman. Plaintiff is now and was at all relevant times a citizen of the United States.

181.    Throughout her employment with Defendants, the Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of her race, which is Asian, and her national origin, which is Chinese-American.

182.    Defendants implemented and made a policy and practice of favoring those of non-Asian descent over people of Asian descent within Yale.

183.    The Plaintiff was repeatedly treated differently than her similarly situated co-workers who were non-Asian and not of Chinese-descent in that she was subjected to the following adverse employment actions which affected the terms, conditions, and privileges of her employment with Yale. The Plaintiff was:

(a)    Denied access to education and employment opportunities within the Yale School of the Environment;

(b)    Subjected to improper supervision, stalking, and surveillance by Professor Vytlacil who surveilled the Plaintiff and improperly monitored her activities in and outside the Department;

(c)    Subjected to unwarranted complaints to the New Haven Police Department against her based on false and fabricated reasons;

(d)    Caused to repeat course-work and forced to enroll in a Ph.D. program in the Economics Department rather than her chosen field; and

(e)    Terminated from her academic program and her employment at Yale in substantial part because she is an Asian-American of Chinese descent.

184.    Defendants' conduct, by and through its agents and employees, including without limitation Professor Vytlacil, in treating the Plaintiff in a manner unequal to other employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of race and national origin in violation of Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 2000e *et seq*.

185.    The discriminatory acts of the Defendants as described above were intentional and were substantially motivated on the basis of the Plaintiff's race and national origin.

186.    The adverse employment actions suffered by the Plaintiff were sufficiently severe or pervasive enough to alter the terms and conditions of her employment.

187.    The employer Yale is liable for the discriminatory adverse actions described hereinabove in that Yale knew of the discriminatory conduct of Professor Vytlacil and refused to act or to investigate properly in accordance with its own anti-discrimination policies.

188.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages which Plaintiff is entitled to an award to recover including without limitation attorney's fees, expenses, and costs.

189.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title VII, for which Plaintiff is entitled to an award of punitive damages.

## II.    SECOND CAUSE OF ACTION

**COUNT TWO:        RETALIATION IN VIOLATION OF TITLE VII OF CIVIL
                    RIGHTS ACT AS AGAINST YALE AND PROFESSOR VYTLACIL**

190.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the Complaint as if fully set forth herein.

191.    To establish a prima facie case of retaliation the Plaintiff must show: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.

192.    Plaintiff engaged in protected activity under Title VII in that she made formal complaints about the discrimination and harassment being committed by Professor Vytlacil, the Department, and the Graduate School first during her admission in 2015, and numerous times during 2017 and thereafter.

193.    In March 2015, Plaintiff complained about discrimination to the Graduate School in its decision to modify Plaintiff's admission to the Ph.D. program at the School of Environment at Yale.

194.    Since the fall academic term of 2017, Plaintiff made numerous internal complaints about the disparate treatment and gender-based harassment led by Professor Vytlacil, in concert with the Department.

195.    Plaintiff made numerous complaints about Professor Vytlacil's discrimination, sexual harassment and misconduct to the officials at the Department and the administration at the Graduate School. In spite of these complaints, Yale did nothing to stop it.

196.    Between August 2019 and February 2020, Plaintiff made numerous reports and internal grievances to the top administration at the Graduate School and the officials at the Department, seeking accommodation, intervention, and protection against further discrimination,

harassment, and retaliation she received from Yale and Professor Vytlacil because Plaintiff complained about discrimination and sexual harassment. Yale took no meaningful action, nor did Yale investigate the Plaintiff's complaints.

197.    On or about December 4, 2020, Plaintiff filed a written complaint with the Office of Provost at Yale against Defendants' discrimination, sexual harassment, and retaliation on the basis of race, sex, and national origin.

198.    On December 22, 2020, the Title IX Office within the Office of Provost confirmed the receipt of Plaintiff's Title IX Complaint but chose not to pursue her claim up to this date.

199.    Defendants were aware of the Plaintiff's numerous complaints of discrimination because they received said complaints and acknowledged them.

200.    The Defendants took adverse action against the Plaintiff in response to her numerous complaints of discrimination and harassment by terminating her from her educational program and her employment at Yale.

201.    On January 27, 2021, Associate Dean for Academic Support at the Graduate School, Allegra di Bonaventura, sent Plaintiff an email, expelling Plaintiff from the Graduate School without due process. This was a clearly adverse employment action against Plaintiff by Defendants.

202.    There is a clear causal connection between the Plaintiff's protected activity and the retaliatory termination in that the events are temporally proximate and there is no other legitimate non-discriminatory reason for the Defendants' adverse actions against Plaintiff. Further the Defendants actions were taken under circumstances that raise a retaliatory inference.

203.    By the actions detailed above, Defendants retaliated against Plaintiff based on her protected activities in violation of Title VII by, *inter alia*, ignoring her multiple and repeated protected complaints about the discriminatory treatment she was subjected to, including

discrimination and harassment that was inflicted subsequent to and in direct connection with her repeated complaints.

204.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

205.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title VII, for which Plaintiff is entitled to an award of punitive damages.

### III.    THIRD CAUSE OF ACTION

<u>COUNT THREE:</u>    **VIOLATIONS OF CFEPA BASED ON RACE AND NATIONAL ORIGIN**

206.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the Complaint as if fully set forth herein.

207.    Plaintiff was born in the People's Republic of China and is an Asian-American woman. Plaintiff is now and was at all relevant times a citizen of the United States.

208.    Throughout her employment with Defendants, the Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of her race, which is Asian, and her national origin, which is Chinese-American.

209.    Defendants implemented and made a policy and practice of favoring those of non-Asian descent over people of Asian descent within Yale.

