## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| V.W. | ) | CASE NO. 3:22-cv-01156 (KAD) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| YALE UNIVERSITY, ET AL. | ) | SEPTEMBER 30, 2024 |
| *Defendants*. | ) | |

## MEMORANDUM OF DECISION
### RE: MOTION TO DISMISS AND MOTION TO STRIKE (ECF NO. 65)

Kari A. Dooley, United States District Judge:

Plaintiff V.W. ("Plaintiff") brings this action against Defendants Yale University, the Graduate School of Arts and Sciences at the Yale University (the "Graduate School"), the Department of Economics at the Yale University (the "Department of Economics"), and Edward Vytlacil, PhD ("Vytlacil"), alleging in Count One, violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* ("Title VII"), based on race and national origin; in Count Two, retaliation in violation of Title VII; in Count Three, violations of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a), based on race and national origin; in Count Four, race discrimination pursuant to 42 U.S.C. § 1981; in Count Five, sexual harassment based on a hostile work environment pursuant to Title VII; in Count Six, sexual harassment based on a hostile work environment pursuant to CFEPA; Count Seven, violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; in Count Eight, violations of the CFEPA related to her disabilities; in Count Nine, retaliation in violation of the ADA and CFEPA for reporting disability discrimination; in Count Ten, violations of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d *et seq.* ("Title VI"); in Count Eleven, violations of Title IX of the Education Amendments of 1972,

20 U.S.C. § 1681 *et seq*. ("Title IX"); in Count Twelve retaliation in violation of Title VI and Title IX; in Count Thirteen, breach of contract; in Count Fourteen, breach of the implied covenant of good faith and fair dealing; in Count Fifteen, wrongful termination in violation of public policy; in Count Sixteen, intentional infliction of emotional distress ("IIED"); and in Count Seventeen, assault and battery as against Vytlacil and Yale. The allegations stem from Plaintiff's time as a graduate student and employee at Yale University, and also derive from her personal relationship with Vytlacil, Plaintiff's ex-husband.

Pending before the Court is Defendants' Motion to Dismiss Counts One, Two, Three, Five, Six, Seven, Eight, and Nine in their entirety; Counts Four, Ten, Eleven, Twelve, and Sixteen to the extent that arise out of conduct which falls outside the applicable statute of limitations period; and Counts One, Two, Three, Five, Six, Seven, Eight, Nine, Ten, Eleven, and Twelve as to Defendant Vytlacil. *See* Defs.' Mot. to Dismiss and Mot. to Strike, ECF No. 65.  Defendants also seek to strike paragraphs 6, 7, and 36 through 55 of Plaintiff's Second Amended Complaint ("SAC"). *Id.*

For the reasons that follow, Defendants' Motion to Dismiss is GRANTED in part and DENIED in part, and the Motion to Strike is DENIED.

**Standard of Review**

To survive a motion to dismiss filed pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it

asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 678. Nevertheless, when reviewing a motion to dismiss, the court must accept well-pleaded factual allegations as true and draw "all reasonable inferences in the non-movant's favor." *Interworks Sys. Inc. v. Merch. Fin. Corp.*, 604 F.3d 692, 699 (2d Cir. 2010).

Because a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence, a court adjudicating such a motion may review only a narrow universe of materials. "Generally, we do not look beyond facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citations omitted, internal quotation marks omitted). A court may consider documents not expressly incorporated in the complaint if they are "integral" to the complaint. *Id.* A document is integral to a complaint "'where the complaint relies heavily upon its terms and effect.'" *Id.* (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002))

**Allegations**

The SAC is 80 pages in length and is comprised of 370 paragraphs which span a thirteen-year time period. The Court therefore provides only a summary of the events alleged. Details will be included as necessary to the Court's decision.

Plaintiff and Vytlacil met in late 2008, while Plaintiff was enrolled in a master's degree program at the University of Connecticut and Vytlacil was a faculty member in the Department of Economics at Yale. SAC, ECF No. 62, at ¶¶ 57–59. Vytlacil left Yale in 2012 and took a job at New York University. *Id.* at ¶ 58. Plaintiff and Vytlacil began dating in 2012, married in April

2013, separated in April 2014, and "commenced a divorce action" in May 2014. *Id.* at ¶ 59. Plaintiff and Vytlacil have a daughter together, who was born in December 2013. *Id.* at ¶ 60.

In December 2014, Plaintiff applied for admission into a doctoral program in Environmental and Resource Policy at the Yale School of the Environment (formerly, the Yale School of Forestry and Environmental Studies). *Id.* at ¶¶ 56, 61. Plaintiff's and Vytlacil's divorce proceedings were ongoing during the pendency of Plaintiff's application. *See id.* at ¶ 59. Upon learning that Plaintiff had applied to Yale, Vytlacil attempted, and was eventually successful, in returning to work at the Yale Department of Economics. *Id.* at ¶¶ 34, 62, 64. Vytlacil, in conjunction with the Economics Department and the Graduate School, intervened to influence Plaintiff's application.[1] *Id.* at ¶¶ 62–70. Plaintiff alleges that the Admission Committee at the School of the Environment had already decided to admit her as a doctoral student, but that the intervention by Defendants resulted in the Graduate School offering "an admission that required Plaintiff first complete the Master of Environmental Science Program and then transfer to the