210.    Plaintiff was at all times relevant hereto, an employee as that term is defined in Connecticut General Statutes §46a-51(9).

211.    Defendant is and at all relevant times was an employer as that term is defined in

Connecticut General Statutes §46a-51(10).

212.    At all relevant times hereto, Defendant employed more than three persons. The acts of the Defendants as described above including without limitation Plaintiff's termination were motivated on the basis of Plaintiff's race in violation of Connecticut General Statutes §46a-60(a), et seq.

213.    The Plaintiff was repeatedly treated differently than her similarly situated co-workers who were non-Asian and not of Chinese-descent in that she was subjected to the following adverse employment actions which affected the terms, conditions, and privileges of her employment with Yale. The Plaintiff was:

(a)    denied access to education and employment opportunities within the Yale School of the Environment;

(b)    subjected to improper supervision, stalking, and surveillance by Professor Vytlacil who surveilled the Plaintiff and improperly monitored her activities in and outside the Department;

(c)    subjected to unwarranted complaints to the New Haven Police Department against her based on false and fabricated reasons;

(d)    caused to repeat course-work and forced to enroll in a Ph.D. program in the Economics Department rather than her chosen field; and

(e)    terminated from her academic program and her employment at Yale in substantial part because she is an Asian-American of Chinese descent.

214.    Defendants' conduct, by and through its agents and employees, including without limitation Professor Vytlacil, in treating the Plaintiff in a manner unequal to other employees as

described above, discriminatorily denied Plaintiff equal treatment on the basis of race and national origin in violation of CFEPA.

215.    The discriminatory acts of the Defendants as described above were intentional and were substantially motivated on the basis of the Plaintiff's race and national origin.

216.    The adverse employment actions suffered by the Plaintiff were sufficiently severe or pervasive enough to alter the terms and conditions of her employment.

217.    The employer Yale is liable for the discriminatory adverse actions described hereinabove in that Yale knew of the discriminatory conduct of Professor Vytlacil and refused to act or to investigate properly in accordance with its own anti-discrimination policies.

218.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages which Plaintiff is entitled to an award to recover including without limitation attorney's fees, expenses, and costs.

219.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of CFEPA, for which Plaintiff is entitled to an award of punitive damages.

## IV.    FOURTH CAUSE OF ACTION

**COUNT FOUR:    RACE DISCRIMINATION UNDER 42 U.S.C. § 1981**

220.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the Complaint as if fully set forth herein.

221.    Defendants have unlawfully and willfully discriminated against the Plaintiff substantially because of her race and national origin as set forth above with regard to the terms, conditions and opportunities of her employment in violation of 42 U.S.C. § 1981.

222.    Defendants have unlawfully and willfully engaged in disparate treatment of the Plaintiff in violation of 42 U.S.C. § 1981 as Defendants took adverse actions as set forth above against the Plaintiff, who is Asian of Chinese descent, who was qualified for her position and was performing in exemplary fashion at the time she was terminated. Similarly situated non-Asian graduate students would not and/or have not been similarly terminated.

223.    The Plaintiff was repeatedly treated differently than her similarly situated co-workers who were non-Asian and not of Chinese-descent in that she was subjected to the following adverse employment actions which affected the terms, conditions, and privileges of her employment with Yale. The Plaintiff was:

    (a)    denied access to education and employment opportunities within the Yale School of the Environment;

    (b)    subjected to improper supervision, stalking, and surveillance by Professor Vytlacil who surveilled the Plaintiff and improperly monitored her activities in and outside the Department;

    (c)    subjected to unwarranted complaints to the New Haven Police Department against her based on false and fabricated reasons;

    (d)    caused to repeat course-work and forced to enroll in a Ph.D. program in the Economics Department rather than her chosen field; and

    (e)    terminated from her academic program and her employment at Yale in substantial part because she is an Asian-American of Chinese descent.

224.    The Defendants' termination decision in this case was pretextual and not legitimate and is the cause of Plaintiff's damages, as described herein, for which the Plaintiff seeks redress.

225.     As a result of the Defendants' unlawful conduct as aforesaid, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, lost educational opportunities, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

226.     Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of 42 U.S.C. § 1981, for which Plaintiff is entitled to an award of punitive damages.

## V.     FIFTH CAUSE OF ACTION

<u>**COUNT FIVE**</u>:        **SEXUAL HARASSMENT BASED ON HOSTILE ENVIRONMENT PURSUANT TO TITLE VII.**

227.     Plaintiff repeats, reiterates and realleges each and every allegation contained in the Complaint as if fully set forth herein.

228.     Plaintiff was sexually harassed in violation of Title VII in that she was subjected to disparate treatment and a sexually hostile work environment based on sex.

229.     As a female, the Plaintiff was a member of a protected class.

230.     Plaintiff was otherwise highly qualified for her position and she had been an exemplary employee of the Defendants.

231.     The Plaintiff was subjected to unwelcome sexual harassment based upon sex which was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive that it altered the conditions of her employment and created an abusive work environment.

232.     Plaintiff was sexually harassed in that she was subjected to:

(a)     frequent stalking and surveillance by Professor Vytlacil;

(b)     sexual assault and battery by Professor Vytlacil;

(c)     false reports to New Haven Police regarding Plaintiff's behavior; and

(d)     frequent public statements by Professor Vytlacil to fellow students and colleagues to the effect that Plaintiff and he continued to be intimate notwithstanding their divorce.

233.    The objectionable conduct based on sex was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the Plaintiff in fact did perceive it to be so.

234.    Yale is liable for the sexual harassment committed by Professor Vytlacil in that the misconduct was reported to Yale as aforesaid and nothing was done to address the harassment.

235.    Defendants' adverse employment actions against the Plaintiff occurred under circumstances giving rise to an inference of sex discrimination.