---

[1] Plaintiff and Defendants offer very different interpretations of this influence over Plaintiff's 2015 application. The SAC references a March 4, 2015, email in which Professor Dirk Bergemann, chair of the Economics Department, "stated… to Plaintiff that the involvement of the Department of Economics and Graduate School with Plaintiff's application for the doctoral-degree program at the School of Environment had caused the Admission Committee at the School of Environment to modify its decision to admit the Plaintiff into the Ph.D. program." SAC at ¶ 70. Plaintiff alleges that the Department of Economics' interference, at Vytlacil's behest, resulted in Plaintiff's admission to a master's degree program rather than her desired doctoral program. *Id.* at ¶ 71. Defendants assert that Plaintiff relies on this email, implying that it is integral to the complaint and therefore can be considered by the Court in deciding their Motion to Dismiss. *See* Defs.' Mem. in Supp., ECF No. 65-1 at 3 (citing *Amron v Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 343-44 (2d Cir. 2006)); They include the email as an exhibit to their motion. Ex. A to Defs.' Mem, ECF No. 65-2. Defendants contend that Vytlacil and the Yale economics department were actually *helping* Plaintiff, and were responsible for salvaging her application. Defs.' Mem in Supp. at 3–4. After reviewing the attached email, the Court finds Defendants' reading of the email is at least as plausible as Plaintiff's allegations to the contrary. However, the Court need not reach this issue. Even assuming that the email is integral to the SAC, it does not "render implausible" Plaintiff's allegations, and would require further "testimonial interpretation." *See Hyman v. Abrams*, 630 F. App'x 40, 42 (2d Cir. 2015). Thus, drawing any inferences from the email would be inappropriate for the Court on a motion to dismiss. *See Oliveira v. Frito-Lay, Inc.*, No. 96-CV-9289, 1997 WL 324042, at *2 (S.D.N.Y. June 13, 1997), *on reargument*, No. 96-CV-9289 (LAP), 1998 WL 267920 (S.D.N.Y. Mar. 30, 1998) ("Although I am not obligated to accept the allegations of plaintiff's complaint with respect to the interpretation of the video of the commercial, I will resolve any ambiguities in plaintiff's favor."). Further, Defendants' conduct relating to Plaintiff's 2015 application does not factor into the Court's decision.

Ph.D. program at the School of Environment." *Id.* at ¶¶ 71–73. Plaintiff alleges that this was confirmed to her via email by her advisor at the School of the Environment, who wrote "'[i]t was not the [School of Environment] that decided not to admit [Plaintiff]. To the contrary, [the School of Environment] recommended [Plaintiff] for admission into the Ph.D. program in 2015, but the Graduate School intervened because the Department of Economics contacted them about [Plaintiff's] application.'" *Id.* at ¶ 76. This intervention was "based on Plaintiff's race, gender, and parenting student status." *Id.* at ¶ 74.

Following Defendants' intervention, Plaintiff reached an agreement with Yale, dated March 4, 2015, that "upon her admission into the master's program," she "shall transfer her study in the master's degree program to the doctoral degree program so that she shall not have to repeat 'all requisite Ph.D. coursework, after completion of the master's degree program.'" *Id.* at ¶ 71. Plaintiff subsequently enrolled in the master's program at the School of the Environment on September 1, 2015, and applied to the Ph.D. program each year from 2014 to 2016. *Id.* at ¶¶ 71, 77. In 2017, the Graduate School transferred her application to the Ph.D. program at the Department of Economics, where Vytlacil was a faculty member. *Id.* at ¶ 78. Plaintiff alleges that this was done "because the Graduate School was led to believe by Professor Vytlacil that Plaintiff, as a single 'Chinese' mother with a young daughter, would be incapable of completing the Department of Environment Ph.D. program," and to increase Vytlacil's ability to control and harass Plaintiff. *Id.* at ¶ 79. As a result of the educational detours caused by Plaintiff's disparate treatment, she received less stipend income than similarly situated Yale graduate students and "suffered loss of educational opportunity and income." *Id.* at 85–86.

In Fall 2017, Plaintiff enrolled in the doctoral program in the Department of Economics. *Id.* at ¶ 87. She enrolled as a first-year Ph.D. student, despite the fact that if she had been allowed

to transition from her master's degree program directly into the doctoral program at the School of the Environment, she "would have completed all required coursework and would have been working on her Ph.D. dissertation" by that time. *Id.* During her time as a Ph.D. candidate, Plaintiff alleges that she was subjected to repeated harassing and intimidating conduct by Vytlacil, which constituted a hostile environment, including giving others the impression she and Vytlacil were in an ongoing relationship, improper surveillance, making false police reports about Plaintiff, coercing her into vacationing with him, sexually assaulting her during the course of that vacation, and causing her to be involuntarily committed from March 27, 2019, to April 18, 2019, by "fabricating a story of Plaintiff's mental state." *Id.* at ¶¶ 90, 92–99. Plaintiff complained about Vytlacil's conduct to the Department of Economics and the Graduate School, but no action was taken. *Id.* at ¶ 101.

In Spring 2019, Plaintiff began seeing a Yale Health doctor for therapy sessions, where she was also subjected to discriminatory conduct based on her doctor's categorization of her as a "Chinese woman." *Id.* at ¶ 102, 108. This conduct included an unjustified 9-1-1 call that resulted in another period of hospitalization, and ultimately admission to an inpatient psychiatric facility until May 17, 2019. *Id.* at ¶¶ 102–108, 111. Plaintiff denies having any mental disorder or mental health conditions and states that her mental health "did not… affect her performance of all duties as a Ph.D. student," but that the situation caused by Vytlatcil and Plaintiff's doctor contributed to the already existing hostile work environment and caused her to miss law school application deadlines. *Id.* at ¶¶ 112–114. Plaintiff again complained to the Department of Economics and the Graduate school, but was disregarded. *Id.* at ¶ 115. The SAC describes ongoing harassment and false reporting by Vytlacil, "based on his perception of her as mentally ill." *Id.* at ¶¶ 130–138.