236.    As a result of the Defendants' unlawful conduct as aforesaid, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, lost educational opportunities, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

237.    Plaintiff is entitled to compensation for lost wages, punitive damages, and attorney's fees and costs as a result of the hostile environment created by Defendants.

## VI.    SIXTH CAUSE OF ACTION

**COUNT SIX:**          **SEXUAL HARASSMENT BASED ON HOSTIL ENVIRONMENT PURSUANT TO CFEPA.**

238.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the Complaint as if fully set forth herein.

239.    Plaintiff was sexually harassed in violation of CFEPA in that she was subjected to a sexually hostile work environment based on sex.

240.    As a female, the Plaintiff was a member of a protected class.

241.    Plaintiff was otherwise highly qualified for her position and she had been an exemplary employee of the Defendants.

242.    The Plaintiff was subjected to unwelcome sexual harassment based upon sex which was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive that it altered the conditions of her employment and created an abusive work environment.

243.    Plaintiff was sexually harassed in that she was subjected to:

(a)    frequent stalking and surveillance by Professor Vytlacil;

(b)    sexual assault and battery by Professor Vytlacil;

(c)    false reports to New Haven Police regarding Plaintiff's behavior; and

(d)    frequent public statements by Professor Vytlacil to fellow students and colleagues to the effect that Plaintiff and he continued to be intimate notwithstanding their divorce.

244.    The objectionable conduct based on sex was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the Plaintiff in fact did perceive it to be so.

245.    Yale is liable for the sexual harassment committed by Professor Vytlacil in that the misconduct was reported to Yale as aforesaid and nothing was done to address the harassment.

246.    The Defendants' adverse employment actions against the Plaintiff occurred under circumstances giving rise to an inference of sex discrimination.

247.    As a result of the Defendants' unlawful conduct as aforesaid, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm,

lost wages, lost employment benefits, lost educational opportunities, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

248.    Plaintiff is entitled to compensation for lost wages, punitive damages, and attorney's fees and costs as a result of the hostile environment created by Defendants.

## VII.    SEVENTH CAUSE OF ACTION

**SEVENTH COUNT:**          **VIOLATION OF THE ADA BASED ON DISPARATE TREATMENT AND DISPARATE IMPACT.**

249.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the Complaint  asif fully set forth herein.

250.    The Plaintiff is and was at all relevant times an individual who is disabled within the meaning of the ADA in that she has a record of mental impairments, and she was regarded as having such mental impairments by Yale.

251.     The Defendants Yale are covered by the ADA and is subject to its mandates.

252.    At all relevant times the Plaintiff was qualified to perform the essential functions of her job as a Graduate Student, enrolled in a Ph.D. program with the Department. Plaintiff could perform the essential functions of her job with or without reasonable accommodations.

253.    The Plaintiff suffered adverse employment actions because of her disability or perceived disability including termination, forced personal leave, withdrawal from her academic program and a campaign of harassment based on her perceived mental impairments.

254.    The Defendants knew of the Plaintiff's perceived disability, knew that she could perform the essential functions of her job with or without reasonable accommodation and engaged in disparate treatment against her based substantially on her perceived disability.

255.    The Plaintiff was repeatedly treated differently than her similarly situated co-workers who were not perceived as mentally disabled in that she was subjected to the following

adverse employment actions which affected the terms, conditions, and privileges of her employment with Yale. The Plaintiff was:

    (a)    denied access to education and employment opportunities within the Yale School of the Environment;

    (b)    subjected to improper supervision, stalking, and surveillance by Professor Vytlacil who surveilled the Plaintiff and improperly monitored her activities in and outside the Department;

    (c)    subjected to unwarranted complaints to the New Haven Police Department against her based on false and fabricated reasons;

    (d)    caused to repeat course-work and forced to enroll in a Ph.D. program in the Economics Department rather than her chosen field; and

    (e)    terminated from her academic program and her employment at Yale in substantial part because she is perceived as mentally disabled.

256.    The disparate treatment described above was based substantially on Plaintiff's perceived mental illness, was committed under circumstances which give rise to an inference of discrimination, and was the cause of Plaintiff's losses and damages described herein.

257.    Further, Yale's facially neutral policy of forcing any student who is perceived as mentally ill to withdraw from the School or to take an unwanted leaves of absence has a disparate impact upon individuals who are disabled in that it forces students with mental illness to withdraw from their academic programs and their employment.

258.    The adverse employment actions taken against the Plaintiff as described herein above were substantially motivated by the discriminatory animus of the Defendants, by and through its employees, including without limitation Professor Vytlacil and Dr. Grunschel based on

Plaintiff's perceived disabilities.

259.    Defendants cannot provide a legitimate, non-discriminatory reason for these adverse actions taken against the Plaintiff. Any excuse proffered by Defendants is not legitimate and is merely a pretext for discrimination based on the Plaintiff's perceived disability.

260.    As a direct result of the Defendants' disparate treatment and disparate impact based on the Plaintiff's perceived disabilities, the Plaintiff suffered loss of wages, loss of benefits, loss of educational benefits, loss of career opportunities, damage to her reputation, loss of status, inability to locate suitable replacement employment, and emotional distress, all to her loss and damage.

### VIII.   EIGHTH CAUSE OF ACTION

**EIGHTH COUNT:**            **VIOLATION OF THE CFEPA BASED ON DISPARATE TREATMENT AND DISPARATE IMPACT.**

261.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the Complaint as if fully set forth herein.

262.    The Plaintiff is and was at all relevant times an individual who is disabled within the meaning of the CFEPA in that she has a record of mental impairments, and she was regarded as having such mental impairments by Yale.