Plaintiff again reported her allegations to administrators at the Graduate School and the Department of Economics, but they refused to investigate her complaints. *Id.* at ¶ 139. Plaintiff also made a complaint regarding the interference with her graduate studies in the School of the Environment on or about February 18, 2017. *Id.* at ¶ 140. Plaintiff reported Vytlacil's harassing behaviors to professors or administrators at the Graduate School on May 22, 2019, and on multiple occasions thereafter to include on September 19, 2019, December 18, 2019, and February 24, 2020. *Id.* at ¶¶ 141–149. No corrective measures were taken as a result of these meetings, other than a recommendation that Plaintiff take a medical leave of absence, which Plaintiff took for the Spring 2020 term. *Id.* at ¶¶ 150–152.

Plaintiff returned from her leave of absence for the Fall 2020 semester and filed a formal Title IX complaint against Vytlacil on December 4, 2020. *Id.* at ¶¶ 153–154. On December 22, 2020, Yale's Office of the Provost confirmed receipt of Plaintiff's Title IX complaint but "chose not to pursue Plaintiff's claim[.]" *Id.* at ¶ 160. On January 27, 2021, Plaintiff received notice from the Graduate School via email that she was "administratively withdrawn from Yale's Graduate School of Arts and Sciences, effective immediately." *Id.* at ¶ 161. Plaintiff's stipend income and salary wages were terminated on February 1, 2021. *Id.* at ¶ 163. On April 28, 2021, Plaintiff's student health benefits were denied after a visit to Yale's Urgent Care office. *Id.* at ¶ 164. On October 26, 2021, Yale opened a collections account against Plaintiff for the cost of her April 28 urgent care visit, as well as the balance owed for her Fall 2020 and Spring 2021 student health coverage. *Id.* at ¶ 165. On May 21, 2021, after Plaintiff was administratively withdrawn from the Graduate School, Vytlacil made another 9-1-1 call regarding Plaintiff. *Id.* at ¶ 167.

Plaintiff submitted a complaint to the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunities Commission ("EEOC") on

February 16, 2022.  *Id.* at ¶ 16.  Plaintiff received Releases of Jurisdiction from the CHRO on June

14, 2022, and two Notices of Right to sue from the EEOC on June 22, 2022, and August 3, 2022.

*Id.* at ¶ 18. She filed her initial Complaint in this action on September 13, 2022.  *See* Complaint,

ECF No. 1.

**Discussion**

### Title VII and ADA Claims: Counts One, Two, Five, Seven, and Nine

Defendants first argue that Plaintiff's Title VII and ADA claims in Counts One, Two, Five,

Seven and Nine are time barred "because Plaintiff did not file her complaints with the [CHRO]

within 300 days of her involuntary withdrawal from the Graduate School of Arts and Sciences."

Defs.' Mem. in Supp, ECF No. 65-1 at 12. They contend that Plaintiff's involuntary administrative

withdrawal from the School of Arts and Sciences on January 27, 2021 was a "discrete act,"

requiring Plaintiff to file her CHRO complaint on or before November 23, 2021, in order to meet

the statutory 300-day deadline.  *See* 42 U.S.C. § 2000e–5(e)(1); 42 U.S.C. § 12117(a); *Nat'l R.R.*

*Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002). Plaintiff did not file her complaint until

February 16, 2022.  SAC at ¶ 16.  In response, Plaintiff asserts that subsequent actions by

Defendants, including denying her health insurance coverage on April 28, 2021, initiating a

collections account for unpaid medical bills on or about October 26, 2021, and a "purposeful false

emergency 9-1-1 alarm" initiated by Vytlacil on May 21, 2021, constitute discriminatory acts

sufficient to trigger the continuing violations doctrine, making her CHRO complaint timely. Pl.'s

Opp'n., ECF No. 71 at 4–5. The Court agrees with Defendants.

It is well-established that Title VII requires a plaintiff to exhaust her administrative

remedies before filing suit in federal court.  *See, e.g.*, *Ragone v. Atl. Video at Manhattan Ctr.*, 595

F.3d 115, 126 (2d Cir. 2010). "'The purpose of this exhaustion requirement is to give the

administrative agency the opportunity to investigate, mediate, and take remedial action.'" *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 384 (2d Cir. 2015) (quoting *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712 (2d Cir. 1998)). A work-sharing relationship between the EEOC and a state discrimination agency such as the CHRO enables the complaint to be cross-listed with the EEOC at the time the CHRO receives it. *See Ortiz v. Prudential Ins. Co.*, 94 F. Supp. 2d 225, 231 (D. Conn. 2000). In states with their own anti-discrimination laws and agencies, like Connecticut, the time period to file the complaint with the EEOC extends from 180 days to 300 days where there is proof that the complaint was first submitted to the state agency. 42 U.S.C. § 2000e-5(e)(1). Further, the ADA explicitly incorporates the time limits established by Title VII. *See* 42 U.S.C. § 12117(a).

"Under the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Patterson v. Oneida County, NY*, 375 F.3d 206, 220 (2d Cir. 2004). However, the continuing violation doctrine does not apply to "discrete discriminatory acts," which "are not actionable if time-barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113. A discrete discriminatory act is a "single completed action" that occurs at a specific time, and typically is actionable on its own. *Elmenayer v. ABF Freight System, Inc.*, 318 F.3d 130, 135 (2d Cir. 2003). The Supreme Court has identified "termination, failure to promote, denial of transfer, or refusal to hire" as examples of discrete acts, each of which "starts a new clock for filing charges." *Morgan*, 536 U.S. at 113–14. "[C]ourts in this circuit disfavor application of the continuing violations doctrine and hold that only compelling circumstances warrant use of this exception to the statute of limitations."