263.     The Defendants Yale are covered by the CFEPA and is subject to its mandates.

264.    At all relevant times the Plaintiff was qualified to perform the essential functions of her job as a Graduate Student, enrolled in a Ph.D. program with the Department. Plaintiff could perform the essential functions of her job with or without reasonable accommodations.

265.    The Plaintiff suffered adverse employment actions because of her disability or perceived disability including termination, forced personal leave, withdrawal from her academic program and a campaign of harassment based on her perceived mental impairments.

266.    The Defendants knew of the Plaintiff's perceived disability, knew that she could perform the essential functions of her job with or without reasonable accommodation and engaged in disparate treatment against her based substantially on her perceived disability.

267.    The Plaintiff was repeatedly treated differently than her similarly situated co-workers who were not perceived as mentally disabled in that she was subjected to the following adverse employment actions which affected the terms, conditions, and privileges of her employment with Yale. Plaintiff was:

(a)    denied access to education and employment opportunities within the Yale School of the Environment;

(b)    subjected to improper supervision, stalking, and surveillance by Professor Vytlacil who surveilled the Plaintiff and improperly monitored her activities in and outside the Department;

(c)    subjected to unwarranted complaints to the New Haven Police Department against her based on false and fabricated reasons;

(d)    caused to repeat course-work and forced to enroll in a Ph.D. program in the Economics Department rather than her chosen field; and

(e)    terminated from her academic program and her employment at Yale in substantial part because she is perceived as mentally disabled.

268.    The disparate treatment described above was based substantially on Plaintiff's perceived mental illness, was committed under circumstances which give rise to an inference of discrimination, and was the cause of Plaintiff's losses and damages described herein.

269.    Further, Yale's facially neutral policy of forcing any student who is perceived as mentally ill to withdraw from the School or to take an unwanted leaves of absence has a disparate

impact upon individuals who are disabled in that it forces students with mental illness to withdraw from their academic programs and their employment.

270.    The adverse employment actions taken against the Plaintiff as described herein above were substantially motivated by the discriminatory animus of the Defendants, by and through its employees, including without limitation Professor Vytlacil and Dr. Grunschel based on Plaintiff's perceived disabilities.

271.    Defendants cannot provide a legitimate, non-discriminatory reason for these adverse actions taken against the Plaintiff. Any excuse proffered by Defendants is not legitimate and is merely a pretext for discrimination based on the Plaintiff's perceived disability.

272.    As a direct result of the Defendants' disparate treatment and disparate impact based on the Plaintiff's perceived disabilities, the Plaintiff suffered loss of wages, loss of benefits, loss of educational benefits, loss of career opportunities, damage to her reputation, loss of status, inability to locate suitable replacement employment, and emotional distress, all to her loss and damage.

## IX.    NINTH CAUSE OF ACTION

**NINTH COUNT:        RETALIATION FOR REPORTING DISABILITY
                      DISCRIMINATION UNDER THE ADA AND THE CFEPA.**

273.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the Complaint as if fully set forth herein.

274.    To establish a prima facie case of retaliation the Plaintiff must show: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.

275.    Plaintiff engaged in protected activity under the ADA and CFEPA in that she made formal complaints about the discrimination and harassment being committed by Professor Vytlacil, the Department, and the Graduate School first during her admission in 2015, and numerous times during 2017 and thereafter.

276.    In March 2015, Plaintiff complained about discrimination to the Graduate School in its decision to modify Plaintiff's admission to the Ph.D. program at the School of Environment at Yale.

277.    Since the fall academic term of 2017, Plaintiff made numerous internal complaints about the disparate treatment and disability-based harassment led by Professor Vytlacil, in concert with the Department and Dr. Grunschel.

278.    Plaintiff made numerous complaints about Professor Vytlacil's mental health discrimination, harassment and misconduct to the officials at the Department and the administration at the Graduate School. In spite of these complaints, Yale did nothing to stop it.

279.    Between August 2019 and February 2020, Plaintiff made numerous reports and internal grievances to the top administration at the Graduate School and the officials at the Department, seeking accommodation, intervention, and protection against further discrimination, harassment, and retaliation she received from Yale and Professor Vytlacil because Plaintiff complained about discrimination and harassment based upon her perceived mental disabilities. Yale took no meaningful action, nor did Yale investigate the Plaintiff's complaints.

280.    On or about December 4, 2020, Plaintiff filed a written complaint with the Office of Provost at Yale against Defendants' discrimination, harassment, and retaliation on the basis of her perceived mental illness.

281.    On December 22, 2020, the Title IX Office within the Office of Provost confirmed the receipt of Plaintiff's Title IX Complaint but chose not to pursue her claim up to this date.

282.    Defendants were aware of the Plaintiff's numerous complaints of discrimination because they received said complaints and acknowledged them.

283.    The Defendants took adverse action against the Plaintiff in response to her numerous complaints of discrimination and harassment by terminating her from her educational program and her employment at Yale.

284.    On January 27, 2021, Associate Dean for Academic Support at the Graduate School, Allegra di Bonaventura, sent Plaintiff an email, expelling Plaintiff from the Graduate School without due process. This was a clearly adverse employment action against Plaintiff by Defendants.

285.    There is a clear causal connection between the Plaintiff's protected activity and the retaliatory termination in that the events are temporally proximate and there is no other legitimate non-discriminatory reason for the Defendants' adverse actions against Plaintiff. Further the Defendants actions were taken under circumstances that raise a retaliatory inference.

286.    By the actions detailed above, Defendants retaliated against Plaintiff based on her protected activities in violation of the ADA and CFEPA by, *inter alia*, ignoring her multiple and repeated protected complaints about the discriminatory treatment she was subjected to, including discrimination and harassment that was inflicted subsequent to and in direct connection with her repeated complaints.

287.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the ADA and CFEPA, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of educational and employment

opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

288.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the ADA and CFEPA, for which Plaintiff is entitled to an award of punitive damages.