*Ravenscroft v. Williams Scotsman, Inc.*, No. 3:14-CV-870 MPS, 2015 WL 1311332, at *3 (D. Conn. Mar. 23, 2015) (quoting *Miner v. Town of Cheshire,* 126 F.Supp.2d 184, 189–90 (D. Conn. 2000) (collecting cases)).

Plaintiff's administrative removal from the School of Arts and Sciences was akin to a "termination," as it ended the then existing relationship between Yale and Plaintiff.  Thus, it falls squarely within the realm of discrete acts as defined in *Morgan. See also King v. Aramark Servs. Inc.*, 96 F.4th 546, 559 (2d Cir. 2024) ("Examples of discrete acts include terminating employment, failing to promote, denying a transfer, and refusing to hire."); *Rodriguez v. Cnty. of Nassau*, 933 F. Supp. 2d 458, 462 (E.D.N.Y. 2013) (holding that an employee's termination was a discrete act, and that it occurred outside the limitations period, rendering his Title VII claims time-barred). Plaintiff's contention that she experienced continuous discrimination during her employment, which perpetuated into the statutory period as evidenced by the cancellation of her health insurance, the opening of a collections account, and Vytlacil's allegedly false 9-1-1 report, does not defeat application of the statutory time limitation. As discussed above, the continuing violations doctrine "is inapplicable to '[d]iscrete acts such as termination [and] failure to promote,' which 'are easy to identify.'"  *Ramlal-Nankoe v. Ithaca Coll.*, 591 F. App'x 23, 25 (2d Cir. 2015) (quoting *Morgan*, 536 U.S. at 114). "[A]n allegation of an ongoing discriminatory policy does not extend the statute of limitations where the individual effects of the policy that give rise to the claim are merely discrete acts." *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 157 (2d Cir. 2012).  Here, although Plaintiff alleges ongoing discrimination by Defendants, the "effect" of that discrimination was her involuntary withdrawal from the graduate program in which she had

enrolled and the immediate termination of her income,[2] both of which occurred more than 300 days before she made her complaint to the CHRO.

Although Plaintiff argues that the post-termination denial of her health insurance coverage on April 28, 2021, and the subsequent collections action initiated on October 26, 2021, are separate, actionable discrete acts, the Court concludes otherwise.  "In analyzing the timing of accrual in the context of discrimination claims, the Supreme Court has instructed that 'the proper focus is on the time of the *discriminatory act,* not the point at which the *consequences* of the act become painful.'" *Morse v. Univ. of Vermont*, 973 F.2d 122, 125 (2d Cir. 1992) (quoting *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) (emphasis in original)).  Cancellation and subsequent denial of Plaintiff's insurance benefits are direct consequences of Plaintiff's termination and involuntary withdrawal.   The court finds instructive and persuasive *Semper v. New York Methodist Hospital*, 786 F. Supp. 2d 566, 580 (E.D.N.Y. 2011).  There, the Plaintiff brought discrimination claims arising out of the defendant's post-termination withholding of vacation and sick time.   The court recognized that "refusal to pay benefits more closely resembles a discrete discriminatory act actionable in itself than evidence of an ongoing discriminatory policy or mechanism." *Id.* Notwithstanding, citing *Morse*, the *Semper* court reasoned that "the 300-day filing period accrues when Plaintiff knew or should have known that Methodist Hospital was unlawfully withholding her pay entitlements: here, at Plaintiff's termination… or shortly thereafter." *Id.*  And because Plaintiff's termination occurred more than 300 days before she filed her EEOC complaint, the subsequent post-termination withholding of benefits, even if discrete acts of discrimination, were not timely. This reasoning is equally applicable here. Plaintiff knew or should have known that her

---

[2]  Indeed, Plaintiff uses the word "terminated" to describe her loss of stipend income and salary that occurred days later.  "On or about February 1, 2021, Yale terminated Plaintiff's stipend income and salary wages . . ." SAC at ¶ 163.

health insurance benefits had been terminated at or shortly after the date of her administrative withdrawal from Yale and the termination of her stipend and wages. Therefore, as in *Semper*, even though Defendants' denial of Plaintiff's medical benefits and subsequent collections action may have been separate discrete acts, her CHRO complaint was still untimely because accrual of claims based upon those events occurred at the time of her withdrawal and/or termination. *Id*.

Nor is the 9-1-1 call initiated by Vytlacil on May 21, 2021, actionable. To state a claim under Title VII or the ADA, a plaintiff must plausibly allege, *inter alia*, that she was subject to an adverse employment action. *See Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016) (articulating the elements a plaintiff must establish for a *prima facie* case of discrimination under Title VII); *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc*., 198 F.3d 68, 72 (2d Cir. 1999) (same, for discrimination under the ADA). The Second Circuit defines an adverse employment action as "a materially adverse change in the terms and conditions of employment," examples of which include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Sanders v. New York City Hum. Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004). "If a purported adverse action has no nexus to a plaintiff's terms and conditions of employment and plaintiff does not otherwise suffer any direct adverse employment consequences as a result, that action cannot serve as a predicate adverse action necessary to show discrimination in employment." *Walia v. Napolitano*, No. 11-CV-2512 (SJF), 2017 WL 10378189, at *8 (E.D.N.Y. Dec. 4, 2017) (collecting cases). At the time of Vytlacil's 9-1-1 call, Plaintiff had already been administratively withdrawn from Yale and her wages terminated. There was no ongoing employment relationship at all. It is therefore axiomatic that Plaintiff has not plausibly

12

alleged that the 9-1-1 call on May 21, 2021, resulted in any adverse employment action or otherwise had any impact on either the terms or conditions of her (former) employment with Yale.