## X.    TENTH CAUSE OF ACTION

**TENTH COUNT:**    **VIOLATIONS OF TITLE VI.**

289.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the Complaint as if fully set forth herein.

290.    In order to establish a claim based on Title VI, the plaintiff must show, that the defendant discriminated against her on the basis of race and that the discrimination was a substantial or motivating factor for the defendant's discriminatory actions.

291.    "Yale has engaged in this race discrimination despite receiving millions of dollars of federal taxpayer funding subject to Title VI's restrictions. Yale's race discrimination violates Title VI's requirement that '[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.' 42 U.S.C. § 2000d." *See USA v. Yale University*, 3:20-cv-01534 (CSH), Dkt No. 1 (Complaint), ¶ 4.

292.    "On August 13, 2020, the United States notified Yale that Yale was in violation of Title VI." *Id.,* ¶ 35.

293.    Plaintiff was born in the People's Republic of China and she is an Asian-American woman.

294.    The Plaintiff was repeatedly treated differently than her similarly situated co-workers who were non-Asian and not of Chinese-descent in that she was subjected to the following

adverse educational actions which affected the terms, conditions, and privileges of her education with Yale. The Plaintiff was:

(a)    denied access to education and employment opportunities within the Yale School of the Environment;

(b)    subjected to improper supervision, stalking, and surveillance by Professor Vytlacil who surveilled the Plaintiff and improperly monitored her activities in and outside the Department;

(c)    subjected to unwarranted complaints to the New Haven Police Department against her based on false and fabricated reasons related to her race;

(d)    caused to repeat course-work and forced to enroll in a Ph.D. program in the Economics Department rather than her chosen field; and

(e)    terminated from her academic program and her employment at Yale in substantial part because she is an Asian-American of Chinese descent.

295.    Plaintiff was subject to the above differential treatment because of her race and national origin, and the discrimination was a substantial or motivating factor for the Defendants' actions. Defendants frequently profiled Plaintiff as "a Chinese woman" and/or "Asian"…and alleged that "[Plaintiff's] mom doesn't speak English," … " is small Chinese woman" in their vicious, malicious attempt to deprive Plaintiff of equal educational opportunity under the law.

296.    Defendants were on notice of the discriminatory conduct engaged in by faculty and employees at Yale. Plaintiff was falsely regarded by Defendants including Professor Vytlacil as "a Chinese woman" even after Plaintiff complained about discrimination and harassment and clarified with Defendants that Plaintiff is an American citizen. Yale Defendants failed to carry out their duties and obligations pursuant to Title VI to take corrective action.

297.    Yale allowed and fostered an environment in which discriminatory and harassing practices that were, and continue to be, sufficiently severe or pervasive to create an educational environment that is both subjectively and objectively hostile, abusive and retaliatory.

298.    Defendants also violated Title VI of the Civil Rights Act of 1964 by creating and allowing a culture of discrimination based on race and national origin to permeate its education program or activity, student health service, and all aspects of Plaintiff's educational environment, by profiling Plaintiff as "Chinese woman" and/or "Asian," rather than "evaluating Plaintiff's work solely on the basis of its intellectual merit and adherence to course or program requirements" in accord with Yale's Faculty Handbook. This hostile and abusive educational environmental was created by decisions, preferences, and conduct engaged in by the defendants. The severe, and pervasively abusive environment was continuous throughout Plaintiff's enrollment and employment at Yale.

299.    Yale tolerated, condoned, ratified and/or engaged in the racially discriminatory educational environment, or, in the alternative, knew, or should have known, of its existence, yet failed to conduct proper investigations and failed to take remedial action, in breach of Yale's "Equal Opportunity Statement" and "Racially Nondiscriminatory Policy."

300.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VI, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

301.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title VI of the Civil Rights Act of 1964, for which Plaintiff is entitled to an award of damages in an amount to be determined at trial.

## XI.    ELEVENTH CAUSE OF ACTION

**ELEVENTH COUNT:        VIOLATIONS OF TITLE IX.**

302.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the Complaint as if fully set forth herein.

303.    Title IX of the Education Amendments Act of 1972 states, "No person in the United States shall on the basis of sex, be … subject to discrimination under any education program or activity receiving Federal financial assistance."

304.    To establish a prima facie case of discrimination in violation of Title IX of the Education Amendments of 1972, a plaintiff needs only allege facts giving rise to a plausible minimal inference of bias.

305.    By the above-described conduct, Plaintiff was discriminated against on the basis of her sex and parenting student status by the defendants, including, but not limited to, by sexual harassment and sexual misconduct during the Plaintiff's education program or activity at Yale.

306.    Plaintiff was discriminated against based on her sex in that she was subjected to:

(a)    frequent stalking and surveillance by Professor Vytlacil;

(b)    sexual assault and battery by Professor Vytlacil;

(c)    false reports to New Haven Police regarding Plaintiff's behavior; and

(d)    frequent public statements by Professor Vytlacil to fellow students and colleagues to the effect that Plaintiff and he continued to be intimate notwithstanding their divorce.

307.    Defendants were on notice of the discriminatory conduct engaged in by faculty and employees at Yale. Yale failed to carry out their duties and obligations pursuant to Title IX to investigate and take corrective action.

308.    Defendants allowed and fostered an environment in which discriminatory and harassing practices based on sex that were, and continue to be, sufficiently severe or pervasive to create an educational environment that is both subjectively and objectively hostile, abusive and discriminatory based on sex.

309.    By the above-described conduct, Defendants tolerated, condoned, ratified and/or engaged in the sexually abusive educational environment, or, in the alternative, knew, or should have known, of its existence, yet failed to conduct proper investigations and failed to take remedial action.