Plaintiff's allegations of a hostile work environment are also not timely. A hostile work environment claim "is composed of a series of separate acts that collectively constitute one unlawful employment practice," and "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Morgan,* 536 U.S. at 117. However, "it is axiomatic that a plaintiff must be *working* to suffer from a hostile *work* environment." *Velez v. New York City Police Pension Fund Article II*, No. 18-CV-1366 (ER), 2019 WL 1382884, at *9 (S.D.N.Y. Mar. 27, 2019) (emphasis in original). Accordingly, "[t]he time for Plaintiff to have filed suit based on a hostile work environment claim was within 300 days after the termination of her employment[.]" *Meyer v. New York Off. of Mental Health*, No. 12-CV-6202 PKC, 2014 WL 1767818, at *6 (E.D.N.Y. May 2, 2014). Plaintiff was involuntarily withdrawn from her program on January 27, 2021, and did not file her CHRO complaint until February 16, 2022, 385 days later. As she cannot rely on post-termination acts to sustain her claim of a hostile work environment, this claim is untimely.

For the foregoing reasons, the Title VII and ADA claims asserted in Counts One, Two, Five, Seven, and Nine are dismissed as time-barred.

**CFEPA Claims: Counts Three, Six, Eight, and Nine**

Plaintiff brings four claims pursuant to the CFEPA: Count Three, alleging violations based on race and national origin; Count Six, alleging violations based on sexual harassment and a hostile work environment; Count Eight, based on disparate treatment and disparate impact due to her disability; and Count Nine, based on retaliation for reporting disability discrimination. SAC at ¶¶

206–219; 238–248; 261–272; 273–288.  Defendant moves to dismiss these claims as untimely as well.[3]  Plaintiff does not explicitly address the timeliness of her CHRO complaint with respect to her CFEPA claims.  She appears, however, to assert the same continuing violations doctrine arguments that she advanced in defending her Title VII and ADA claims.[4]  Additionally, she argues that the CFEPA's statutory time limit to file a district court complaint should be equitably tolled based on a medical emergency that prevented her from meeting her deadline.

Plaintiffs asserting claims under the CFEPA must, by statute, first pursue administrative remedies with the CHRO before bringing suit.  *See Sullivan v. Bd. of Police Comm'rs of City of Waterbury*, 196 Conn. 208, 215–16 (1985) (explaining that "CFEPA not only defines important rights designed to rid the workplace of discrimination, but also vests first-order administrative oversight and enforcement of these rights in the CHRO").  Conn. Gen. Stat. § 46a-82(f)(1)(B) provides that "[A]ny complaint by a person claiming to be aggrieved by a violation of section 46a-60 . . . that occurred on or after October 1, 2019, and prior to October 1, 2021, shall be filed not later than three hundred days after the date of the alleged act of discrimination."  Plaintiff's involuntary administrative withdrawal occurred on January 27, 2021, and so 300 days is the applicable limitations period, as it was for her Title VII and ADA claims. Section 46a-101(a) provides that "[n]o action may be brought in accordance with section 46a-100 unless the

---

[3] As with Plaintiff's Title VII and ADA claims, Defendants first assert that Plaintiff's CFEPA claims are time barred "because Plaintiff failed to file a complaint with the CHRO within the prescribed time limit of 300 days."  Defs.' Mem. in Supp. at 14–15.  Second, Defendants argue that Plaintiff also failed to timely file her district court complaint.  *Id.* at 16.

[4] In her opposition, Plaintiff included a section titled "Plaintiff's Title VII and ADA Claims Should Not Be Dismissed As Time Barred," in which she argues against dismissal of Counts 1, 2, 5, 7, and 9.  Pl.'s Opp'n at 4–5.  Therein, she does not specifically mention the CFEPA claims, but did include, at the end of the section: "[t]herefore, Plaintiff's claims that predate 300 days prior to her CHRO and EEOC complaints filed on February 16, 2022, are not time barred."  *Id.* at 5.  The Court construes this argument as encompassing the CFEPA claims, though they are not mentioned in the section.  Plaintiff then included a section titled "Plaintiff (sic) CFEPA Claims Should Not Be Dismissed as Timebarred," wherein she addressed only the 90-day time limit for filing the complaint.

complainant has received a release from the [CHRO] in accordance with the provisions of this section." The release of jurisdiction triggers administrative dismissal or disposal of the complaint, and the complainant has 90 days from the date of receipt of the release to file an action in court. *Id.* at § 46a-101(d)-(e). The failure to satisfy the exhaustion provisions of CFEPA results in dismissal for lack of subject matter jurisdiction. *See Anderson v. Derby Bd. of Educ.*, 718 F. Supp. 2d 258, 272 (D. Conn. 2010) (collecting cases).

Connecticut courts have held that "Connecticut antidiscrimination statutes should be interpreted in accordance with federal antidiscrimination laws," and therefore courts must "look to federal law for guidance in interpreting state employment discrimination law, and analyze claims under [CFEPA] in the same manner as federal courts evaluate federal discrimination claims." *Roman v. A&S Innersprings USA, LLC*, 223 Conn. App. 403, 420–21 (2024) (internal citations and quotations omitted). The standard for evaluating the CFEPA's statutory limitation period with respect to discrete acts is therefore the same as that articulated in *Morgan*, 536 U.S. 101, 113, which this Court applied above. *See Roman*, 223 Conn. App. at 421–422. Though Plaintiff alleges various discriminatory conduct as part of her CFEPA claims in Counts Three, Six, Eight, and Nine, the effect of that conduct was her termination on January 27, 2021. As described above, this was a discrete act that occurred more than 300 days before she filed her CHRO complaint. And for the reasons already articulated, the allegations regarding Defendants' post-termination conduct are insufficient to bring her claims within the continuing violations doctrine; to establish a timely hostile work environment claim; or to plausibly allege non-time barred independently actionable discrete acts. Plaintiff's CFEPA claims in Counts Three, Six, Eight, and Nine are therefore dismissed.