310.    By reason of the continuous and ongoing nature of the above-described sexual harassment and sexual discrimination conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

311.    As a direct and proximate result of Defendants' unlawful actions or inactions, Plaintiff has suffered, and will continue to suffer, harm, including, but not limited to, loss of educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

312.    Plaintiff is entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, attorneys' fees and costs and other appropriate relief.

313.    Plaintiff also seeks punitive damages against Defendants because of Defendants' willful and/or reckless disregard for Plaintiff's civil rights, in an amount to be determined at trial.

## XII.    TWELFTH CAUSE OF ACTION

__TWELFTH COUNT__: RETALIATION IN VIOLATION OF TITLE VI AND TITLE IX.

314.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the Complaint as if fully set forth herein.

315.    To establish a prima facie case of retaliation the Plaintiff must show: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.

316.    Plaintiff engaged in protected activity under the Title VI and Title IX in that she made formal complaints about the discrimination and harassment based on both race and sex being committed by Professor Vytlacil, the Department, and the Graduate School first during her admission in 2015, and numerous times during 2017 and thereafter.

317.    In March 2015, Plaintiff complained about discrimination to the Graduate School in its decision to modify Plaintiff's admission to the Ph.D. program at the School of Environment at Yale.

318.    Since the fall academic term of 2017, Plaintiff made numerous internal complaints about the disparate treatment and racial and sexual harassment led by Professor Vytlacil, in concert with the Department and Dr. Grunschel.

319.    Plaintiff made numerous complaints about Professor Vytlacil's discrimination, harassment and misconduct to the officials at the Department and the administration at the Graduate School. In spite of these complaints, Yale did nothing to stop it.

320.    Between August 2019 and February 2020, Plaintiff made numerous reports and internal grievances to the top administration at the Graduate School and the officials at the Department, seeking accommodation, intervention, and protection against further discrimination,

harassment, and retaliation she received from Yale and Professor Vytlacil because Plaintiff complained about discrimination and harassment based upon her race, national origin, and sex in violation of both Title VI and Title IX. Yale took no meaningful action, nor did Yale investigate the Plaintiff's complaints.

321.    On or about December 4, 2020, Plaintiff filed a written complaint with the Office of Provost at Yale against Defendants' discrimination, harassment, and retaliation on the basis of her race, national origin, and sex.

322.    On December 22, 2020, the Title IX Office within the Office of Provost confirmed the receipt of Plaintiff's Title IX Complaint but chose not to pursue her claim up to this date.

323.    Defendants were aware of the Plaintiff's numerous complaints of discrimination because they received said complaints and acknowledged them.

324.    The Defendants took adverse action against the Plaintiff in response to her numerous complaints of discrimination and harassment by terminating her from her educational program and her employment at Yale.

325.    On January 27, 2021, Associate Dean for Academic Support at the Graduate School, Allegra di Bonaventura, sent Plaintiff an email, expelling Plaintiff from the Graduate School without due process. This was a clearly adverse employment action against Plaintiff by Defendants.

326.    There is a clear causal connection between the Plaintiff's protected activity and the retaliatory termination in that the events are temporally proximate and there is no other legitimate non-discriminatory reason for the Defendants' adverse actions against Plaintiff. Further the Defendants actions were taken under circumstances that raise a retaliatory inference.

327.    By the actions detailed above, Defendants retaliated against Plaintiff based on her protected activities in violation of Title VI and Title IX by, *inter alia*, ignoring her multiple and

repeated protected complaints about the discriminatory treatment she was subjected to, including discrimination and harassment that was inflicted subsequent to and in direct connection with her repeated complaints.

328.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Title VI and Title IX, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

329.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title VI and Title IX, for which Plaintiff is entitled to an award of punitive damages.

### XIII.   THIRTEENTH CAUSE OF ACTION

**THIRTEENTH COUNT:**    **BREACH OF CONTRACT PURSUANT TO CONNECTICUT COMMON LAW.**

330.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the Complaint as if fully set forth at length herein.

331.    Yale entered into a contract with Plaintiff regarding her education and employment with Yale. Yale's policies, Faculty Handbook, as well as Plaintiff's express agreements with Yale on March 4, 2015 and February 18, 2017 constitute a contract between Yale and Plaintiff.

332.    Yale breached its agreement by failing to perform its obligations pursuant to the agreement between Yale and Plaintiff.

333.    In addition to Yale's nonperformance, Yale's conduct constitutes a total breach of contract by repudiation of any future performance in issuing an official statement to Plaintiff on

January 27, 2021, stating "that [Plaintiff is] administratively withdrawn from Yale's Graduate School of Arts and Sciences effective immediately."

334.    As a direct and proximate result of Yale's total breach of contract by repudiation of any future performance to Plaintiff, Plaintiff has suffered and will continue to suffer damages for which she is entitled to recover for a total breach.

335.    On March 4, 2015, Plaintiff entered into the agreement with Defendants that Plaintiff first enroll in the Master of Environmental Science program ("MESc") to do "right from the beginning all the requisite Ph.D. work, and after completion of the MESc, with a strengthened academic profile, simply transfers into the Ph.D. program, and thus will not take any more time than if [Plaintiff] was to directly enter into the Ph.D. program," at the School of Environment.

336.    Defendants breached its agreement by denying Plaintiff's application for the Ph.D. program at the School of Environment and by denying Plaintiff's direct transfer into the Ph.D. program upon her "completion of the MESc" degree program at the School of Environment at Yale.