Because Plaintiff's CFEPA claims are dismissed for her failure to file her CHRO complaint within the time limit proscribed by Conn. Gen. Stat. § 46a-82(f), the Court need not reach the question of whether Plaintiff timely filed her district court complaint in accordance with Conn. Gen. Stat. § 46a-101(d)–(e), nor the issue of equitable tolling.

### Claims against Edward Vytlacil: Counts One, Two, Three, Five, Six, Seven, Eight, Nine, Ten, Eleven, and Twelve

Defendants next argue that there is no individual liability under Title VI, Title VII, Title IX, the ADA, and CFEPA, and therefore the claims against Defendant Vytlacil in Counts One, Two, Three, Five, Six, Seven, Eight, Nine, Ten, Eleven, and Twelve must be dismissed. Defs.' Mem. in Supp. at 19–20. Plaintiff concedes as much, with the exception of the CFEPA retaliation claim in Count Nine. Pl.'s Opp'n. at 15. Accordingly, and insofar as Counts One, Two, Three, Five, Six, Seven, and Eight are time-barred and have already been dismissed in their entirety, Counts Ten, Eleven, and Twelve are further dismissed as to Defendant Vytlacil.[5] And because Count Nine was dismissed as time barred, the Court need not take up the issue of whether Defendant Vytlacil might be held individually liable for retaliation under the CFEPA.

### Title VI, Title IX, § 1981, and IIED Claims: Counts Four, Ten, Eleven, Twelve, and Sixteen

Defendants next argue that Counts Four (alleging race discrimination under 42 U.S.C. § 1981)[6], Ten (alleging racial discrimination under Title VI), Eleven (alleging sex discrimination under Title IX), Twelve (alleging retaliation under Title VI and Title IX), and Sixteen (alleging common law IIED) should be dismissed "insofar as they assert claims based upon conduct that

---

[5] The Court notes that even if Counts One, Two, Three, Five, Six, Seven and Eight were not time-barred, those claims would be dismissed as against Defendant Vytlacil.

[6] In their motion to dismiss, Defendants originally stated that claims under 42 U.S.C. § 1981 are subject to "the most analogous [state] statute of limitations…", which in Connecticut would be three years. Defs.' Mem. in Supp. at 17–18 (citing *Adams v. Yale-New Haven Hosp.*, 2008 WL 358644 *2 (D.Conn. February 8, 2008) (Fitzsimmons, M.J.). However, as Plaintiff pointed out in her opposition, and Defendants conceded in their reply, the statute of limitations for claims under § 1981 is four years, set by 18 U.S.C. § 1658. Pl.'s Opp'n at 8; Defs.' Reply, ECF No. 73 at 5.

occurred outside of the three year statute of limitations." Defs.' Mem. in Supp. at 17. Plaintiff responds that the otherwise time barred conduct upon which Counts Four, Ten, Eleven, and Sixteen are based is saved by the continuing violations doctrine, and that any such conduct related to Count Twelve "may be utilized as circumstantial evidence of intent" regarding the retaliatory nature of her forcible withdraw from her academic program in January 2021. Pl.'s Opp'n. at 9–15. In their reply, Defendants acknowledge that the continuing violation doctrine may bring otherwise time barred conduct within the applicable statute of limitations for claims brought pursuant to Title IX, § 1981, and common law IIED. Defs.' Reply, ECF No. 73 at 5. Defendants argue however that no such expansion of the limitations period for Title VI claims has been or should be recognized.

Insofar as Plaintiff has plausibly alleged conduct which, if proven, would implicate the continuing violation doctrine as to the claims brought pursuant to § 1981, Title IX and for IIED, the motion to dismiss as to these claims is denied. Accordingly, Defendants' Motion to Dismiss Counts Four, Eleven, Twelve (Title IX only), and Sixteen to the extent that they rely on conduct outside the statute of limitations period is denied.

*Title VI: Count 10 and Count 12*

Title VI "prohibits a recipient of federal funds from discriminating on the basis of race, color, or national origin." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir. 2012). The statute only prohibits intentional discrimination. *Id.*; *see also Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) ("[I]t is similarly beyond dispute . . . that [42 U.S.C. § 2000d] prohibits only intentional discrimination."). Consequently, "[a] substantive violation of Title VI occurs when (1) ... there is racial or [other prohibited] discrimination and (2) the entity engaging in discrimination is receiving federal funds." *Rafi v. Yale University School of Medicine*, No. 3:14-CV-1582 (VAB), 2017 WL 3205548, at *11 (D. Conn. July 27, 2017) (citation and quotation omitted); *see also*

*Baker v. Board of Regents of the State of Kansas*, 991 F.2d 628, 631 (10th Cir. 1993) (adopting these two elements as those necessary to establish a Title VI cause of action); *Karlen ex rel. J.K. v. Westport Bd. of Educ.*, 638 F. Supp. 2d 293, 300 (D. Conn. 2009). "To plead a sufficient discrimination claim under Title VI, 'a plaintiff need only give plausible support to a minimal inference of discriminatory motivation.'" *Bhatnagar v. Parsons Sch. of Design at the New Sch.*, No. 20-CV-2321 (LGS), 2021 WL 2333243, at *2 (S.D.N.Y. June 8, 2021) (quoting *Ikedilo v. Statter*, 19-CV-9967, 2020 WL 5849049, at *8 (S.D.N.Y. Sept. 30, 2020) (applying Title VII pleading requirement to Title VI and citing *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015))).