337.    Defendants' offer of an employment and enrollment contract to Plaintiff dated February 18, 2017, expressly provides, in relevant part:

> "[Yale Graduate School] award [Plaintiff] a financial aid package that pays [Plaintiff's] full tuition and provides a minimum level of support of $30,250 per twelvemonth year for up to five years. Students pursue course work during their first two years of study. Because the faculty considers teaching essential to the professional preparation of all doctoral students, students normally teach in years three and four. In year five, students receive a stipend to work exclusively on the dissertation. [Graduate School] hope that [Plaintiff] will finish in five years, but a sixth year of funding is available, if necessary. If [Plaintiff] have not completed [Plaintiff's] dissertation by the end of year five and the Department of Economics certifies that [Plaintiff] will do so by August of the following year, [Plaintiff] will be eligible in year six for a teaching position and a nine-month, academic-year stipend, i.e. three quarters of the twelve-month stipend. If as occasionally happens, no suitable teaching is available in any of the years in which [Plaintiff] are scheduled to teach, [Plaintiff] will nonetheless continue to receive a full stipend

during that period. (For further detail on teaching expectations, please review [Plaintiff's] program's section of the Programs and Policies.) The Department of Economics, Cowles Foundation and Economic Growth Center have awarded [Plaintiff] a fellowship of $7,750 in each of [Plaintiff's] first four years of study, bringing [Plaintiff's] annual stipend to at least $38,000. All stipends and teaching assignments are contingent on satisfactory academic progress."

338.    Defendants breached the agreement by denying Plaintiff an opportunity to complete her academic program by forcing her to take an unwanted leave of absence and by ejecting her before completion of her program.

339.    Defendants further breached the agreement with Plaintiff in that they withdrew the Plaintiff's financial stipend and benefits as specified in the aforesaid agreement prior to the completion of Plaintiff's sixth year in the program.

340.    Defendants further breached the agreement by terminating Plaintiff's "financial aid," "salary wages in a teaching position," and/or "a stipend to work exclusively on the dissertation" in violation of the aforesaid agreement.

341.    Yale's Faculty Handbook on Academic Freedom and Faculty Standards of Conduct expressly provides, in relevant part:

"The integrity of the teacher-student relationship is crucial to the University's educational mission. This relationship vests considerable trust in the faculty member, who, in turn, bears authority and accountability as mentor, educator, and evaluator. When acting in their role as teachers, members of Yale faculty treat students and trainees with respect. They set an example of academic integrity and educate their students and trainees in the requirements of honest scholarship. They evaluate their students' and trainees' work solely on the basis of its intellectual merit and adherence to course or program requirements. They maintain proper professional boundaries and never exploit the unequal institutional power inherent in the relationship between faculty member and student or trainee."

342.    Defendants further breached the agreement by failing to evaluate Plaintiff based solely on the basis of the intellectual merit of her work.

343.    Defendants further breached the agreement by failing to hold its faculty, including without limitation Professor Vytlacil to the stated standards for faculty conduct as to the Plaintiff

although it had reason to know of the breach of the standards as to Plaintiff's interactions with Professor Vytlacil.

344.    At all relevant times the Plaintiff performed all of her obligations under the aforesaid agreements.

345.    As a direct and proximate result of Defendants' breach of contract as afore-said, Plaintiff has suffered, and continues to suffer, monetary and/or economic losses and damages including, but not limited to, loss of stipend income and benefits of her employment.

## XIV.    FORTEENTH CAUSE OF ACTION

**FOURTEENTH COUNT**:    **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING PURSUANT TO CONNECTICUT COMMON LAW.**

346.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the Complaint as if fully set forth herein.

347.    The Plaintiff's employment and educational program with Defendants was based on an employment agreement as set forth above. The terms and conditions of Plaintiff's employment as to her compensation and access to her academic program were set forth in the express agreements dated and in various faculty and student documents published by Yale.

348.    The Defendants had a duty to use good faith and fair dealing to fulfill its contractual obligations with Plaintiff.

349.    Plaintiff justifiably relied on Defendants not to engage in bad faith actions to deprive her of the benefits of her employment agreement including her ability to earn her stipend income and the value of her educational program and benefits.

350.    Defendants engaged in bad faith actions to deny the Plaintiff the benefits of the aforesaid agreements in that it refused to allow Plaintiff to complete her academic program or to

complete her Ph.D. requirements by terminating her enrollment at Yale without cause and prematurely.

351.    As a result of Defendants' breach of the duty of good faith and fair dealing it owes to Plaintiff, Plaintiff has been, and continues to suffer damages and losses in the form of lost stipend income, lost educational benefits, and compensation in an amount to be determined at trial.

## XV.    FIFTEENTH CAUSE OF ACTION

**FIFTEENTH COUNT**:    **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY PURSUANT TO CONNECTICUT COMMON LAW.**

352.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the Complaint as if fully set forth herein.

353.    Under Connecticut law, in order to state a claim for common law wrongful discharge in violation of public policy, a plaintiff must: (1) plead that the alleged conduct by the employer contravenes public policy and (2) demonstrate that the plaintiff is otherwise without remedy and that permitting the discharge to go unredressed would leave a valuable social policy to go unvindicated.

354.    As stated above, Yale's conduct as to the Plaintiff in connection with her termination of employment at Yale in this case has violated a number of public policies as set forth by statute as follows:

(a)    violations of FERPA related to the improper disclosure of Plaintiff's educational and medical information by Yale to Professor Vytlacil and others as set forth in detail above;

(b)    violations of Conn. General Statutes §§ 52-146d to 52-146j related to the improper disclosure of psychiatric information by Dr. Grunschel and others as set forth above; and

(c)     violations of Conn. General Statutes §17a-504 by wilfully and maliciously causing, or attempting to cause, or conspiring with other persons to cause, Plaintiff who does not have psychiatric disabilities to be committed to the Yale New Haven Hospital, Inc. and Yale Health for psychiatric disabilities.