In Connecticut, the statute of limitations for a Title VI claim is three years. *See Karlen ex rel. J.K. v. Westport Bd. of Educ.*, 638 F. Supp. 2d 293, 300 (D. Conn. 2009) ("Connecticut courts apply Connecticut's three-year statute of limitations for actions sounding in tort, Conn.Gen.Stat. § 52–577, to civil rights actions, including actions brought under Section 1983 and Title VI.") Generally, as it pertains to this case, a three-year statute of limitations would bar claims arising from conduct occurring prior to September 13, 2019.  However, during the COVID-19 pandemic, Connecticut Governor Ned Lamont issued executive orders suspending all statutes of limitations in Chapter 926 of the Connecticut General Statutes, which contains § 52-577, from March 19, 2020, to March 1, 2021, or 347 days. *Santana v. Quiros*, No. 3:21-CV-376 (SVN), 2022 WL 16706959, at *6 (D. Conn. Nov. 4, 2022) (citing Executive Order No. 7G (March 19, 2020), CT.GOV,        https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7G.pdf; Executive Order No. 10A (February 8, 2021), CT.GOV,        https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-10A.pdf).  Plaintiff   filed   her   initial   complaint   on

September 13, 2022. ECF No. 1.  Incorporating the COVID-19 tolling period, Defendants seek to dismiss Plaintiff's Title VI claims to the extent that they rely on conduct occurring before October 1, 2018.[7]

Plaintiff again argues that conduct prior to October 1, 2018, is actionable due to the continuing violations doctrine.  Pl.'s Opp'n at 8. With respect to Title VI claims, "courts in this Circuit have noted that 'it is questionable whether the [continuing violation] doctrine applies to claims brought under Title VI ... Whereas Title VII acts as an outright prohibition applicable to all employers, aiming centrally to compensate victims of discrimination, Title VI conditions an offer of federal funding on a promise by the recipient not to discriminate. Title VI is therefore contractual in nature, and a drastic expansion of its limitations period might exceed the goals of the statute.'" *Rafi*, 2017 WL 3205548 at *10 (quoting *Martin v. State Univ. of New York*, 704 F. Supp. 2d 202, 234 (E.D.N.Y. 2010)).

The Second Circuit has not spoken specifically to whether the continuing violations doctrine applies to Title VI claims. However, in *Johnson v. New York University*, the court considered the doctrine's application to a Title VI claim and addressed the merits of the claimant's argument rather than categorically holding it inapplicable to Title VI claims.  *See* 800 F. App'x 18, 20–21 (2d Cir. 2020) ("Johnson's situation does not qualify for relief under this doctrine because his expulsion in 2007 and the denial of readmittance in 2017 are discrete incidents which are 'easy to identify' and thus not evidence of a continuing violation.").  In so holding, the court

---

[7]  Defendants state that the statute was suspended for 357 days and therefore assert that the limitations period runs from September 21, 2018.  Defs.' Mem. in Supp. at 19.  However, the Court's own calculation, as well as those of other courts to address the issue, put the suspension at 347 days. *See Sakon v. Johnson*, No. 3:23-CV-107 (AWT), 2024 WL 1176571, at *3 (D. Conn. Mar. 19, 2024); *Pileggi v. Mathias*, No. 3:22-CV-1315 (AWT), 2024 WL 1345186, at *10 (D. Conn. Mar. 29, 2024); *Bernstein v. Town of Stratford*, No. AAN-CV-22-6047562-S, 2024 WL 3579549, at *5 (Conn. Super. Ct. July 22, 2024).

cited and applied the standard in *Chin*, which assessed a continuing violations doctrine argument related to a Title VII claim.  685 F.3d at 157.  While not of precedential value, the decision does portend that in this Circuit, the continuing violations doctrine may apply to Title VI claims under the same standard as is applied to Title VII claims.

In light of this conclusion, and as discussed above, the Court concludes that Plaintiff has plausibly alleged facts, which if proven, would implicate the continuing violations doctrine as to her Title VI claims as well.  The SAC alleges that Defendants' February 2017 decision to transfer Plaintiff's Ph.D. application from the School of the Environment to the Department of Economics was based on her status as a "single 'Chinese' mother with a young daughter," and alleges that her administrative withdrawal from the school on January 27, 2021 was "in substantial part because she is an Asian-American of Chinese descent."   SAC at ¶¶ 78–79.  These discriminatory acts, occurring both within and outside of the statute of limitations period, coupled with the fact that Defendants only challenge Plaintiff's allegations on timeliness grounds, are sufficient to establish a plausible practice and policy of discrimination by Defendants.  Therefore, Defendants' Motion to Dismiss Counts Ten and Twelve (Title VI claims) to the extent that Plaintiff's claims therein relate to conduct occurring before October 1, 2018, is denied.

**Motion to Strike**

In addition to the relief sought pursuant to Rule 12(b)(6), Defendants further move to strike Paragraphs 6, 7, and 36 through 55 of the SAC, in accordance with Rule 12(f).  *See* Defs. Mem. in Supp. at 21–26.  The paragraphs challenged by Defendants: (1) describe a "troubling pattern" of indifference to sexual harassment by Yale University (*see* SAC at ¶¶ 6–7); (2) allege that Yale has historically done little to address sexual harassment (¶¶ 36–39); (3) describe prior allegations of sexual misconduct and racial discrimination related to Yale (*see* ¶¶ 37, 40–46, 51–55); and (4)

reference survey data highlighting campus sexual misconduct at Yale (¶¶ 48–49). Defendants argue that the content of these paragraphs is "immaterial, impertinent, scandalous, and inadmissible," and thus must be stricken pursuant to Rule 12(f), under the standard set forth in *Walczak*. *See* 2019 WL 145526 at *2; Defs. Mem. in Supp. at 21. In response, Plaintiff argues that previously litigated claims against Yale and survey statistics are relevant to establishing a pattern of behavior, that the paragraphs at issue are not scandalous and inflammatory because they "simply identify publicly available prior litigation against Yale University," and that at the pleadings stage "the Court must not closely analyze whether content of the paragraphs are later admissible as evidence at trial." Pl.'s Opp'n. at 16–18. The Court agrees with Plaintiff.