355.     The violations of public policy as set forth above were willful, malicious and the Plaintiff here is otherwise without remedy. Permitting the wrongful termination in violation of public policy to go unredressed would leave a valuable social policy as set forth in the above statutes to go unvindicated.

356.    As a direct and proximate result of the Plaintiff's wrongful discharge in violation of public policy the Plaintiff has suffered and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

## XVI.   SIXTEENTH CAUSE OF ACTION

**<u>SIXTEENTH COUNT</u>:     INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.**

357.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the Complaint as if fully set forth herein.

358.    Defendants knew or should have known that severe emotional distress was a likely outcome of its discriminatory and retaliatory conduct towards the Plaintiff.

359.    Defendants' intentional discriminatory and retaliatory conduct resulted in Plaintiff's wrongful and unlawful termination.

360.    Defendants' conduct as set forth above caused the Plaintiff severe emotional distress which was likely to cause the Plaintiff harm.

361.    Defendants' persistent and pervasive conduct and treatment of Plaintiff was intentional and so severe that Defendants should have known that it would result in extreme emotional distress, and in fact it did result in Plaintiff's extreme emotional distress.

362.    The emotional distress inflicted on the Plaintiff by the Defendants has caused the Plaintiff to suffer losses and damages including emotional distress damages, lost wages and lost earning capacity.

## XVII.  SEVENTEENTH CAUSE OF ACTION

**SEVENTEENTH COUNT: CIVIL ASSAULT AND BATTERY PURSUANT TO CONNECTICUT COMMON LAW.**

363.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the Complaint as if fully set forth herein.

364.    Defendant Professor Vytlacil was at all relevant times acting as an agent, servant, or employee of Yale and the Department.

365.    On or around August 18-22, 2019, Professor Vytlacil, using his influence and power as a faculty member in an authoritative role over the Plaintiff coerced and intimidated the Plaintiff into taking a trip to Owl's Head Maine with him.

366.    Professor Vytlacil sexually harassed, assaulted and battered the Plaintiff on several occasions during the "vacation" traveling from New Haven, Connecticut to Owl's Head, Maine, stopping overnight at Newburyport, New Hampshire. Professor Vytlacil arranged one hotel room for the one-night stop in Newburyport on August 18, 2019, then one rental house with three bedrooms for three consecutive nights in Owl's Head, Maine.

367.    Once arrived in Maine, it soon became clear that Professor Vytlacil's true intention was to sexually assault the Plaintiff. Professor Vytlacil asked Plaintiff's mother to look after her

daughter, while he repeatedly entered Plaintiff's room and began to unwantedly touch and forcibly grope the Plaintiff, despite her objections.

368.    Professor Vytlacil's conduct constitutes assault in that he committed overt acts intended to cause Plaintiff to reasonably fear an imminent and dangerous touching by Professor Vytlacil and it did in fact result in an unwanted and dangerous and harmful touching of the Plaintiff.

369.    Professor Vytlacil committed battery in that he directly touched the person of the Plaintiff with the intent to harm or offend her, without her consent and over her strenuous objections and as a result Plaintiff was seriously harmed and reasonably offended.

370.    As a result of the assault and battery by the Defendant Professor Vytlacil the Plaintiff suffered and will continue to suffer monetary and/or economic harm, including, but not limited to, loss of educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment in her favor and against Defendants, containing the following relief:

A.    Compensatory money damages;

B.    Consequential and benefit of the bargain damages for breach of contract;

C.    Statutory attorney's fees and costs;

D.    A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate the laws of the United States and the State of Connecticut;

E.    An award of compensatory damages in an amount to be determined at trial;

F.  An award of punitive damages in an amount to be determined at trial;

G.  Temporary injunctive relief to (a) reinstate Plaintiff as a full-time doctoral student in the Graduate School of the Yale University; (b) enjoin the defendants, upon penalty to be determined by the Court, from using Plaintiff's (regarded) disability against Plaintiff to impede the completion of Plaintiff's doctoral studies in the Department of Economics; (c) enjoin the defendants, upon penalty to be determined by the Court, from taking any further actions to impede or block Plaintiff's ability to complete her Ph.D. program in Economics; and (d) order specific performance of the contract such that Plaintiff is permitted to finish her doctoral studies;

H.  Injunctive relief requiring the University to (a) take effective steps to prevent sex-based discrimination and harassment, including sexual assault, in its education program or activity; (b) fully investigate conduct that may constitute sex-based harassment and/or sexual assault; (c) appropriately respond to all conduct that may constitute sex-based harassment and/or sexual assault; (d) treat all victims as complainants and provide such victims with "complainant" rights under Title IX and the University's Policy, regardless of whether the victims want to remain anonymous or pursue a formal investigation; (e) mitigate the effects of harassment and/or assault including by eliminating any hostile environment that may arise from or contribute to it; and (f) make Yale University's place of public accommodation fully accessible so that Plaintiff and other similarly situated can have the full and equal access that the defendants provide to non-disabled peers;

I.  A declaratory judgment that the decision to arbitrarily, administratively withdraw Plaintiff from the Yale University without due process was improper and void;

J.      An order for the defendants to pay all medical costs incurred by Plaintiff as a result of from emotional and physical distress, mental anguish, discrimination and harassment she suffered;

K.      An award of attorney's fees and costs that Plaintiff has incurred in this action, including but not limited to, expert witness fees, as well as Plaintiff's reasonable attorney's fees and costs to the fullest extent permitted by law; and

L.      For such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all issues properly trial by jury in this action.

Respectfully submitted,

_s/ Marshall B. Bellovin_
Marshall B. Bellovin (MB PHV20635)
BALLON STOLL P.C.
_Attorneys for Plaintiff_
810 Seventh Avenue, Suite 405
New York NY 10019
mbellovin@ballonstoll.com
(212) 575-7900