Under Rule 12(f) of the Federal Rules of Civil Procedure, "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "[T]he party moving to strike 'bears a heavy burden' and must show that '(1) no evidence in support of the allegations would be admissible; (2) the allegations have no bearing on the issues in the case; and (3) permitting allegations to stand would result in prejudice to the movant.'" *Walczak*, 2019 WL 145526 at *2 (quoting *Tucker v. Am. Int'l Grp.*, 936 F. Supp. 2d 1, 16 (D. Conn. 2013)). "Motions to strike under Rule 12(f) are generally disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute. Furthermore, [t]o the extent that Defendants' aim is to avoid unduly inflaming and prejudicing the jury, the court may take into account that the Complaint will not be submitted to the jury." *Walczak*, 2019 WL 145526 at *2 (citations and internal quotation marks omitted); *see also Gierlinger v. Town of Brant*, No. 13-CV-370, 2015 WL 3441125, at *1 (W.D.N.Y. May 28, 2015) ("[B]ecause striking a [part] of a pleading is a drastic remedy . . . motions under Rule 12(f) are viewed with disfavor by the federal courts and are infrequently granted."). "Inappropriately hyperbolic allegations, ill-

conceived attempts at levity, and other similar manifestations of bad judgment in drafting pleadings, by themselves, fall short of the threshold that Rule 12(f) contemplates." *Saylavee LLC v. Hockler*, 228 F.R.D. 425, 426 (D. Conn. 2005).

Here, the Court finds that the challenged allegations—while no doubt provocative—are not so immaterial and/or irrelevant that they must be stricken from the SAC. Indeed, the allegations have at least some bearing on the central issues in this case, for example, the suppression of Plaintiff's and other female voices "within [Yale's] student body, professors and employee ranks," and the purportedly "endemic sex-based discrimination and harassment at Yale and Yale's unlawful policy and practice in denying accommodation of disability," to which Plaintiff attributes her own ordeal. *See* SAC at ¶¶ 6, 53. Moreover, the Court does not view the challenged paragraphs as serving no purpose other than to inflame the reader. *See Impulsive Music v. Pomodoro Grill, Inc.*, No. 08-CV-6293, 2008 WL 4998474, at *2 (W.D.N.Y. Nov. 19, 2008). Rather, many of the challenged paragraphs merely summarize background or historical material such as prior litigation against Yale and studies/surveys regarding sexual harassment at Yale. *See, e.g.*, SAC at ¶¶ 40–49, 51–52. 55. That these allegations "may also be of an inflammatory nature is not sufficient to grant [a] motion to strike." *Schoolcraft v. City of New York*, 299 F.R.D. 65, 67 (S.D.N.Y. 2014) (declining to strike allegation that the plaintiff made "a race-based discriminatory remark" because, though inflammatory, the allegation was relevant to defendant's counterclaim).

Additionally, Defendants assert that they will suffer prejudice if the challenged paragraphs remain, given the purported risk that "the jury will base its assessment of liability on remote events involving other employees or students, or will become angered by the allegations and seek to punish the defendants for conduct unrelated to the claims asserted in this action." Defs. Mem. in Supp. at 26. However, it is not this Court's practice to provide a copy of the complaint to the jury

at trial.  Thus, because the jury will not see the challenged paragraphs, the Defendants' concern in this regard is misplaced. Finally, questions regarding admissibility of evidence in support of these allegations will be addressed in due course, and with the benefit of a more fully developed record. *See Walczak*, 2019 WL 145526 at *2. The Court's ruling does not restrict Defendants in any fashion from challenging evidence as to these allegations nor presage the court's ruling on any such challenges.

For the foregoing reasons, Defendants' Motion to Strike is denied.

**Conclusion**

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED in part and DENIED in part, and Defendants Motion to Strike is DENIED:

Plaintiff's Title VII and ADA claims asserted in Counts One, Two, Five, Seven, and Nine are DISMISSED as time-barred;

Plaintiff's CFEPA claims in Counts Three, Six, Eight, and Nine are DISMISSED as time-barred;

Plaintiff's claims in Counts Ten, Eleven, and Twelve are DISMISSED as to Defendant Edward Vytlacil;

Defendant's Motion to Dismiss Counts Four, Ten, Eleven, Twelve, and Sixteen to the extent that they rely on conduct outside the applicable statute of limitations period is DENIED; and

Defendants' Motion to Strike is DENIED.

Accordingly, this case will proceed as to the following: (1) Plaintiff's § 1981, breach of contract, breach of implied covenant of good faith and fair dealing, wrongful termination, IIED, and civil assault and battery claims (Counts Four, Thirteen, Fourteen, Fifteen, Sixteen, and

Seventeen); (2) Plaintiff's Title VI claim (Count Ten) against all Defendants except Defendant Vytlacil; (3) Plaintiff's Title IX hostile work environment claim (Count Eleven) as to all Defendants except Defendant Vytlacil; (4) Plaintiff's Title VI and IX retaliation claim (Count Twelve) as to all Defendants except Defendant Vytlacil.

The STAY previously entered is lifted.  The parties are directed to meet and confer and to file an Amended Rule 26(f) Report on or before October 30, 2024.

**SO ORDERED** at Bridgeport, Connecticut, this 30th day of September 2024.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE